BUCHALTER
A Professional Corporation
  Oren Bitan, Esq. [SBN# 251056]
   obitan@buchalter.com
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Telephone (213) 891-0700
Fax (213) 896-0400

FISHERBROYLES, LLP
  Anthony J. Calamunci, Esq. [*pending pro hac vice*]
   anthony.calamunci@fisherbroyles.com
600 Superior Avenue East
Fifth Third Building, Suite 1300
Cleveland, Ohio 44114
Direct: 567-455-5257
Fax: 484-251-7797

Attorneys for Plaintiff,
Vivera Pharmaceuticals, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIVERA PHARMACEUTICALS, INC., a Delaware corporation,<br><br>                              Plaintiff,<br><br>v.<br><br>SOLUTECH PHARMACEUTICALS, LLC, an Arizona limited liability company,<br><br>                              Defendant. | Case No.<br><br>**COMPLAINT**<br><br>1. **Declaratory Judgment**<br>2. **Tortious Interference**<br>3. **Unjust Enrichment**<br>4. **Injunctive Relief**<br><br>**JURY DEMANDED** |

1
COMPLAINT

BN 38108650v1

Plaintiff, Vivera Pharmaceuticals, Inc., a Delaware corporation ("Vivera" or "Plaintiff"), herein alleges in its Complaint as follows:

1.      This action arises out of Defendant, Solutech Pharmaceuticals, LLC's ("Solutech" or "Defendant"), unlawful and unethical misappropriation of Vivera's proprietary and confidential trade secret information, maintenance of Vivera's pharmaceutical products, and continued sale and disbursement of pharmaceutical products that do not belong to Defendant.

2.      Vivera has exclusive rights to a product by the name of SIL-K PAD (NDC#70350-2615-01) and all related intellectual property rights associated with the development, manufacture, and use of the SIL-K PAD product and inventory that Defendant ordered from an unnamed third-party causing harm to Vivera.

3.      SIL-K PAD is intended for non-invasive management of old and new hypertrophic or keloid scars resulting  from burns, surgical procedures or trauma wounds. SIL-K PAD contains: Silicone, Polydimethyl hydrogenmethyl siloxane, Polydimethylsiloxane, and Polydimethylsiloxane hydrogen terminated and each unit includes four scar pads in foils and a box bearing the SIL-K PAD name.

## JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds Seventy-five Thousand Dollars ($75,000.00) and the parties are citizens of different states.

5.      This Court also has jurisdiction pursuant to 28 U.S.C. §2201 (Declaratory Judgment Act).

6.      This Court has personal jurisdiction over Defendant because Defendant has and continues to transact business in the State of California.

7.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) as a substantial amount of the events and/or omissions giving rise to the claim occurred in this jurisdiction.

BN 38108650v1

**THE PARTIES**

8.      Vivera is a Delaware corporation authorized to do and doing business in the State of California.  At all times relevant hereto, Vivera maintained its principal place of business in the County of Los Angeles, State of California.

9.      Defendant is an Arizona limited liability company with a principal place of business in Peoria, Arizona.

**FACTUAL ALLEGATIONS**

10.     Vivera is, and at all times relevant hereto was, a pharmaceutical company that is focused on research and the development and commercialization of pharmaceutical and medical device products.  Vivera enters into strategic relationships with existing medical, pharmaceutical, manufacturing and distribution companies that it believes to be capable of achieving that vision.

11.     On December 14, 2017, non-party Dr. Robert C. Blaine of Blaine Laboratories ("Blaine") entered into a supplier/distributor agreement with Defendant whereby Defendant ordered the manufacturing of at least 30,000 units of the pharmaceutical product SIL-K PAD product  in 2018 but refused to tender payment for the product.

12.     In 2018, Vivera entered into an Agreement with non-party Blaine, whereby non-party Blaine sold the ownership interest, including the Sil-K PAD product and inventory held by Defendant, in non-party Blaine.  As part of the Agreement, Vivera gained strategic, operational, and procedural control of Blaine and had consolidated its' financials and inventory to its' books and records.

13.     Through an injunction obtained while Vivera was in control of Blaine Labs, Vivera was found to have tangible and intangible rights to SIL-K PAD product, including but not limited to direct licensing rights and other intellectual property rights associated with the SIL-K PAD product and inventory in any form.

14.     Despite repeated demand, Defendant refused to ever tender payment or return the SIL-K PADS ordered in 2018.

COMPLAINT

BN 38108650v1

FISHERBROYLES
A LIMITED LIABILITY PARTNERSHIP

15.    Further, Defendant continued ongoing negotiations in 2019 with non-party Blaine to sell and distribute the SIL-K PAD product.

16.    Unfortunately, the Agreement between Vivera and non-party Blaine was not without incident and resulted in litigation that was commenced on February 19, 2019 and a preliminary injunction issued after a show cause hearing held on March 14, 2019 relative to pharmaceutical products.  A true and accurate copy of the Second Amended Complaint is attached hereto as Exhibit "1" and a true and accurate copy of the Injunction is attached here to as Exhibit "2."

17.    Pursuant to the express terms of the injunctive order dated March 15, 2019, non-party Blaine was immediately ordered to: "[T}urn over to Vivera all Scarcare Gel-Pads, the Scarcare Gel-Pad Kit, Siltrex Silicone Gel-Pad, Sil-K, Visilage, TVIA Kit, Opitox Kit, Zyrexal, Folinex, Odor Blast  in Defendants' possession custody or control, including  any  related  raw  materials,  components,  electronic  files,  and  marketing materials….." Ex. 2.

18.    Non-party Blaine was also ordered to provide Vivera with a royalty free, perpetual, irrevocable license to any products completed prior to his employment.  Ex. 2.

19.    On March 19, 2019, in response to the March 14, 2019 order received to the benefit  of  Vivera,  Defendant  counsel  was  advised  Defendant  was  in  breach  of  the supplier/distributor  agreement  for  nonpayment  and  to  cease  and  desist  any  sales  or distribution of the SIL-K PAD as Vivera retained the right to sell and distribute the product, not non-party Blaine.  It was further noted that Blaine was ordered to turn over all Scarcare Gel-Pads and the SIL-K PAD product and inventory to Vivera.

20.    Defendant failed to respond to this notice.

21.    Defendant failed to turn over the inventory and upon information and belief, Vivera became aware of Defendant's ongoing actions, in conjunction with non-party Blaine, to cause the purchase and distribution of the SIL-K PAD product and inventory in violation of the March 14, 2019 order prohibiting Blaine from selling the SIL-K PAD

FISHERBROYLES
A LIMITED LIABILITY PARTNERSHIP

BN 38108650v1

product and inventory, ordering that all inventory be provided to Vivera, and finding that Vivera is the proper owner of same.

22.     On September 30, 2019, Vivera, again, restated the prior cease and desist to Defendant and requested immediate confirmation that Defendant was not selling or distributing the SIL-K PAD product or inventory and that Defendant had ceased all action interfering with the prospective economic advantage of Vivera relative to the sale and distribution of the SIL-K PAD product or inventory which were judicially determined to be owned by Vivera and for which Defendant has never tendered any consideration.

23.     Despite confirmation from Defendant's counsel that the cease and desist communications were received by Defendant, Defendant continues to ignore Vivera's demands.

24.     Defendant continues to remain in possession of the SIL-K PAD product and/or monies received for same without ever tendering consideration for the purchase of the SIL-K PAD product or inventory.

25.     Defendant continues to sell and/or distribute the SIL-K PAD product and inventory, despite having no right or authority to do so, and retain the benefit of both possession and sale of the SIL-K PAD product and inventory.

26.     Vivera owns all rights and interest in the SIL-K PAD product and inventory which were ordered to be placed in the possession of Vivera on March 14, 2019.

## COUNT I

## DECLARATORY JUDGMENT

27.     Vivera incorporates by reference as though fully set forth herein paragraphs 1 through 26 of the Complaint.

28.     Under the Declaratory Judgment Act, 28 U.S.C.A. §2201 and California Code of Civil Procedure §1060, this Court may declare the rights and other legal relations of any interest party in a case of actual controversy.

BN 38108650v1

29.   Vivera's rights with respect to ownership and interests in the SIL-K PAD is resolved as codified in a court order dated March 14, 2019, attached hereto as Ex. 2.

30.   Vivera seeks declaratory judgment in this action given its rights to the intellectual property rights, including but not limited to the rights to the product NCP numbers, patent rights as licensed  and trademarks.

31.   Viviera seeks declaratory judgment in this action confirming that it has all tangible and intangible rights to SIL-K PAD, including but not limited to direct licensing rights and other intellectual property rights associated with the SIL-K PAD product and inventory in any form.

32.   There is a dispute as to the obligations, duties, rights, and responsibilities under the March 14, 2019 court order, which constitutes an actual and justiciable controversy between the parties.

33.   A declaratory judgment is both necessary and proper to establish the obligations, duties, rights, and responsibilities under the March 14, 2019 court order.

34.   Vivera respectfully requests that this Court declare the parties' rights and obligations pursuant to the agreement.

## COUNT II

## TORTIOUS INTERFERENCE

35.   Vivera incorporates by reference as though fully set forth herein paragraphs 1 through 34 of the Complaint.

36.   Defendant has knowledge of the contractual and business relationships between Vivera and its wholesalers, manufacturers, distributors, customers, and general public.

37.   Defendant has knowledge of Vivera's expectancy that it would maintain its contractual and business relationships with its wholesalers, manufacturers, distributors, customers, and the general public.

FISHERBROYLES
A LIMITED LIABILITY PARTNERSHIP

38.     Vivera has invested substantial resources in developing and maintaining those contractual and business relationships.

39.     Despite having knowledge of Vivera's contractual and business relationships with wholesalers, manufacturers, distributors, customers, and the general public, Defendant tortuously interfered with such contractual and/or business relationships, without justification or excuse.

40.     Further, upon information and belief, Defendant intends to further tortuously interfere with Vivera's contractual and business relationships, in a manner both willful and intentional, without justification or excuse and with reckless disregard.

41.     As a direct and proximate result of the multiple and ongoing actions of Defendant, Vivera has been and continues to be injured and sustain damages in an amount to be proven at trial.

42.     Upon information and belief, Defendant's actions were and are willful, malicious, spiteful, deceitful, wanton, reckless, and carried out with any evil mind entitling Vivera to an award of punitive damages sufficient to deter Defendant from engaging in conduct similar to that described herein.

## COUNT III

## UNJUST ENRICHMENT

43.     Vivera incorporates by reference as though fully set forth herein paragraphs 1 through 42 of the Complaint.

44.     Defendant ordered the manufacturing of at least 30,000 units of SIL-K PAD that are rightfully the current property of Vivera and refused to pay for the SIL-K PAD product.

45.     Defendant refuses to return the SIL-K PAD product to Vivera in compliance with the court order of March 14, 2019.  Ex. 2.

46.     Defendant refuses to cease and desist sales and distribution of the SIL-K PAD.

BN 38108650v1

FISHERBROYLES
A LIMITED LIABILITY PARTNERSHIP

47.     Defendant is not entitled to nor deserving of the SIL-K PAD or any financial gain or incentive it can manipulate by retaining without payment or as a result of the sale and/or distribution of the SIL-K PAD.

48.     It is inequitable for Defendant to accept and retain the benefit of conversion, poaching, diverting, or eliminating business from Vivera.

49.     Defendant has no right or justification to receive a benefit for the SIL-K PAD.

50.     As a result of Defendant's actions, Defendant will be unjustly enriched to the detriment of Vivera.

51.     Vivera has and continues to sustain damages.

## COUNT IV

## INJUNCTIVE RELIEF

52.     Vivera incorporates by reference as though fully set forth herein paragraphs 1 through 51 of the Complaint.

53.     In violation of the March 14, 2019 preliminary injunction order, Defendant is refusing to return the SIL-K PAD product and inventory and is interfering with Vivera's lawfully adjudicated interest in the SIL-K PAD product and inventory as well as Vivera's business expectancy, relationships, and entire business model.

54.     Defendant's wrongful refusal to cease and desist sales and distribution of the SIL-K PAD product and inventory as ordered and provide the inventory to the Court ordered recipient, Vivera, will, unless restrained by this Court, cause irreparable injury to Vivera's business including, but not limited to, interference with the ability to sustain the business, elimination of ancillary service providers, and decimation of the reputation of Vivera for which there is no adequate remedy at law.

55.     Defendant's wrongful conduct proximately caused loss to Vivera in an amount to be determined at trial, as well as an amount that cannot be financially recovered and for which the only recovery is injunctive relief.

BN 38108650v1

FISHERBROYLES
A LIMITED LIABILITY PARTNERSHIP

WHEREFORE, Plaintiff Vivera respectfully requests that this Court enter judgment in its favor against Defendant Solutech as follows:

A. Enjoin Defendant from:

    1) Communicating with anyone about or in an attempt to sell or distribute the SIL-K PAD product;

    2) Interfering with Vivera's direct licensing rights and other intellectual property rights associated with the SIL-K PAD product and inventory in any form.

    3) Unlawfully asserting exclusive rights to the SIL-K PAD product and inventory in violation of the March 14, 2019 court order; and

    4) Any interference with Vivera's business relationships with wholesalers, manufacturers, distributors, or other third parties;

B. Awarding Vivera for damages suffered in an amount to be proven at trial;

C. Declaring the rights, of Vivera to the SIL-K PAD product and inventory consistent with March 14, 2019 order attached;

D. Awarding Vivera its attorneys' fees and costs of this action;

E. Awarding Vivera compensatory and punitive damages;

F. Awarding Vivera pre-judgment and post-judgment interest on all amounts due and owing by Defendant; and

G. Granting such other further relief as the Court deems just and equitable.

Dated: October 22, 2019

BUCHALTER
A Professional Corporation

By: _____

Oren Bitan
Attorney for Plaintiff,
Vivera Pharmaceuticals, Inc., a Delaware corporation

FISHERBROYLES
A LIMITED LIABILITY PARTNERSHIP

## JURY DEMAND

Pursuant to the Federal Rules of Civil Procedure, Vivera hereby requests a trial by jury on all issues so triable.

Dated: October 22, 2019

BUCHALTER
A Professional Corporation

By: _____
        Oren Bitan
    Attorney for Plaintiff,
Vivera Pharmaceuticals, Inc., a Delaware
            corporation

**FISHERBROYLES**
A LIMITED LIABILITY PARTNERSHIP

10
COMPLAINT

BN 38108650v1

# Exhibit 1

Electronically FILED by Superior Court of California, County of Los Angeles on 05/10/2019 04:47 PM Sherri R. Carter, Executive Officer/Clerk of Court, by D. Ramos,Deputy Clerk

Case 2:19-cv-09086-RGK-JC   Document 1   Filed 10/22/19   Page 12 of 165   Page ID #:12

BUCHALTER
A Professional Corporation
OREN BITAN (SBN: 251056)
AARON LEVINE (SBN: 299260)
WEISS HAMID (SBN: 300792)
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Telephone: 213.891.0700
Fax: 213.896.0400
E-mail: obitan@buchalter.com

Attorneys for Plaintiff and Cross-Defendant
Vivera Pharmaceuticals, Inc.

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

| | |
|---|---|
| VIVERA PHARMACEUTICALS, INC., a Delaware corporation,<br><br>       Plaintiff,<br><br>       v.<br><br>DR. ROBERT C. BLAINE, an individual; BLAINE LABORATORIES, INC., a California corporation; BLAINE HOLDING & DEVELOPMENT, LLC, a California limited liability company; FRED BATTAH aka FREDDY BATTAH, an individual; REAL VALUE PRODUCTS CORP., dba HOSPITAL PHARMACEUTICAL CONSULTANTS a Texas corporation; JM LOGISTICAL SERVICES dba RX LOGISTICAL, a Texas limited liability company; and DOES 1 through 20, inclusive,<br><br>       Defendants. | CASE NO. 19STCV05281<br>Civil Unlimited – Claim Over $25,000<br><br>**SECOND AMENDED COMPLAINT**<br><br>1.  Breach of Contract (Share Exchange Agreement);<br>2.  Breach of the Covenant of Good Faith and Fair Dealing;<br>3.  Money Had and Received;<br>4.  Unjust Enrichment;<br>5.  Breach of Contract (Executive Employment Agreement);<br>6.  Breach of Covenant of Good Faith and Fair Dealing;<br>7.  Misappropriation of Trade Secrets;<br>8.  Negligent Misrepresentation;<br>9.  Concealment;<br>10. Intentional Interference with Contractual Relations;<br>11. Conversion;<br>12. Fraudulent Conveyance (Civ. Code, § 3439.04);<br>13. Breach of Contract (Commercial Lease Agreement);<br>14. Breach of the Implied Covenant of Quiet Enjoyment;<br>15. Trespass;<br>16. Wrongful Eviction; and<br>17. Trespass to Chattels. |

Plaintiff and Cross-Defendant VIVERA PHARMACEUTICALS, INC., a Delaware corporation ("Vivera" or "Plaintiff"), herein alleges in its Second Amended Complaint as follows:

1.      This action arises out of defendant Robert C. Blaine's ("Blaine") breach of that certain Share Exchange Agreement, whereby Blaine agreed to transfer 100% of his stock in Blaine Laboratories, Inc. to Vivera and agreed that Vivera would exclusively maintain strategic, operational, and procedural control over Blaine Laboratories pending the closing of the stock transfer (the "Closing"), effective as of October 1, 2018.  This action also arises out of the unlawful and unethical misappropriation of Vivera's proprietary and confidential trade secret information by Blaine, including the misappropriation of Vivera's customer lists, product formulation, and future product lists for pharmaceutical products.  This action also arises out of Blaine's refusal to comply with the terms of a written commercial lease agreement (the "Lease") entered into between Vivera and Blaine Holding & Development, LLC ("Blaine Holding").  Despite being in full compliance with the terms of the Lease, Blaine and Blaine Holding have engaged in actions of self-help and denied Vivera full access to the real property identified in the Lease.  Vivera reserves its right to seek arbitration of this matter.

## JURISDICTION AND VENUE

2.      Jurisdiction in this Court is proper because each of the causes of action set forth in this Complaint arises under California law and because the amount of damages sought is within the jurisdiction of the Superior Court.

3.      Venue is proper in Los Angeles County under California *Code of Civil Procedure* §§ 393, 395 and 395.5 because: (i) one or more of the acts, breaches, misappropriations, and wrongs giving rise to the causes of action asserted herein occurred or were to be performed in Los Angeles County; and, (ii) on information and belief, Blaine Holding and Blaine Laboratories are based in Los Angeles County.

4.      Plaintiff VIVERA PHARMACEUTICALS, INC. is a Delaware corporation authorized to do and doing business in the State of California.  At all times relevant hereto, Plaintiff maintained its principal place of business in the County of Los Angeles, State of California.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

2

**SECOND AMENDED COMPLAINT**

BN 35822046v6

## THE PARTIES

5.      Plaintiff is informed and believes, and on that basis alleges, that defendant DR. ROBERT C. BLAINE ("Blaine") is an individual who is and at all times herein mentioned was a resident of the County of Los Angeles, State of California.

6.      Plaintiff is informed and believes, and on that basis alleges, that defendant BLAINE LABORATORIES, INC. ("Blaine Laboratories") is and at all times relevant hereto was a closely held California corporation with its principal place of business in the County of Los Angeles, State of California.  Plaintiff is further informed and believes, and on that basis alleges, that at all times relevant hereto, Blaine was the sole shareholder and Chief Executive Officer of Blaine Laboratories.

7.      Plaintiff is informed and believes, and on that basis alleges, that defendant BLAINE HOLDING & DEVELOPMENT, LLC ("Blaine Holding" and collectively referred to with Blaine and Blaine Laboratories as "Defendants") is and at all times relevant hereto was a California limited liability company with its principal place of business in the County of Los Angeles, State of California.  Plaintiff is further informed and believes, and on that basis alleges, that at all times relevant hereto, Blaine was the President and sole manager of Blaine Holding.

8.      Plaintiff is informed and believes, and on that basis alleges, that defendant FRED BATTAH, aka FREDDY BATTAH ("Battah"), is an individual who is and at all times herein mentioned was a resident of Bexar County, Texas.  Plaintiff is further informed and believes and thereon alleges, that Battah regularly conducts business within the state of California.

9.      Plaintiff is informed and believes, and on that basis alleges, that defendant REAL VALUE PRODUCTS CORPORATION ("Real Value") aka Real Value Products Corp dba Hospital Pharmaceutical Consultants is and at all times relevant hereto was a Texas corporation that regularly conducts business within the state of California.

10.      Plaintiff is informed and believes, and on that basis alleges, that defendant JM LOGISTICAL SERVICES LLC DBA RX LOGISTICAL ("JM Logistical") is and at all times relevant hereto was a Texas corporation that regularly conducts business within the state of California.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 35822046v6

3

**SECOND AMENDED COMPLAINT**

11.     Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 20 inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities, when ascertained. Plaintiff is informed and believes, and thereon alleges that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

12.     At all times mentioned herein, Defendants, and each of them, were the agents, servants and employees of the remaining Defendants, and of each other and that at all times mentioned herein, Defendants and each of them were acting with the knowledge of each other and within the course and scope of their agency or employment, as applicable.

13.     Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Blaine Laboratories, Blaine Holding, and Dr. Blaine each constitute the alter ego of the other by virtue of the manner of operation of the businesses of Blaine Laboratories and Blaine Holding in that, at all relevant times, (i) there existed and now exists such a unity of interest and ownership between said Defendants such that the individuality and separateness of said Defendants has ceased, and despite knowledge thereof, Dr. Blaine has acquiesced in and agreed and consented to and ratified such conduct as herein alleged such that adherence to the fiction of said Defendants' separate existence would, under the circumstances, promote injustice and fraud; (ii) said Defendants have been but an instrumentality or conduit of one another in the pursuit of a single business venture, and disregard of the separate nature of said Defendants is necessary to prevent an injustice to Vivera; and (iii) said Defendants have committed, *inter alia*, the following acts:

a.     Plaintiff is informed and believes, and on that basis alleges, that Dr. Blaine is the only shareholder, sole director, and sole manager of both Blaine Laboratories and Blaine Holding;

b.     Plaintiff is informed and believes, and on that basis alleges that Dr. Blaine conducted himself and Blaine Laboratories and Blaine Holding in a manner such that the interests of Blaine Laboratories and Blaine Holding were the same as the interests of Dr. Blaine, by treating the companies' assets as his own and not that of the companies, improperly manipulating

1  the companies' assets for his benefit and to the detriment of his creditors, intermingling his own

2  assets with the companies', and guaranteeing and paying the debts incurred by himself personally

3  with the companies' assets, and vice versa;

4        c.   Plaintiff is informed and believes, and on that basis alleges, that Defendants

5  violated corporate formality requirements, as required by law, including the California

6  Corporations Code, to maintain the separate existences of Blaine Laboratories and Blaine Holding

7  from Dr. Blaine;

8        d.   Plaintiff is informed and believes, and on that basis alleges, that Dr. Blaine

9  directed the actions of and made the decisions on behalf of Blaine Laboratories and Blaine

10  Holding as the only shareholder, director, manager, and officer of each company;

11        e.   Plaintiff is informed and believes, and on that basis alleges, that Dr. Blaine

12  completely controlled, dominated, managed, and operated Blaine Laboratories and Blaine

13  Holding such that these companies were, and are nothing more than sham, shell instrumentalities

14  through which Dr. Blaine carries on his personal business; and

15        f.   Plaintiff is informed and believes, and on that basis alleges, that if either Blaine

16  Laboratories or Blaine Holding's acts were treated as their acts alone, this would have an

17  inequitable result of Plaintiff enforcing the Agreement and Lease (as defined herein below)

18  against shell entities thereby denying Plaintiff the benefit its bargain under both agreements.

19                         **FACTUAL ALLEGATIONS**

20      14.    Vivera is, and at all times relevant hereto was, a biopharmaceutical company that

21  holds a global license to research, develop and commercialize hemp-based cannabinoid

22  pharmaceutical products, which utilize the internationally patented and patent-pending Tabmelt®

23  sublingual drug-delivery system, and other pharmaceutical and medical device products.

24  Plaintiff's goal is to reach patients worldwide with its innovative, hemp-based cannabinoid

25  biopharmaceutical products and other pharmaceutical and medical device products.  To achieve

26  that goal, Plaintiff seeks to license its technologies to select pharmaceutical companies and

27  research institutions.  Moreover, Plaintiff also enters into strategic relationships with existing

28  medical, pharmaceutical and distribution companies that it believes to be capable of achieving

1    that vision.

2         15.    Blaine is, and at all times relevant hereto was, a practicing podiatrist and the sole

3    shareholder and founder of Blaine Laboratories, a company that principally specializes in the

4    research and development, manufacturing and retail of foot and skin care products.

5         16.    Plaintiff first met Dr. Blaine in or around October 2017 with the intention of

6    entering into a contract to manufacture its products.  During those conversations, Dr. Blaine made

7    it clear that he was interested in a larger deal, and informed Plaintiff that he wanted to sell his

8    company Blaine Laboratories, and the parties entered into negotiations for the acquisition of

9    Blaine Laboratories, shortly thereafter.

10        17.    On or around September 28, 2018, Plaintiff on the one hand, and Dr. Blaine on the

11   other hand, entered into a written Share Exchange Agreement (the "Agreement") whereby

12   Plaintiff agreed to purchase all of Dr. Blaine's ownership interest in Blaine Laboratories in

13   exchange for cash and stock as detailed in the Agreement.  At all times relevant hereto, Blaine

14   was represented by corporate counsel, Roby Yadegar, throughout the negotiation and execution

15   of the Agreement.

16        18.    Paragraph 2.5 of the Agreement acknowledged that Vivera would act as the

17   distributor of certain products on behalf of Blaine Laboratories prior to the closing of the

18   acquisition and that 50% of the profits from such sales would be paid to Blaine as part of the cash

19   payment.  Pursuant to this provision, Blaine has received over $2,111,850 to date.

20        19.    Plaintiff is informed and believes, and thereon alleges, that Blaine has already

21   started spending $2,111,850 that Vivera has already paid to him.  Prior to Vivera's payments to

22   Blaine, Blaine was not able to afford any luxurious purchases.  After Vivera paid Blaine the

23   monies referenced herein, Blaine went on a lavish spending spree.  Blaine purchased a Bentley

24   Continental automobile that cost approximately $150,000.  Blaine also spent $100,000 on a new

25   Range Rover for his wife, Diana Blaine. Blaine made a payment in the sum of $25,000 to

26   Congressman Kevin McCarthy on or around October 29, 2018 for a private luncheon.  After Dr.

27   Blaine started receiving money from Vivera, Blaine also began construction and remodeling of

28   his home property located at 1901 Kashlan Road, La Habra Heights, CA 90631, including the

installation of a new pool and construction costing approximately $450,000.  Blaine also spent approximately $250,000 on private, luxury VIP Box seats on the "end zone" at the LA Rams for the 2018 and 2019 seasons that his family attended with him.

20.     Blaine provided disclosure, representations and warranties in connection with the Agreement.  For example, Blaine represented in Paragraph 5.10 of the Agreement that there was no basis for any present or future proceeding against Blaine Laboratories giving rise to any liability. Blaine also represented in Paragraph 5.20 of the Agreement that no circumstance exists that that is reasonably likely to give rise to or serve as a basis for the commencement of any proceeding against or involving Blaine Laboratories.

21.     In Paragraph 6.1 of the Agreement, Blaine agreed that, between execution of the Agreement and the Closing, Blaine would maintain the assets of Blaine Laboratories.

22.     In Paragraph 6.7, Blaine agreed to treat and hold as confidential all of Vivera's confidential information.

23.     Paragraph 11.14, entitled "Specific Performance," states:

11.14   <u>Specific Performance</u>.  Each Party acknowledges and agrees that the other Parties would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise is breached. Without limiting the foregoing, the Parties acknowledge that the Business is unique and recognize and affirm that in the event that Stockholder breaches this Agreement before Closing, money damages would be inadequate and **Buyer would have no adequate remedy at law, so that Buyer shall have the right, in addition to any other rights and remedies existing in its favor, to enforce its rights and the other Parties' obligations hereunder not only by action for damages but also by action for specific performance, injunctive and/or other equitable relief.**

(emphasis added.)

24.     On or around December 31, 2018, the parties entered into APPENDIX A to the Share Exchange Agreement (collectively referred to with the Share Exchange Agreement as the "Agreement"), wherein Blaine agreed to extend the closing date until January 2020 and that effective October 1, 2018, Vivera would be provided with complete "strategic, operational and procedural control of Blaine Laboratories."  Blaine also agreed that Vivera was authorized to

"consolidate the operations of Blaine Laboratories, Inc. into its books and records" pending the closing of the parties' transaction while Plaintiff engaged in due diligence efforts and made payments to Blaine.  A true and correct and redacted copy of the Agreement is attached hereto as **Exhibit "1**."

25.   Concurrently with the execution of the Agreement, the parties agreed that Dr. Blaine would transition from his former role as Chief Executive Officer at Blaine Laboratories into a new role as Vivera's Chief Medical Officer, and ultimately, Vivera's Chief Scientific Officer.  A true and correct, fully executed copy of Dr. Blaine's Executive Employment Agreement with Vivera (the "Executive Employment Agreement") is attached hereto as **Exhibit "2."**  Blaine was placed on the payroll and given a salary $120,000 per year.  Blaine was also given new Vivera Pharmaceuticals business cards, with his new title of Chief Medical Officer and ultimately Chief Scientific Officer, and his office was moved to be closer to the lab.  Blaine authored, published, and circulated to the Company, including at the Q1 2019 Advisory Board meeting, an article promoting himself as the Chief Medical Officer of Vivera.

26.   Blaine agreed in Paragraph 5.1 of the Executive Employment Agreement to "never disclose or make unauthorized use of any" of Vivera's confidential information as that term was defined in the attached Confidential Information, Non-Disclosure, and Trade Secret Agreement (the "NDA").  Paragraph 5.2 of the Executive Employment Agreement prohibited Blaine from rendering any services that would be in competition to Vivera.  Paragraph 7 of the Executive Employment Agreement required Blaine to return all of Vivera's property in the event the Executive Employment Agreement was terminated, including without limitation Vivera's customer lists or other proprietary information belonging to Vivera.

27.   After execution of the Executive Employment Agreement, an organizational chart was circulated to Blaine Laboratories' management team, which identified Paul Edalat as the Chairman, Interim CEO and Chief Business Development Officer of the newly combined entity. Blaine also participated in a promotional video to publicize his role within Vivera and to acknowledge Vivera's acquisition of Blaine Laboratories and approved of and authored and published written materials representing that Blaine Labs and Vivera had entered into a

1  partnership with one another wherein Vivera had acquired Blaine Laboratories and that he was

2  the Chief Medical Officer of Vivera Pharmaceuticals.

3         28.    Separate and apart from the Agreement, Blaine, acting in his capacity as CEO, also

4  presented Vivera with, and executed a Commercial Lease Agreement (the "Lease") on behalf of

5  Blaine Holding in which Blaine Holding granted Vivera the right to possess the following real

6  property: (1) 21,412 square feet (SF) located at 11037 Lockport Place, Santa Fe Springs,

7  California, 90670 ("Building One"); (2) 14,670 square feet (SF) of the North warehouse space

8  located at 11100 Greenstone Avenue, Santa Fe Springs, California, 90670 ("Building Two"); and

9  (3) 11,450 square feet (SF) South warehouse space located at 11110 Greenstone Avenue, Santa

10  Fe Springs, California, 90670 (the "Warehouse" and with Building One and Building Two

11  referred to herein as the "Premises"). A true and correct copy of the Lease is attached hereto as

12  **Exhibit "3."** The Lease was prepared by Blaine and his corporate counsel, and was subject to

13  multiple rounds of revisions and negotiations, which took place between July 8 and October 22,

14  2018. Per the Lease, Plaintiff is a key holder and tenant for each of the buildings that comprise

15  the Premises and pays rent for the Premises.

16         29.    After execution of the Agreement, and pursuant to the terms of the Agreement,

17  Vivera assumed "strategic, operational, and procedural control" over Blaine Laboratories,

18  including consolidating the operations of Blaine Laboratories into Vivera's books and records.

19  Blaine Labs needed a significant overhaul to meet capacity needs for Vivera as Vivera was

20  commercializing products in new ways that Blaine was never aware of, and introducing new

21  products, brands, and high-volume distribution channels. Paul Edalat held a team meeting and

22  asked the leaders of each department at Blaine Labs to email him their biggest complaints and a

23  list of items needed in their respective departments to increase morale and efficiency. Mr. Edalat

24  engaged in extensive efforts to ensure that these needs were met and operationally, Plaintiff

25  invested considerable time and resources into improving the operations of Blaine Laboratories,

26  by, among other things:

27        a.   Hiring a consulting firm to reconcile Blaine Laboratories' disorganized financials

28  and hiring three additional, full-time accounting employees;

1        b.  Hiring an auditor to complete an audit of Blaine Laboratories' financials;

2        c.  Hiring new personnel including a Director of Corporate Security, Head of

3 Production, Vice President of Sales, and additional employees and consultants who could help

4 grow the business of Blaine Laboratories;

5        d.  Reducing corporate waste including products, processes, technology and

6 personnel;

7        e.  Updating outdated technology which included hiring two consulting firms to

8 completely overhaul Blaine Labs outdated and failing server system, software systems, licenses

9 and technology systems

10        f.  Bringing in its own proprietary network of customers and industry contacts,

11 netting millions of dollars to Blaine Labs' bottom line;

12        g.  Increasing the value of Blaine's foot care products through updated branding and

13 marketing initiatives, resulting in hundreds of thousands of dollars in increased profits;

14        h.  Purchasing equipment to eliminate the outdated, limited, manual processes that

15 Blaine Labs had previously utilized;

16        i.  Upgrading the office in general with new paint, chairs, desks, expensive and

17 upgraded computer and software systems, faster Wi-Fi, new microwaves, coffee makers, printers

18 and laptops; and

19        j.  Fixing human resources issues, including implementing mandatory and Company-

20 wide sexual harassment training, and placing employees who were previously paid cash by Blaine

21 "under the table," on the formal payroll with pay raises to meet state requirements.

22      30.    In addition to the above, Vivera also realized that, despite having a drug and

23 medical device license, Blaine Labs, under previous management by Blaine, was storing sterile

24 production materials from vendor 3M in employee lunchroom refrigerators alongside employee

25 lunches, spillage and other non-sterile items.  Vivera immediately corrected the situation by

26 purchasing two new lunchroom-specific and two new lab-specific refrigerators.  This ensured a

27 sterile, compliant and safe working environment for employees and consumers alike.

28      31.    It was difficult to tell through Plaintiff's audit of Blaine Labs, which products and

1   raw materials were or were not expired. Plaintiff had already learned through due diligence and

2   through discussions with Blaine Labs' employees that a formal inventory system did not exist,

3   that inventory was managed using a "tribal knowledge" system, and that there were unlabeled and

4   mislabeled products throughout the warehouse and product testing areas. Plaintiff further learned

5   that Blaine instructed employees that it was okay to not place expiration dates on perishable

6   products.   Plaintiff also learned that employees were taking advantage of the lack of an inventory

7   system prior to Plaintiff taking over the operation and were keeping commissions on returned

8   inventory.  Plaintiff began to remedy and implement a compliant solution for inventory control.

9        32.     Plaintiff also discovered that Blaine would regularly go to the bank and withdraw

10   cash to pay manufacturing employees. Plaintiff put a stop to this and immediately placed all

11   employees onto the Company payroll system.

12        33.     Plaintiff also infused additional capital into the combined operations of Vivera and

13   Blaine Laboratories totaling approximately $1,000,000 and spent over $500,000 on upgrades to

14   the Premises and for purchase of necessary office and manufacturing equipment (the "Vivera

15   Improvements").  Further, because much of the inventory was mislabeled or expired when

16   Plaintiff started managing the operation, Plaintiff purchased hundreds of thousands of dollars of

17   Blaine Laboratories' inventory, new packaging, components and raw materials that were

18   necessary for the manufacture of additional products (the "Vivera Materials").  Plaintiff also paid

19   to renew Blaine Laboratories' various business licenses including its Drug and Medical Device

20   licenses and registrations.  The result of Plaintiff's efforts and investment were immediate; and,

21   beginning in October 2018, Plaintiff rapidly increased the productivity, revenue, and profitability

22   of Blaine Laboratories.

23        34.     At all times relevant hereto, it was understood and agreed between the parties that

24   the monies paid and improvements made by Vivera to Blaine and Blaine Labs were done

25   specifically within the context of Vivera's efforts to consummate the Agreement and finalize its

26   purchase of Blaine Labs.  The parties further understood and agreed that if the Agreement were

27   not fully consummated, Blaine and Blaine Labs would be under an obligation to reimburse Vivera

28   for the full value of the benefit conferred upon Blaine and Blaine Labs.

35.     The purchase price detailed in the Agreement was determined based on representations made by Blaine that Blaine Laboratories earned USD $7.5 million in revenues in 2017 with 20% profitability.  During Plaintiff's due diligence review of Blaine Laboratories, Plaintiff discovered that Blaine misrepresented the revenues and that Blaine Laboratories had only earned approximately $5.7 million in revenues during that period, approximately 20% less than what was represented by Dr. Blaine, and that profitability was less than $350,000 USD, nowhere near the 20% profitability from revenues represented by Blaine.  In 2016, Blaine Labs earned $6.1 million in revenue with less than $50,000 in profitability.

36.     Through the audit of Blaine Labs, Plaintiff also discovered that, despite being contractually obligated to disclose such information, Dr. Blaine concealed from Plaintiff the fact that Blaine had been individually named as a defendant in and paid at least $475,000 to settle several legal actions, including actions for wrongful termination (filed by Galal Gough in the Los Angeles Superior Court) and discrimination, retaliation, wrongful termination and sexual harassment by at least three women; but had failed to disclose that information as he was required to do under Paragraph 5.20 of the Agreement.  These actions, which were filed in late 2017 immediately prior to or within the same month of Plaintiff's introduction to Blaine, were brought against Blaine individually, Blaine Labs, and Blaine's brother-in-law (and Blaine Labs employee), Pablo Sandoval.  On information and belief, Blaine's failure to disclose these actions was intentional.  Shortly after Plaintiffs discovered the concealed litigation, Plaintiff's investment banker requested clarity from Dr. Blaine regarding these newly discovered facts, and communicated the potential impact they would have on Vivera's efforts to become a publicly traded corporation, but Blaine did not respond to these communications.

37.     On January 15, 2019, Plaintiffs met with Dr. Blaine and his counsel Mr. Yadegar at the law offices of Greenberg Traurig to confront him about the misrepresented revenues and previously undisclosed lawsuits.  When asked for an explanation as to why he had not disclosed these actions (despite being contractually obligated to do so and despite having 14 months to disclose this information), Blaine stated that, because the settlement was confidential, he "didn't think Vivera would find out about it."

38.     Blaine's behavior became strange, manic, impulsive, and erratic following the January 15, 2019 meeting.  For example, Blaine reported that employees brought in by Plaintiff were standing too close to Paulina Godinez and Patty Ortiz.  These allegations were investigated by Plaintiffs and human resources' representatives and found to be untrue.  Blaine also showed Plaintiffs a photograph on his phone, taken of him by his children, of Blaine sleeping outside of his house on his porch in a jacket and a winter hat, clinging to his dog for warmth in cold weather. He stated his family became worried for him as they could not find him and that his children found him after some time and took a photo of him.  He started to say and take actions that were manic, impulsive and erratic.

39.     In addition to the above, Plaintiff also discovered that Blaine had a history and pattern of inappropriate contact with female employees and female patients which did not result in litigation.  For example, Plaintiff discovered:

a.     Blaine regularly treated "patients" (including employee Paulina Godinez) in his office in violation of Section 2742 of the Medical Practice Act, and provided medical services outside the scope of those permitted by licensed podiatrists and in unlicensed locations.  When asked about this, Ms. Godinez informed Vivera officials that she was at one time Blaine's patient, and would go to Dr. Blaine's office during business hours so that he could "trim" her feet (calluses) and so that she could save money.  Ms. Godinez also mentioned that Dr. Blaine had also removed her calluses in employee areas including the Blaine Labs conference room.

b.     Blaine maintained a secret room in his office at the Premises that he called the "SSR" room (an acronym for Secret Sex Room), which had a bed and a shower, and which was only accessible via a move-away bookshelf, wherein Blaine would reportedly engage in illicit activities with female employees and other persons during regular business hours.

c.     Blaine had a reported pattern of having inappropriate romantic relationships with women at Blaine Labs, including an alleged relationship with former employee, Patricia Montalvo.

d.     Blaine had a history of utilizing security cameras to watch female employees while they utilized the on-site gym facilities at the Premises and Plaintiff's representatives repeatedly

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 35822046v6

1   observed Blaine watching these security cameras on a second computer monitor in his office.

2        e.  Blaine had a history of making racist and defamatory comments about female

3   employees, and discriminatory comments about employees and people, including his own wife.

4   For example, Blaine would make comments about an employee's ethnicity, and would refer to

5   Mexican employees as "The Mexicans," "Worker Bees," or "Worker B's".  Blaine also often

6   made comments about his wife stating, "My wife is a typical Mexican and crazy," and referring

7   to her constantly at business meetings as "My Crazy Mexican Wife," in front of employees.

8   Blaine would also single out women and ask if they were Mexican, which Plaintiff is informed

9   made the women feel uncomfortable.  Further, Blaine would make derogatory and sexist

10   statements about and to female employees by referring to them as "ovaries." Despite Vivera

11   implementing mandatory sexual harassment training after taking over the operation, Blaine would

12   repeatedly state that the typical customer for his products at Walgreens, Walmart, and CVS were

13   "ovaries," and that a pair of "ovaries" should determine what the packaging should look like.

14        f.  Blaine had a repeated habit of referring to customers and clients in an

15   unprofessional, disrespectful and inappropriate manner.  He called Fred "Freddy" Battah the

16   "Texas Boy," and referred to a customer, a husband and wife team with the last name Ball as

17   "The Balls," which we would repeatedly state in meetings in front of employees.

18        g.  Blaine repeatedly and inappropriately tried to set his sons up romantically with

19   Blaine Labs interns, stating that his son missed out on the opportunity to date a former employee

20   and intern Blaine referred to as "legs," who he stated was "tall and an athlete," and tried to have

21   Plaintiff hire a woman in the sales department so that he could set her up with one of his sons.

22        h.  Blaine regularly discussed inappropriate content like the "birthing process" on

23   repeated occasions.

24        i.  Blaine retaliated against and wrongfully terminated a former sales employee

25   named Patricia "Patty" Ortiz for reporting Blaine's wrongful conduct to her superior.  For

26   example, Ms. Ortiz informed a superior that Blaine had an inappropriate, illicit relationship with

27   and showed preferential treatment to former employee Patricia Montalvo and current employee

28   Paulina Godinez (who Blaine is widely believed to have fathered a child with).

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

14

**SECOND AMENDED COMPLAINT**

j.    Plaintiff also discovered an inappropriate article Blaine authored and published as "Vivera's Chief Medical Officer and member of the Executive Board of Vivera," in which Blaine admitted to providing his patients with unlabeled cannabis products without disclosing its contents and to providing these same unlabeled cannabis products to co-workers to give to their patients during their visits to Healthpointe Medical Group located at 1717 E. Lincoln Ave., Anaheim, CA 92805.  In this article, Blaine wrote: "My 'clinical trials' include me simply handing a blank tube of gel (Orthonesic with 25mg of Cannabidiol) and asking that they try it on the area of pain.  I hand the patient the tube and leave the treatment room for about ten minutes while seeing other patients….This observation extends to neuroma pain, myotendinous calf pain, bunion pain, and trauma closed wounds I even gave some of my orthopedist co-workers the non-opioid CBD gel and they also eradicated their patient's painful pathologies."  Aside from the CBD-based drug Epidiolex, which is approved by the FDA to treat seizures with Lennox Gastaut syndrome and Dravet syndrome, Cannabidiol, or "CBD," is a compound that is derived from the cannabis sativa plant and is considered a Schedule 5 substance, requiring a prescription.  Blaine authored and published the article without permission from Vivera's Executive Board, bankers, lawyers, and auditors.

40.    In light of the misrepresentations and discoveries identified above, it became apparent that Vivera needed to lower its valuation price for Blaine Laboratories.  Vivera officials approached Blaine about a revised purchase price, and he verbally agreed to accept the same, stating that his trusted accountant, Emil Estafanous, CPA, CFF, CGMA, had informed him that Blaine Labs was worth no more than $7 Million.  As a result of these discussions, on January 18, 2019, Vivera proposed that the parties enter into an Amended and Restated Share Exchange Agreement, which, among other things, included a lower purchase price.  A draft of a revised agreement reflecting these changes was provided to Blaine and the parties exchanged communications regarding the specifics of the revised agreement thereafter.  In response, Blaine sought additional monies to offset the reduced valuation, including an additional $1,300,000 to reimburse him for expired or discarded inventory.  As a result, the revised agreement was never executed, and the original Agreement remained in place.

41.     Between January 18 and January 30, 2019, Vivera and Blaine continued to attempt to negotiate a reduction in the purchase price to account for the reduced revenue of Blaine Laboratories.  As part of these negotiations, on January 31, 2019, Vivera communicated an alternative proposal that if Blaine: (i) immediately returned the $2,111,850 he had already been paid as part of the acquisition price for Blaine Laboratories; (ii) compensated Vivera for the hundreds of thousands of dollars it paid in tenant improvements to Building One; and (iii) if the parties successfully negotiated contract manufacturing agreement for Vivera's products, that Vivera would be willing to terminate the Share Exchange Agreement (the "January 31 Offer"). Blaine did not satisfy the conditions necessary to effectuate a termination of the Agreement, including failing to return any monies paid to him.  In addition, the parties never finalized a contract manufacturing agreement.  As a result, Vivera withdrew this offer and sought to proceed with the parties' original agreement.

42.     After the January 31 Offer was communicated, Blaine reaffirmed the Agreement, apologized for his attempt to seek increased payment to offset the reduced valuation, and expressed a desire to close the Agreement.  Shortly thereafter, however, Blaine took a decidedly different approach and started displaying erratic, manic, and impulsive behavior; and beginning on February 4, 2019, Blaine engaged in a series of unlawful self-help remedies intended to interfere with Vivera's operations and existence, including its management of Blaine Laboratories and occupancy of the leased Premises.  For example, Blaine began improperly utilizing Vivera's confidential customer list and attempting to replicate Vivera's business model, despite the fact that he had contractually agreed not to do so.  Blaine also attempted to terminate Vivera employees who had been transferred to Blaine Laboratories, prohibited Vivera from accessing its inventory, and refused to return Vivera's proprietary information.  Blaine also instructed Wells Fargo & Company to remove Vivera's Chairman Paul Edalat from a joint bank account that was established when Vivera took over Blaine Labs, and which Mr. Edalat was named a primary signor.  This joint account was set up by Vivera and funded with Vivera's own monies.  When Vivera assumed operational control of Blaine Labs, Blaine Labs had only $150,000 of operating capital in its bank accounts.  Everything paid for from that point forward was paid for by Vivera.

By removing Mr. Edalat from the joint account, Blaine maintained possession and control of the monies infused into Blaine Labs by Vivera. Blaine also instructed Derek Gentry of Black Tie I.T., who was retained and paid by Vivera, to lock Vivera out of a server that was purchased by Vivera and which contained Vivera's proprietary information. Mr. Gentry also denied Vivera access to documents and files created and collaborated on by Vivera's employees. Blaine also took control of and commercialized raw materials, components, blended products, and packaging materials that were purchased by Vivera. Further, Blaine prohibited Vivera from accessing Building One and the Warehouse, and re-keyed the buildings with no notice to Vivera, thereby obstructing Vivera's ability to carry on its daily operations and interfering with Vivera's rights under the Lease. Blaine also interfered with Vivera's ability to fulfill purchase orders from accounts that Vivera procured, and terminated equipment orders that Vivera placed under the combined Blaine Labs / Vivera account in an attempt to get the monies paid by Vivera returned to Blaine. Moreover, despite requests from Plaintiff, Blaine refused to return the Vivera Improvements and Vivera Materials to Plaintiff's possession. Said items were purchased using Vivera's capital and sales proceeds secured by Vivera, and as such, Plaintiff is entitled to immediate possession and control of these items.

43. During this timeframe, Plaintiff also obtained banking records evidencing the fact that immediately before executing the Agreement, Blaine transferred in excess of $1.3 million from a Blaine Laboratories' bank account into a previously undisclosed "Blaine Savings" account.

44. Plaintiff also learned that in the days before Plaintiff was to assume control of Blaine Labs, Blaine artificially and dramatically increased the salaries being paid to his children and family members – in some cases tripling the salaries even though most of these people did not perform any work for Blaine Labs - in order to shift the burden of higher payroll onto Vivera.

45. Because of Blaine's actions, Vivera has been locked out of and denied strategic, operational, and procedural control of the day-to-day operations of Blaine Laboratories.

46. Plaintiff is informed and believes, and on that basis alleges, that Dr. Blaine is now operating Blaine Laboratories using Plaintiff's confidential and proprietary information, including

1  customer lists and information, leads, files, formulations for new products, and pending purchase

2  orders.

**FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(Against Blaine, Blaine Labs, and DOES 1-20, Inclusive)**

47.     Plaintiff incorporates by reference paragraphs 1 through 46, inclusive of this

Complaint, as though fully set forth herein.

48.     The Agreement constitutes a valid written contract between the parties.

49.     The Agreement provides that Vivera has the right to maintain strategic,

operational, and procedural control of Blaine Laboratories until the Closing.  The Agreement also

provides that Blaine will maintain the confidentiality of Vivera's confidential information.

50.     Plaintiff has performed all of its obligations presently due and owing under the

Agreement except for those obligations excused by the acts and omissions of Blaine as alleged

herein.

51.     Events of default have occurred under the Agreement including but not limited to

Dr. Blaine's efforts to interfere with and interrupt Plaintiff's strategic, operational, and procedural

control of Blaine Laboratories by, among other things: (1) denying Vivera's and its employees'

access to the Premises leased by Vivera, both through acts of intimidation and by rekeying the

facilities without notice to Vivera, thereby interfering with Plaintiff's ability to carry on the daily

operations of Blaine Laboratories; (2) instructing Derek Gentry of Black Tie I.T., a firm retained

and paid by Plaintiff, to lock Plaintiff out of the server systems and security systems, that were

also paid for by Vivera and  contained Vivera's customer lists and proprietary product

formulations; (3) denying Vivera access to documents and files created and collaborated on by

Vivera's employees; (4) improperly, and without authority, terminating thirteen of Vivera's

employees who were transferred to Blaine Laboratories; (5) interfering with Vivera's ability to

fulfill purchase orders to its customers including Real Value Products Corp d/b/a Hospital

Pharmaceutical Consultants and JM Logistical Services dba RX Logistical by persuading Real

Value's and JM Logistical's principal, Fred "Freddy" Battah, to issue payment for an order he

had previously requested to Vivera, directly to a bank account Blaine believed Vivera could not access, and other accounts procured by Vivera after October 1, 2018 that Vivera both infused its own capital in to and brought revenues in to; (6) removing Vivera's access from the joint bank accounts that were established when Vivera assumed control of Blaine Labs; (7) prohibiting Vivera from accessing its inventory of products; (8) cancelling equipment orders placed by Vivera; (9) failing to disclose previous lawsuits as required pursuant to the Agreement; and (10) misrepresenting revenues and profitability pursuant to the Agreement.

52.     As a proximate result of these actions, Vivera has been denied the benefit of the bargain it negotiated for in the Agreement.  Specifically, Vivera has been denied ownership and control over Blaine Laboratories, a company uniquely qualified to expand Vivera's position in the hemp-based cannabinoid biopharmaceutical product industry, the pharmaceutical industry, and the medical device industry.

53.     As a proximate result of these actions, Vivera has also suffered damages in an amount to be proven at trial but in any event no less than $3,861,390.00.

54.     Paragraph 11.11 of the Agreement provides: "Except as otherwise provided in this Agreement, each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated by this Agreement.  In the event that any legal, declaratory, or equitable action is commenced between the Parties hereto or its personal representatives concerning any provision of this Agreement or the rights and duties of any person in relation thereto, all costs and expenses relating to such action (including attorneys' fees) shall be borne by the Party who is the least successful in such action, which shall be determined by comparing (A) the position asserted by each Party on all disputed matters taken together to (B) the final decision of the court on all disputed matters taken together."  Plaintiff has employed the law firm of Buchalter, A Professional Corporation, for the purpose of initiating this action.

## SECOND CAUSE OF ACTION

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

## (Against Blaine, Blaine Labs, and DOES 1-20, Inclusive)

55.     Plaintiff incorporates by reference paragraphs 1 through 54, inclusive of this Complaint, as though fully set forth herein.

56.     The Agreement contained an implied covenant of good faith and fair dealing by which each party covenanted to refrain from doing any action to injure, frustrate, or interfere with the right of the other party to receive the benefits of that contract.  This implied promise imposed a duty of good faith and fair dealing to the parties to the Agreement and specifically obligates Blaine to refrain from any action that would undermine or contravene the Agreement.  The implied promise imposes on Blaine a duty to act in a fair and honest manner.

57.     The Agreement provides that Vivera has the right to maintain strategic, operational, and procedural control of Blaine Laboratories until the Closing, which can occur at any time through January 1, 2020.  The Agreement also provides that Blaine will maintain the confidentiality of Vivera's confidential information, business operations, and trade secrets.

58.     Plaintiff has performed all of its obligations presently due and owing under the Agreement except for those obligations excused by the acts and omissions of Blaine as alleged herein.

59.     Blaine has breached this duty to deal fairly and in good faith with Plaintiff by engaging in various activities which have frustrated or interfered with Plaintiff's ability to receive the benefit of the bargain negotiated for in the Agreement, including but not limited to: (1) denying Vivera's and its employees' access to the Premises leased by Vivera, both through acts of intimidation and by rekeying the facilities without notice to Vivera, thereby interfering with Plaintiff's ability to carry on the daily operations of Blaine Laboratories; (2) instructing Derek Gentry of Black Tie I.T. to lock Plaintiff out of the server, that was paid for by Vivera, containing Vivera's customer lists and proprietary product formulations; (3) denying Vivera access to documents and files created and collaborated on by Vivera's employees; (4) improperly, and without authority, terminating thirteen of Vivera's employees who were transferred to Blaine

Laboratories; (5) interfering with Vivera's ability to fulfill purchase orders to its customers including Real Value Products Corp d/b/a Hospital Pharmaceutical Consultants and JM Logistical Services dba RX Logistical by persuading Real Value's and JM Logistical's principal, Fred "Freddy" Battah, to issue payment for an order he had previously requested to Vivera, directly to a bank account Blaine believed Vivera could not access, and other accounts procured by Vivera after October 1, 2018 that Vivera both infused its own capital in to and brought revenues in to; (6) removing Vivera's access from the joint bank accounts that were established when Vivera assumed control of Blaine Labs; (7) prohibiting Vivera from accessing its inventory of products; (8) cancelling equipment orders placed by Vivera; (9) failing to disclose previous lawsuits as required pursuant to the Agreement; and (10) misrepresenting revenues and profitability pursuant to the Agreement.

60.     As a proximate result of Blaine's conduct, Plaintiff has been damaged in an amount to be proven at trial, but in any event, no less than $3,861,390.00.

## THIRD CAUSE OF ACTION

## MONEY DUE

## (Against Blaine, Blaine Labs, and DOES 1 through 20, Inclusive)

61.     Plaintiff incorporates by reference paragraphs 1 through 60, inclusive of this Complaint, as though fully set forth herein.

62.     Within the last four years, Blaine became indebted to Plaintiff in the sum of $2,111,850.00 for money expended for the benefit of Blaine by Plaintiff at Blaine's request.

63.     There is now due, owing and unpaid from Blaine to Plaintiff the sum of $2,111,850.00, plus interest thereon at the legal rate according to proof at time of trial or entry of judgment.  Although demand for payment has been made, Blaine has failed and refused, and continues to fail and refuse, to pay any part thereof.

//
//
//
//

**FOURTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**

**(Against Blaine, Blaine Labs and DOES 1-20, Inclusive)**

64.     Plaintiff incorporates by reference paragraphs 1 through 63, inclusive of this Complaint, as though fully set forth herein.

65.     Plaintiff is informed and believes, and on that basis alleges, that because of Blaine's wrongful acts, Blaine and Blaine Labs have derived and continue to derive a benefit from failing to perform his contractual obligations pursuant to the Agreement.  Specifically, Blaine has been paid over $2,111,850 in cash from Plaintiff, and has received an additional loan for $250,000 from Plaintiff based on the parties' understanding and agreement that Plaintiff would acquire Blaine Laboratories pursuant to the Agreement.  Moreover, Plaintiff also spent in excess of $1.5 Million on upgrades and improvements to Blaine Labs and dramatically improved the profitability of Blaine Labs.

66.     Blaine is under an obligation to pay Plaintiff forthwith all amounts by which Blaine has been unjustly enriched, which sum is not less than $3,861,390.00.

**FIFTH CAUSE OF ACTION**

**BREACH OF CONTRACT (EXECUTIVE EMPLOYMENT AGREEMENT)**

**(Against Blaine and DOES 1-20, Inclusive)**

67.     Plaintiff incorporates by reference paragraphs 1 through 46, inclusive of this Complaint, as though fully set forth herein.

68.     Plaintiff and Blaine entered into the Executive Employment Agreement on or about October 1, 2018.

69.     Plaintiff performed all that it was required of it under the Executive Employment Agreement or was excused from performance by Blaine's misconduct.

70.     Blaine breached the Executive Employment Agreement by: (1) misappropriating Plaintiff's trade secrets and confidential information; (2) engaging in actions which are directly in competition with Vivera; (3) refusing to return all of Vivera's property including but not limited to, computer files containing private and proprietary information, raw materials, components and

**SECOND AMENDED COMPLAINT**

1  packaging purchased by Vivera, finished products made with the raw materials and components

2  purchased by Vivera and office equipment and/or machinery purchased by Vivera; and (4)

3  disavowing his agreement to provide Vivera with a perpetual royalty free license to sell any

4  previously produced products.

5       71.    As a direct and proximate cause of Blaine's actions, Plaintiff has suffered damages

6  in an amount to be proven at trial.

7       72.    Paragraph 9.8 of the Employment Agreement provides: "The prevailing party in

8  any action brought to enforce this Agreement may recover reasonable attorneys' fees and costs

9  including all costs and fees incurred in the preparation, trial, and appeal of an action brought to

10  enforce this Agreement." Plaintiff has employed the law firm of Buchalter, A Professional

11  Corporation, for the purpose of initiating this action.

12                        **SIXTH CAUSE OF ACTION**

13       **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

14                     **(Against Blaine and DOES 1-20, Inclusive)**

15       73.    Plaintiff incorporates by reference paragraphs 1 through 46 and 67 through 72,

16  inclusive of this Complaint, as though fully set forth herein.

17       74.    The Executive Employment Agreement contained an implied covenant of good

18  faith and fair dealing by which each party covenanted to refrain from doing any action to injure,

19  frustrate, or interfere with the right of the other party to receive the benefits of that contract. This

20  implied promise imposed a duty of good faith and fair dealing to the parties to the Agreement and

21  specifically obligates Blaine to refrain from any action that would undermine or contravene the

22  terms of the Executive Employment Agreement. The implied promise imposes on Blaine a duty

23  to act in a fair and honest manner.

24       75.    Paragraph 5.1, and the attached NDA, of the Executive Employment Agreement

25  prohibited Blaine from disclosing or making unauthorized use of any of Vivera's confidential

26  information. Further, Paragraph 5.2 of the Executive Employment Blaine prohibited Blaine from

27  rendering any services that would be in competition to Vivera. Moreover, paragraph 7 of the

28  Executive Employment Agreement required Blaine to return all of Vivera's property in the event

1  the Executive Employment Agreement was terminated, including without limitation Vivera's

2  customer lists or other proprietary information belonging to Vivera.  Moreover, Plaintiff agreed to

3  provide Vivera with a perpetual royalty free license to sell any previously produced products.

4      76.    Plaintiff has performed all of its obligations presently due and owing under the

5  Agreement except for those obligations excused by the acts and omissions of Blaine as alleged

6  herein.

7      77.    Blaine breached the Executive Employment Agreement by: (1) misappropriating

8  Plaintiff's trade secrets and confidential information; (2) engaging in actions which are directly in

9  competition with Vivera; (3) refusing to return all of Vivera's property including but not limited

10  to, computer files containing private and proprietary information, raw materials, components and

11  packaging purchased by Vivera, finished products made with the raw materials and components

12  purchased by Vivera and office equipment and/or machinery purchased by Vivera; and (4)

13  disavowing his agreement to provide Vivera with a perpetual royalty free license to sell any

14  previously produced products.

15      78.    As a proximate result of Blaine's conduct, Plaintiff has been damaged in an

16  amount to be proven at trial.

17  **SEVENTH CAUSE OF ACTION**

18  **MISAPPROPRIATION OF TRADE SECRETS (California UTSA)**

19  **(Against Blaine, Blaine Labs, and DOES 1-20, Inclusive)**

20      79.    Plaintiff incorporates by reference paragraphs 1 through 46, inclusive of this

21  Complaint, as though fully set forth herein.

22      80.    Plaintiff possesses trade secrets as defined by California's Uniform Trade Secrets

23  Act, Civil Code sections 3426-3426.11.  These trade secrets include but are not limited to: (i) the

24  identities of existing and prospective customers; (ii) client leads and contact information

25  regarding customers and potential customers; (iii) information regarding current orders from

26  existing customer; and (iv) formulations for new products (collectively, referred to as Plaintiff's

27  "Trade Secrets").

28      81.    The Trade Secrets derive independent economic value, actual or potential, from

1  not being generally known to the public or to other persons who can obtain economic value from

2  its disclosure or use.

3        82.     Plaintiff has taken reasonable measures to maintain the secrecy of the Trade

4  Secrets, including but not limited to maintaining the information in a secure manner in Vivera's

5  facilities, limiting the employees and personnel who have access to the Trade Secrets, and

6  requiring the execution of Non-Disclosure Agreements for employees that access Vivera's trade

7  secrets.

8        83.     The Defendants have misappropriated and threaten to further misappropriate the

9  Trade Secrets by: (i) soliciting and/or attempting to solicit Plaintiff's customers by use of the

10  Trade Secrets; (ii) using the Trade Secrets with knowledge or reason to know that they are not

11  authorized to do so; and (iii) refusing to return Vivera's trade secrets.

12        84.     Defendants, and each of them, have been using the Trade Secrets with knowledge

13  or reason to know that the Trade Secrets were acquired under circumstances giving rise to a duty

14  to maintain their secrecy, and using the Trade Secrets derived through or from individuals who

15  had obligations to Plaintiff to maintain the information as confidential.  In misappropriating

16  Plaintiff's Trade Secrets, Defendants acted willfully and with the intent to cause injury to Plaintiff

17  and/or with a willful and conscious disregard of Plaintiff's rights and with deceit or concealment

18  of material facts regarding their misconduct, their intent to cause Plaintiff injury, their intent to

19  disrupt Plaintiff's business and customer relations, and their intent to deprive Plaintiff of its Trade

20  Secrets.

21        85.     Plaintiff has suffered damages, and Defendants have been unjustly enriched in an

22  amount to be proven at trial as a direct result of Defendants' Trade Secret misappropriation.

23        86.     Defendants' Trade Secret misappropriation has caused and continues to cause

24  Plaintiff irreparable injury and cannot be fully redressed through damages alone. An injunction

25  prohibiting the Defendants from further use or disclosure of Vivera's Confidential Information

26  and Trade Secrets, and requiring the return thereof to Plaintiff, is necessary to provide Vivera

27  with complete relief.

28        87.     The Defendants' misappropriation of Plaintiff's trade secrets has been willful and

1   malicious entitling Plaintiff to an award of its reasonable attorneys' fees pursuant to Civil Code

2   § 3426.4.

3       88.    The Defendants' misappropriation of Plaintiff's trade secrets has been willful and

4   malicious entitling Plaintiff to exemplary damages pursuant to Civil Code § 3426.3(c).

5                          **EIGHTH CAUSE OF ACTION**

6                          **NEGLIGENT MISREPRESENTATION**

7                      **(Against Blaine and DOES 1-20, Inclusive)**

8       89.    Plaintiff incorporates by reference paragraphs 1 through 46, inclusive of this

9   Complaint, as though fully set forth herein.

10      90.    As part of the negotiation process related to the execution of the Agreement,

11  Blaine represented to Plaintiff that Blaine Industries had annual revenues in 2017 of $7.5 million

12  with 20% profitability and that neither Blaine nor Blaine Labs was a party to any legal action.

13      91.    Plaintiff learned during the audit and due diligence period associated with the

14  Agreement that these representations were not true, and that Blaine failed to disclose certain facts

15  to Plaintiff including: (1) that immediately prior to the execution of the Agreement, Blaine

16  diverted in excess of $1.3 million to previously undisclosed Blaine Laboratories bank accounts;

17  (2) Immediately before Plaintiff was to assume control of Blaine Labs, Blaine, without disclosure

18  to Plaintiff, dramatically increased the salaries of his children and family members who worked

19  for Blaine Labs in order to shift an increased payroll burden onto Plaintiff, (3) Blaine was named

20  as a defendant in and settled several lawsuits, for amounts in excess of $475,000, including

21  actions for wrongful termination and sexual harassment; (4) Blaine has been accused of engaging

22  in inappropriate and damaging behavior both inside and outside of Blaine Laboratories which

23  includes rumors of extramarital affairs and inappropriate relationships with employees and

24  clients; and (5) Blaine Laboratories' annual revenue in 2017 was only $5.7 Million with

25  approximately $350,000 in profitability and Blaine Laboratories' annual revenue in 2016 was

26  only $6.1 million with less than $50,000 in profitability, as opposed to the $7.5 Million with 20%

27  profit margin represented by Blaine.

28      92.    Plaintiff is informed and believes, and on that basis alleges, that Blaine had no

1  reasonable grounds for believing that the representations regarding Blaine Laboratories' inflated

2  earnings or lack of litigation were true when he made it.

3        93.    Blaine intended that Plaintiff would rely on this representation.

4        94.    Plaintiff did reasonably rely on this representation and assigned a valuation to

5  Blaine Laboratories that was twenty percent higher than it otherwise would have been based on

6  these representations.  The parties executed a Stock Exchange Agreement for the acquisition of

7  Blaine Laboratories based on these representations.

8        95.    Plaintiff was harmed because of its reliance on Blaine's representations.

9        96.    As a result of Blaine's conduct, Plaintiff has incurred damages in an amount to be

10  proven at trial.

11  **NINTH CAUSE OF ACTION**

12  **CONCEALMENT**

13  **(Against Blaine and DOES 1-20, Inclusive)**

14        97.    Plaintiff incorporates by reference paragraphs 1 through 46, inclusive of this

15  Complaint, as though fully set forth herein.

16        98.    Plaintiff and Blaine were business partners who entered into a written agreement

17  for Plaintiff to acquire Blaine's ownership interest in Blaine Laboratories.

18        99.    Plaintiff is informed and believes, and on that basis alleges, that during the

19  negotiation process for Plaintiff's acquisition of Blaine Industries, Blaine intentionally failed to

20  disclose certain facts to Plaintiff including: (1) that immediately prior to the execution of the

21  Agreement, Blaine diverted in excess of $1.3 million to previously undisclosed Blaine

22  Laboratories bank accounts; (2) Immediately before Plaintiff was to assume control of Blaine

23  Labs, Blaine, without disclosure to Plaintiff, dramatically increased the salaries of his children

24  and family members who worked for Blaine Labs in order to shift an increased payroll burden

25  onto Plaintiff, (3) Blaine was named as a defendant in and settled several lawsuits, for amounts in

26  excess of $475,000, including actions for wrongful termination and sexual harassment; (4) Blaine

27  has been accused of engaging in inappropriate and damaging behavior both inside and outside of

28  Blaine Laboratories which includes rumors of extramarital affairs and inappropriate relationships

with employees and  clients; and (5) Blaine Laboratories' annual revenue in 2017 was only $5.7 Million with approximately $350,000 in profitability and Blaine Laboratories' annual revenue in 2016 was only $6.1 million with less than $50,000 in profitability, as opposed to the $7.5 Million with 20% profit margin represented by Blaine.

100.    Plaintiff did not know of these concealed facts.

101.    Plaintiff is informed and believes, and on that basis alleges, that Blaine intended to deceive Plaintiff by concealing these facts in order to induce Plaintiff to enter into the Agreement.

102.    Had these facts been previously disclosed, Plaintiff would not have agreed to enter into the Agreement under the negotiated terms.

103.    Plaintiff has been harmed because of Blaine's concealment; and as a result, has incurred damages in an amount to be proven at trial.

104.    Plaintiff is informed and believes, and on that basis alleges, that Blaine's conduct was fraudulent, willful, malicious, and oppressive, and constitutes despicable conduct and a conscious disregard of Plaintiff's rights, and was intended to cause harm to Plaintiff, thereby entitling Plaintiff to recover punitive damages.

## TENTH CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

### (Against Blaine, Blaine Laboratories, Battah, Real Value, JM Logistical and DOES 1-20, Inclusive)

105.    Plaintiff incorporates by reference paragraphs 1 through 46, inclusive of this Complaint, as though fully set forth herein.

106.    In fulfillment of its obligations and duties under the Agreement, Vivera has brought countless advisors, consultants, and high value sales accounts to its relationship with Blaine Laboratories.  In addition to these introductions, Vivera has also secured purchase orders, which it is entitled to compensation for and which it is presently unable to fulfill, in excess of $700,000, including a $142,500 order from Real Value Products Corp d/b/a Hospital Pharmaceutical Consultants being shipped through JM Logistical Services, d/b/a RX Logistical (the "Purchase Orders").

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 35822046v6

107.    Blaine, Blaine Laboratories, Battah, and Real Value and JM Logistical were aware of the existence of the Purchase Orders.  Battah, Real Value and JM Logistical were also aware of the existence of the Share Exchange Agreement and Executive Employment Agreement.

108.    Defendants' actions, specifically their efforts to deny Plaintiff strategic, procedural, and operational control of Blaine Laboratories prevented Plaintiff's performance of the Share Exchange Agreement and Plaintiff's fulfillment of the Purchase Orders.  Moreover, Plaintiff is informed and believes, and on that basis alleges, that Dr. Blaine, in an attempt to circumvent Vivera, has conspired with Fred "Freddy" Battah of Real Value Products Corp d/b/a Hospital Pharmaceutical Consultants and JM Logistical Services dba Rx Logistical to continue transacting business without Vivera's participation, despite the fact that this account was specifically secured by Vivera in furtherance of its expansion plans for Blaine Laboratories.

109.    By virtue of the afore-mentioned actions, Battah, Real Value and JM Logistical intended to disrupt performance of the Share Exchange Agreement and Executive Employment Agreement and knew that their actions were substantially certain to disrupt performance of the Share Exchange Agreement and Executive Employment Agreement.

110.    Defendants knew that, as a result of the disruption of these contracts, and as a result of Defendants' interference with Plaintiff's business contacts, it was substantially certain that Vivera's rights under the Agreement would be severely impaired.

111.    As a direct and proximate result of Defendants' conduct, Plaintiff was harmed in an amount to be proven at trial but in any event no less than $700,000.

### ELEVENTH CAUSE OF ACTION

### CONVERSION

### (Against Blaine, Blaine Laboratories, and DOES 1-20, Inclusive)

112.    Plaintiff incorporates by reference paragraphs 1 through 46, inclusive of this Complaint, as though fully set forth herein.

113.    At all times mentioned herein, Plaintiff owned the Vivera Improvements and Vivera Materials.

114.    Blaine Laboratories, at the direction of Blaine, intentionally and substantially

interfered with Vivera's ownership rights by refusing to return the Vivera Improvements and Vivera Materials to Plaintiff's possession and by maintaining control of these items in the portions of the Premises under which Blaine and Blaine Laboratories maintain sole control.

115. Plaintiff did not consent to Blaine Laboratories or Blaine's conversion of the Vivera Improvements and Vivera Materials.

116. As a direct and proximate result of Blaine Laboratories' and Blaine's' wrongful conversion, Plaintiff has sustained damages in an amount to be proven at trial.

117. Blaine Labs and Blaine acted with oppression, fraud, and/or malice with full knowledge of the wrongfulness of their conduct. This conduct was carried on with a willful and conscious disregard of Plaintiff's rights, and subjected Plaintiff to unjust hardship, such that Plaintiff should be awarded punitive and exemplary damages sufficient to punish Blaine Laboratories and Blaine for engaging in this conduct and to deter similar conduct on Defendants' behalf in the future.

## TWELFTH CAUSE OF ACTION

## VIOLATION OF UNIFORM VOIDABLE TRANSACTIONS ACT – FRAUDULENT TRANSFER OR CONVEYANCE WITH ACTUAL INTENT (CIV. CODE §3439.04)

### (Against Blaine and DOES 1-20, Inclusive)

118. Plaintiff incorporates by reference paragraphs 1 through 46, inclusive of this Complaint, as though fully set forth herein.

119. At all times relevant hereto, until October 1, 2018, Blaine was the owner of and in possession and control of Blaine Laboratories and its assets, including funds maintained within Blaine Laboratories' various bank accounts.

120. On September 28, 2018, Plaintiff on the one hand, and Blaine on the other hand, entered into the Agreement whereby Plaintiff agreed to purchase all of Blaine's ownership interest in Blaine Laboratories in exchange for cash and stock as detailed in the Agreement. Plaintiff's offer to purchase Blaine Laboratories was premised, in part, based on representations by Blaine regarding the financial performance of Blaine Laboratories, and the anticipated and agreed upon full disclosure of Blaine Laboratories' financial assets.

121.    Plaintiff is informed and believes, and thereon alleges, that on September 28, 2018, immediately prior to the execution of the Agreement, Blaine transferred in excess of $1.3 million from a Blaine Laboratories' bank account into a previously undisclosed "Blaine Savings" account.  Said transfer was part of the Blaine Labs valuation and was concealed from Plaintiff and not discovered until months after the fact.

122.    Plaintiff is informed and believes, and based thereon alleges, that Blaine maintains control of the previously undisclosed "Blaine Savings" account and thus maintains possession of the secretly transferred $1.3 million.

123.    Plaintiff is informed and believes, and based thereon alleges, that Blaine made the above-referenced transfer with the actual intent to hinder, delay, or defraud his existing and future creditors, and the existing and future creditors of Blaine Laboratories, including Plaintiff.

124.    As a direct and proximate result of Blaine's conduct, Plaintiff has been damaged in an amount to be proven at trial.

125.    Blaine's conduct as alleged herein was fraudulent, malicious, and intended to defraud and oppress Plaintiff.  As such, Plaintiff is entitled to punitive damages.

## THIRTEENTH CAUSE OF ACTION

## BREACH OF CONTRACT (COMMERCIAL LEASE AGREEMENT)

### (Against Blaine, Blaine Holding, and DOES 1-20, Inclusive)

126.    Plaintiff incorporates by reference paragraphs 1 through 46, inclusive of this Complaint, as though fully set forth herein.

127.    The Lease constitutes a valid written contract between the parties and gives Plaintiff the right to access and use the Premises for the warehousing, storage, receipt, and shipping Plaintiff's products, as well as general business operations, for an initial term of no less than 3 years.

128.    Events of default have occurred under the Lease including, but not limited to, Blaine and Blaine Holding's efforts to deny Plaintiff and its employees' access to the Premises.

129.    Plaintiff has performed all of its obligations under the Lease and remains ready and willing to perform all of the terms of the Lease applicable to Plaintiff.

130.    Plaintiff has no adequate remedy at law because the Lease is a contract for the transfer of real property, and pursuant to California Civil Code Section 3387 monetary damages are presumed inadequate for its breach.

131.    Because of Blaine and Blaine Holding's actions, including changing the locks of the leased Premise, Plaintiff has also suffered incidental damages in an amount to be proven at trial.

## FOURTEENTH CAUSE OF ACTION

## BREACH OF THE IMPLIED COVENANT OF QUIET ENJOYMENT

### (Against Blaine, Blaine Holding, and DOES 1-20, Inclusive)

132.    Plaintiff incorporates by reference paragraphs 1 through 46 and 125 through 130, inclusive of this Complaint, as though fully set forth herein.

133.    Every lease contains an implied covenant of quiet enjoyment.

134.    Blaine and Blaine Holding breached the implied covenant of quiet enjoyment by, among other things, denying Plaintiff the right to access and use the Premises for the warehousing, storage, receipt, and shipping Plaintiff's products, as well as general business operations as required pursuant to the terms of the Lease.

135.    As a direct and proximate cause of Blaine and Blaine Holding's actions, Plaintiff has suffered damages in an amount to be proven at trial.

136.    As a direct and proximate cause of Blaine and Blaine Holding's actions, Plaintiff has suffered damages in an amount to be proven at trial.

## FIFTEENTH CAUSE OF ACTION

## TRESPASS

### (Against Blaine, Blaine Holding, and DOES 1-20, Inclusive)

137.    Plaintiff incorporates by reference paragraphs 1 through 46 and 125 through 134, inclusive of this Complaint, as though fully set forth herein.

138.    Plaintiff leased the Premises pursuant to the Lease.

139.    Blaine and Blaine Holding intentionally entered the Premises and in doing so, denied Plaintiff with access to Building One and portions of the warehouse that Plaintiff was

**SECOND AMENDED COMPLAINT**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 35822046v6

1  entitled to access pursuant to the Lease.

2      140.   Plaintiff did not grant permission for Blaine and Blaine Holding's entry to the

3  Premises.

4      141.   As a proximate result of Blaine and Blaine Holding's conduct, Plaintiff has been

5  harmed in an amount to be proven at trial.

6  **SIXTEENTH CAUSE OF ACTION**

7  **WRONGFUL EVICTION**

8  **(Against Blaine, Blaine Holding, and DOES 1-20, Inclusive)**

9      142.   Plaintiff incorporates by reference paragraphs 1 through 46 and 125 through 139,

10  inclusive of this Complaint, as though fully set forth herein.

11      143.    On or about June 8, 2018, Blaine Holding leased the Premises to Plaintiff

12  pursuant to the written Lease, a true and correct copy of which is attached hereto as Exhibit 3.

13      144.   Plaintiff has duly performed all conditions, covenants, and promises required to be

14  performed by it under the Lease in accordance with its terms and conditions, except for those acts

15  that have been prevented, delayed, or excused by acts or omissions of Blaine Holding.

16      145.   Beginning on or about February 4, 2019, Blaine and Blaine Holding wrongfully

17  evicted Plaintiff from the Premises by changing the locks and blocking Plaintiff's access to

18  certain portions of the Warehouse and the entirety of Building One.  Although the locks to only

19  one of the buildings have been subsequently rekeyed subject to a Court order, Blaine and Blaine

20  Holding have still engaged in actions designed to block Plaintiff's access to portions of the

21  Warehouse and the entirety of Building One.

22      146.   As a proximate result of Blaine and Blaine Holding's actual eviction of Plaintiff

23  sustained general and special damages in an amount to be proven at trial.

24  **SEVENTEENTH CAUSE OF ACTION**

25  **TRESPASS TO CHATTELS**

26  **(Against Blaine, Blaine Holding, Blaine Laboratories, and DOES 1-20, Inclusive)**

27      147.   Plaintiff incorporates by reference paragraphs 1 through 46 and 125 through 144,

28  inclusive of this Complaint, as though fully set forth herein.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

33

**SECOND AMENDED COMPLAINT**

BN 35822046v6

148.     Plaintiff owned and had a right to possess the Vivera Improvements and Vivera Materials.

149.     Plaintiff is informed and believes, and thereon alleges, that Defendants intentionally interfered with Plaintiff's use and possession of the Vivera Improvements and Vivera Materials by refusing to return those items to Plaintiff's possession.

150.     Plaintiff did not consent to Defendants' actions.

151.     As a proximate result of Defendants' conduct, Plaintiff has been harmed in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them as follows:

**AS TO THE FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT (SHARE EXCHANGE AGREEMENT):**

1.     For specific performance of the Agreement;

2.     For other incidental damages in an amount according to proof at trial;

3.     For interest on the amount of incidental damages according to proof;

4.     For rescission of the Agreement and return of consideration;

5.     For attorneys' fees and costs of suit pursuant to contract;

6.     For any further relief as the Court may deem proper;

**AS TO THE SECOND CAUSE OF ACTION FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, THE THIRD CAUSE OF ACTION FOR MONEY HAD, AND THE FOURTH CAUSE OF ACTION FOR UNJUST ENRICHMENT:**

1.     For damages in an amount to be proven at trial;

2.     For interest on the amount of damages awarded according to proof at trial;

3.     For any further relief as the Court may deem proper;

**AS TO THE FIFTH CAUSE OF ACTION FOR BREACH OF THE EXECUTIVE EMPLOYMENT AGREEMENT AND SEVENTH CAUSE OF ACTION FOR TRADE SECRET MISAPPROPRIATION:**

1.     For an order requiring Defendants, and each of them, to show cause they should

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**SECOND AMENDED COMPLAINT**

BN 35822046v6

1    not be enjoined as hereafter set forth, during the pendency of this action;

2           2.      For a temporary restraining order, a preliminary injunction, and a permanent

3    injunction, all providing that Defendants, and each of them, and their officers, agents, employees,

4    representatives, and all persons acting in concert or participating with them, are restrained and

5    enjoined from engaging in or performing, directly or indirectly, any and all of the following acts:

6                  a.      Using, destroying, concealing from Plaintiff and/or disclosing to third

7    parties any of Plaintiff's confidential customer information including, without limitation, any

8    confidential, proprietary and/or Trade Secret information regarding any current or potential

9    Vivera customers (hereinafter, "Vivera's Customers") including, without limitation:

10                        i.      Any and all lists of Vivera Customers;

11                        ii.     Any and all information including, without limitation, any and all

12                                forms of hard copy or electronic data, relating or referring to Vivera

13                                Customers that were contained and/or maintained in any Vivera

14                                documents or files on or before February 4, 2019;

15                       iii.     Any and all Vivera business plan, products, documents,

16                                information, data, emails sent from or received by a Vivera

17                                computer, agreements and/or forms of agreements, of any kind or

18                                nature;

19                       iv.      Any and all software programs, data processing, electronic

20                                information, and/or data which refers or relates to any of the

21                                foregoing or which was duplicated from a file, disc or data which

22                                existed at Vivera; and

23                        v.      Any and all information pertaining to the identity, needs,

24                                requirements and/or financial condition of any Vivera Customers;

25                                and

26                 b.      Copying, disseminating, duplicating, conveying, communicating or

27                        destroying any and all Trade Secrets, confidential customer information,

28                        and/or any other property of Plaintiff in the custody or control of

1  Defendants or their agents, servants, employees, and representatives, and

2  all persons acting in concert or participating with them, and specifically

3  including information within the possession, custody or control of Dr.

4  Blaine;

5     c.  Concealing, modifying and/or destroying any Trade Secrets, proprietary

6  information, and/or any other Vivera property; and

7     d.  Using any of Vivera's confidential customer information or Trade Secrets

8  and/or any other property of Vivera in the possession, custody or control of

9  Defendants, and each of them other than for the purpose of its immediate

10  turnover to Vivera;

11    3.    For general damages and the amount necessary to prevent the unjust enrichment of

12  Defendants;

13    4.    For punitive and exemplary damages;

14    5.    For its reasonable attorney's fees; and

15    6.    For any further relief as the Court may deem proper.

16 **AS TO THE SIXTH CAUSE OF ACTION FOR BREACH OF THE COVENANT OF**

17 **GOOD FAITH AND FAIR DEALING:**

18    1.    For damages in an amount to be proven at trial;

19    2.    For interest on the amount of damages awarded according to proof at trial;

20    3.    For any further relief as the Court may deem proper;

21 **AS TO THE EIGHTH CAUSE OF ACTION FOR NEGLIGENT**

22 **MISREPRESENTATION:**

23    1.    For damages in an amount to be proven at trial;

24    2.    For interest on the amount of damages awarded according to proof at trial;

25    3.    For any further relief as the Court may deem proper;

26 **AS TO THE NINTH CAUSE OF ACTION FOR CONCEALMENT:**

27    1.    For damages in an amount to be proven at trial;

28    2.    For interest on the amount of damages awarded according to proof at trial;

**SECOND AMENDED COMPLAINT**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 35822046v6

3.      For exemplary and punitive damages;

4.      For any further relief as the Court may deem proper;

**AS TO THE TENTH CAUSE OF ACTION FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS:**

1.      For damages in an amount to be proven at trial;

2.      For interest on the amount of damages awarded according to proof at trial;

3.      For any further relief as the Court may deem proper;

**AS TO THE ELEVENTH CAUSE OF ACTION FOR CONVERSION:**

1.      For damages to compensate Plaintiff for the fair market value of the Vivera Improvements and the Vivera Materials at the time that Blaine and Blaine Laboratories wrongfully exercised control over them;

2.      For interest on the amount of damages awarded according to proof at trial;

3.      For exemplary and punitive damages;

4.      For any further relief as the Court may deem proper;

**AS TO THE TWELFTH CAUSE OF ACTION FOR FRAUDULENT CONVEYANCE:**

1.      For damages in an amount to be proven at trial;

2.      For interest on the amount of damages awarded according to proof at trial;

3.      For exemplary and punitive damages;

4.      For any further relief as the Court may deem proper;

**AS TO THE THIRTEENTH CAUSE OF ACTION FOR BREACH OF CONTRACT (COMMERCIAL LEASE AGREEMENT):**

1.      For specific performance of the Lease;

2.      For other incidental damages in an amount according to proof at trial;

3.      For interest on the amount of incidental damages according to proof;

4.      For any further relief as the Court may deem proper;

///

///

///

1   **AS TO THE FOURTEENTH CAUSE OF ACTION FOR BREACH OF THE IMPLIED**

2   **COVENANT OF QUIET ENJOYMENT, THE FIFTEENTH CAUSE OF ACTION FOR**

3   **TRESPASS; THE SIXTEENTH CAUSE OF ACTION FOR WRONGFUL EVICTION;**

4   **AND THE SEVENTEENTH CAUSE OF ACTION FOR TRESPASS TO CHATTELS:**

5       1.    For compensatory damages in an amount according to proof at trial.

6       2.    For interest on the amount of compensatory damages according to proof;

7       3.    For any further relief as the Court may deem proper.

8

9   DATED:  May 10, 2019                BUCHALTER

10                                          A Professional Corporation

11

12                              By:    /s/ - Oren Bitan

                                             OREN BITAN

13                                          AARON LEVINE

                                   Attorneys for Plaintiff VIVERA

14                                       PHARMACEUTICALS, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DEMAND FOR TRIAL BY JURY

2

VIVERA hereby demands a trial by jury in this matter as to all causes of action.

3

4    DATED: March 10, 2019                    BUCHALTER
                                              A Professional Corporation
5

6
                                      By:    /s/ - Oren Bitan
7                                            OREN BITAN
                                             AARON LEVINE
8                                        Attorneys for Plaintiff VIVERA
                                          PHARMACEUTICALS, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

39

**SECOND AMENDED COMPLAINT**

# EXHIBIT 1

SHARE EXCHANGE AGREEMENT

by and among

VIVERA PHARMACEUTICALS, INC.

and

Dr. Robert C. Blaine

Dated as of

October 1st, 2018

# TABLE OF CONTENTS

Article I DEFINITIONS ........................................................................................................1
Article II SHARE EXCHANGE ...........................................................................................10
    2.1       Basic Transaction ...............................................................................................10
    2.2       Share Exchange. ..................................................................................................10
    2.3       Closing.................................................................................................................10
    2.4       Deliveries and Actions at Closing .....................................................................10
    2.5       Interim Payments ...............................................................................................11
    2.6       Working Capital Adjustments ............................................................................11
Article III REPRESENTATIONS AND WARRANTIES OF STOCKHOLDER REGARDING THE TRANSACTION .....................................................................................................13
    3.1       Authorization of Transaction .............................................................................13
    3.2       Noncontravention ...............................................................................................14
    3.3       Brokers' Fees .....................................................................................................14
    3.4       Shares .................................................................................................................14
    3.5       Solvency. ............................................................................................................14
    3.6       Absence of Claims .............................................................................................14
    3.7       Purchase Entirely for Own Account ...................................................................15
    3.8       Available Information .........................................................................................15
    3.9       Non-Registration ................................................................................................15
    3.10     Restricted Securities ..........................................................................................15
    3.11     Legends...............................................................................................................15
    3.12     Additional Legend .............................................................................................16
    3.13     Accredited Investor ...........................................................................................16
Article IV REPRESENTATIONS AND WARRANTIES OF BUYER REGARDING THE TRANSACTION .....................................................................................................16
    4.1       Organization .......................................................................................................16
    4.2       Authorization of Transaction .............................................................................16
    4.3       Noncontravention ...............................................................................................16
    4.4       Brokers' Fees .....................................................................................................16
Article V REPRESENTATIONS AND WARRANTIES OF STOCKHOLDER REGARDING THE COMPANY ............................................................................................................18
    5.1       Organization, Qualification, Corporate Power and Authorization .....................18
    5.2       Capitalization .....................................................................................................18
    5.3       Noncontravention ...............................................................................................19
    5.4       Brokers' Fees; Company Transaction Expenses ................................................19
    5.5       Tangible Assets ..................................................................................................19
    5.6       Real Property ......................................................................................................19
    5.7       Subsidiaries........................................................................................................20
    5.8       Financial Statements and Projections ................................................................20
    5.9       Events Subsequent to Most Recent Fiscal Year End..........................................21
    5.10     Undisclosed Liabilities; Indebtedness ...............................................................21
    5.11     Legal Compliance ..............................................................................................21
    5.12     Permits ...............................................................................................................21
    5.13     Environmental Compliance ...............................................................................22
    5.14     Taxes..................................................................................................................22
    5.15     Intellectual Property and Software ....................................................................24
    5.16     Contracts ............................................................................................................25
    5.17     Notes and Accounts Receivable; Inventory .......................................................26
    5.18     Powers of Attorney ............................................................................................26
    5.19     Insurance............................................................................................................26

i

| | | |
|---|---|---|
| 5.20 | Litigation | 27 |
| 5.21 | Important Customers and Suppliers | 27 |
| 5.22 | Restrictions on Business Activities | 27 |
| 5.23 | Employees | 27 |
| 5.24 | Employee Benefits | 28 |
| 5.25 | Guarantees | 29 |
| 5.26 | Certain Business Relationships with the Company | 29 |
| 5.27 | Absence of Certain Payments | 30 |
| 5.28 | Products; Product Liability; Product Warranties | 30 |
| 5.29 | Bank Accounts | 33 |
| 5.30 | Health Law Compliance | 33 |
| 5.31 | Disclosure | 33 |

Article VI COVENANTS OF THE PARTIES ..... 33
| | | |
|---|---|---|
| 6.1 | Conduct of Business Prior to the Closing | 33 |
| 6.2 | Access to Information | 35 |
| 6.3 | Notice of Certain Events | 35 |
| 6.4 | General | 36 |
| 6.5 | Transition | 36 |
| 6.6 | Litigation Support | 36 |
| 6.7 | Confidentiality | 37 |
| 6.8 | Books and Records | 37 |
| 6.9 | Lock-Up | 37 |

Article VII CONDITIONS TO OBLIGATION TO CLOSE ..... 38
| | | |
|---|---|---|
| 7.1 | Conditions to Buyer's Obligations for the Closing | 38 |
| 7.2 | Conditions to Stockholder's Obligations for the Closing | 40 |

Article VIII REMEDIES FOR BREACHES OF AGREEMENT ..... 41
| | | |
|---|---|---|
| 8.1 | Survival of Representations, Warranties and Covenants | 41 |
| 8.2 | Indemnification Provisions for Benefit of Buyer | 41 |
| 8.3 | Matters Involving Third Party Claims | 43 |
| 8.4 | Matters not Involving Third Party Claims | 44 |
| 8.5 | Adjustments to Purchase Price | 44 |
| 8.6 | Waiver of Certain Damages | 45 |
| 8.7 | Other Indemnification Provisions | 45 |
| 8.8 | Payment of Claims | 46 |

Article IX TERMINATION ..... 46
| | | |
|---|---|---|
| 9.1 | Termination | 46 |

Article X CERTAIN TAX MATTERS ..... 47
| | | |
|---|---|---|
| 10.1 | Post-Closing Tax Returns | 47 |
| 10.2 | Pre-Closing Tax Returns | 47 |
| 10.3 | Straddle Periods | 47 |
| 10.4 | Cooperation on Tax Matters | 47 |
| 10.5 | Certain Taxes | 48 |
| 10.6 | Confidentiality | 48 |
| 10.7 | Audits | 48 |
| 10.8 | Control of Proceedings | 48 |
| 10.9 | Remittance of Refunds | 49 |
| 10.10 | Property Taxes | 49 |

Article XI MISCELLANEOUS ..... 49
| | | |
|---|---|---|
| 11.1 | Press Releases and Public Announcements | 49 |
| 11.2 | No Third-Party Beneficiaries | 50 |
| 11.3 | Entire Agreement | 50 |
| 11.4 | Succession and Assignment | 50 |

ii

| | | |
|---|---|---|
| 11.5 | Counterparts | 50 |
| 11.6 | Headings | 50 |
| 11.7 | Notices | 50 |
| 11.8 | Governing Law | 51 |
| 11.9 | Amendments and Waivers | 51 |
| 11.10 | Severability | 51 |
| 11.11 | Expenses | 51 |
| 11.12 | Construction | 52 |
| 11.13 | Incorporation of Exhibits and Schedules | 52 |
| 11.14 | Specific Performance | 52 |
| 11.15 | Arbitration | 52 |
| 11.16 | Disclosure Schedule | 53 |
| 11.17 | Waiver of Jury Trial | 53 |

OC 287832843v8

GT Draft 9-20-18

## SHARE EXCHANGE AGREEMENT

THIS SHARE EXCHANGE AGREEMENT (this "Agreement") is made as of _____, 2018, by and among Vivera Pharmaceuticals, Inc., a Delaware corporation ("Buyer") and Dr. Robert C. Blaine ("Stockholder"). Buyer and Stockholder are referred to in this Agreement individually as a "Party" and together as the "Parties."

## RECITALS

**WHEREAS**, Stockholder owns all of the issued and outstanding capital stock (the "Shares") in Blaine Laboratories, Inc., a California corporation (the "Company");

**WHEREAS,** the Company is a biopharmaceutical company primarily focused on the research and development of finished cannabinoid and other pharmaceutical products (the "Business");

**WHEREAS**, Stockholder desires to sell and transfer to Buyer, and Buyer desires to purchase and acquire from Stockholder, all of the outstanding capital stock of the Company upon the terms and subject to the conditions set forth in this Agreement; and

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained in this Agreement, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Unless otherwise expressly provided in this Agreement, the following terms, as used in this Agreement, have the following meanings:

"Adverse Consequences" means all claims, demands, damages, dues, penalties, fines, costs, amounts paid in settlement, Liabilities, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person and, in the case of an individual, includes the individual's immediate family.

"Agreement" has the meaning set forth in the preamble.

"Base Price" means, with respect to each Product, the price set forth opposite such Product on Exhibit A.

"Basis" means any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction that forms or could form the foundation for any specified consequence.

"Books and Records" means the original or true and complete copies of all of the books and records of the Company, whether in paper or electronic format, including but not limited to, customer lists, employee records, Contracts, sales orders and sales order log books, credit and collection records, drawings and specifications, environmental reports and studies, marketing studies and plans, correspondence and miscellaneous records with respect to customers and supply sources, lessors and lessees, engineering data, equipment maintenance records, Tax records, leases, lessor and lessee correspondence files, abstracts, title

*OC 287832843v1*

*OC 287832843v8*

reports and opinions, and title insurance policies, and all other general correspondence, records, books and files owned by the Company.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than a Saturday, a Sunday or a United States federal or California State banking holiday.

"Buyer" has the meaning set forth in the preamble.

"Buyer Indemnitees" means, collectively, Buyer and its Affiliates (including, after the Closing, the Company), and the officers, directors, employees and agents of Buyer and its Affiliates.

"Buyer Intellectual Property Rights" has the meaning set forth in Section 4.12.

"CERCLA" has the meaning set forth in the definition of "Environmental Laws".

"CERCLIS" has the meaning set forth in Section 5.13(a).

"Claim" or "Claim for Indemnification" means a written notice by Buyer to Stockholder asserting a claim under Article VIII delivered in accordance with Section 11.7. Such notice shall be sufficient if it provides a general description of the Adverse Consequences that the Buyer is likely to suffer, with an estimate of the extent of the dollar amount of Adverse Consequences.

"Closing" has the meaning set forth in Section 2.3.

"Closing Date" has the meaning set forth in Section 2.3.

"Closing Date Payment" has the meaning set forth in Section 2.6(a)(i).

"Closing Working Capital" means: (a) the Current Assets of the Company, less (b) the Current Liabilities of the Company, determined as of the close of business on the Closing Date.

"Closing Working Capital Statement" has the meaning set forth in Section 2.6(b)(i).

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Commercially Reasonable Efforts" means the efforts that a prudent person would contemplate using in similar circumstances in an effort to achieve a result in an expeditious manner, consistent with his or her good faith business judgment, including by paying necessary filing costs, fees and expenses of counsel and accountants, consent fees, and fees and charges of Governmental Authorities.

"Company" has the meaning set forth in the Recitals.

"Company Lease" means that certain commercial lease entered into between the Company and the Buyer as of the date hereof.

"Company Transaction Expenses" means all fees, costs and expenses incurred by the Company in anticipation of, in connection with, or otherwise related to, the transactions contemplated by this Agreement

2

and/or any related transactions (including all of the fees, expenses and other costs of legal counsel, investment bankers, brokers, accountants and other representatives and consultants).

"Confidential Information" means any information concerning the Business or the Company that is not already generally available to the public.

"Contaminated" or "Contamination" means the presence of one or more Hazardous Substances in such quantity or concentration as to: (i) violate any Environmental Law; (ii) require disclosure to any Governmental Authority; (iii) require remediation or removal; or (iv) interfere with or prevent the customary use of real property.

"Contracts" means all of the contracts, agreements, purchase orders, invoices, leases and other legally binding commitments and understandings, whether written or oral, of the Company.

"Current Assets" means cash and cash equivalents, accounts receivable, inventory and prepaid expenses, but excluding (a) the portion of any prepaid expense of which Buyer will not receive the benefit following the Closing, (b) deferred Tax assets and (c) receivables from any of the Company's Affiliates, directors, employees, officers or stockholders and any of their respective Affiliates, determined in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Audited Financial Statements for the most recent fiscal year end as if such accounts were being prepared and audited as of a fiscal year end.

"Current Liabilities" means accounts payable, accrued Taxes and accrued expenses, but excluding payables to any of the Company's Affiliates, directors, employees, officers or stockholders and any of their respective Affiliates, deferred Tax liabilities, Transaction Expenses and the current portion of any Indebtedness of the Company, determined in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Audited Financial Statements for the most recent fiscal year end as if such accounts were being prepared and audited as of a fiscal year end.

"Decree" means any injunction, judgment, order, decree, charge or ruling of any applicable Governmental Authority.

"Deductible" has the meaning set forth in Section 8.2(c).

"Disclosure Schedule" has the meaning set forth in Article III.

"Dispute" has the meaning set forth in Section 11.15.

"Disputed Amounts" has the meaning set forth in Section 2.6(c)(iii).

"Distribution Agreement" means that certain Distribution Agreement entered into by the Buyer and Company as of the date hereof.

"Employee" means any individual who, as reflected in the Company's payroll records, is, as of a specified date, (i) employed by and rendering personal services for the Company, (ii) receiving short-term or long-term disability benefits from the Company under an Employee Benefit Plan, (iii) on vacation or an approved leave of absence from his or her employment with the Company or (iv) off work from the Company and receiving or eligible to receive benefits under a Workers' Compensation Act. The term

3

"current and former Employees" means all individuals that fall within the term Employee at any time prior to the Closing Date.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in ERISA Section 3(3)), any Employee Pension Benefit Plan, any Employee Welfare Benefit Plan and any other employee benefit plan, program or arrangement of any kind, including all bonus, equity, equity units or appreciation rights, incentive, deferred compensation, retiree medical, dental or life insurance, supplemental retirement, cafeteria, dependent care, adoption assistance, fringe benefits, severance or other benefit plans, programs or arrangements, and all employment, termination, severance or other contracts or agreements, to which any of the Company is a party, for the benefit of any current or former employee, independent contractor, officer or director of the Company, and including any contracts, arrangements or understandings relating to the sale of any of the Company.

"Employee Pension Benefit Plan" has the meaning set forth in ERISA Section 3(2).

"Employee Welfare Benefit Plan" has the meaning set forth in ERISA Section 3(1).

"Employment Laws" has the meaning set forth in Section 5.23(a).

"Employment Agreement" means that certain Employment Agreement entered into by the Buyer and Stockholder as of the date hereof.

"Encumbrances" means any charge, claim, community or other marital property interest, right of way, easement, encroachment, servitude, option, right of first refusal, restriction on use, mortgage, pledge, lien, encumbrance, charge, property right or interest, sales contract, restriction on transfer, security interest, equity interest or defect in title.

"Entity" means a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a Governmental Authority.

"Environment" means surface or ground water, water supply, soil, the ambient air, oceans, rivers or other bodies of water.

"Environmental Laws" means all Laws that relate to (i) the prevention, abatement or elimination of pollution, or the protection of the Environment, or of natural resources, (ii) the generation, handling, treatment, storage, disposal or transportation of waste materials, (iii) the regulation of or exposure to Hazardous Substances, including the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§9601 et. Seq. ("CERCLA"), the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §§6901 et. seq. ("RCRA"), the Clean Air Act, 42 U.S.C. §§7401 et. seq., the Clean Water Act, 33 U.S.C. §§1251 et. seq., the Toxic Substances Control Act, 15 U.S.C. §§2601 et. seq. and the Emergency Planning and Community Right to Know Act, 42 U.S.C. §§11001 et. seq.; (iv) Healthcare Laws; and (v) any other similar Laws relating to the matters set forth in (i) through (iv) above whether applicable in the United States or in foreign countries.

"Environmental Matter" means any assertion of a violation, claim, Decree or directive by any Governmental Authority or any other Person for personal injury, damage to property or the Environment, nuisance, Contamination or other adverse effects on the Environment, or for damages or restrictions resulting from or related to (i) the operation of the Business or the ownership, use or operation at or on any real property or other assets owned, operated or leased by the Company or any of its Affiliates or predecessors; or (ii) the existence or the continuation of a Release of, or exposure to, or the transportation, storage or treatment of any Hazardous Substance into the Environment from or related to any real property

4

or assets currently or formerly owned, operated or leased by the Company or any of its Affiliates or predecessors or any activities on or operations thereof.

"EPA" has the meaning set forth in Section 5.13(b).

"Equipment" means the material tangible machinery, vehicles, equipment, office equipment, computer hardware, supplies, materials, furniture, fixtures, furnishings, trailers, tools, parts and other personal property of every kind owned or leased by the Company (wherever located and whether or not carried on the books of the Company), together with any express or implied warranty by the manufacturers or sellers or lessors of any item or component part thereof and all maintenance records and other documents relating thereto in the Company's possession.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means each Entity which is treated as a single employer with the Company for purposes of Code §414.

"Estimated Closing Working Capital" has the meaning set forth in Section 2.6(a)(ii).

"Estimated Closing Working Capital Statement" has the meaning set forth in Section 2.6(a)(ii).

"FDA" means the United States Food and Drug Administration, an agency within the Department of Health and Human Service

"FFDC Act" means the Federal Food, Drug and Cosmetic Act.

"FPLA" means the Federal Fair Packaging and Labeling Act.

"Final Determination" has the meaning set forth in Section 8.8(b).

"Financial Projections" has the meaning set forth in Section 5.8(b).

"Financial Statements" has the meaning set forth in Section 5.8(a).

"Fundamental Representations" has the meaning set forth in Section 8.1.

"GAAP" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

"Governmental Authority" means any agency, authority, board, bureau, commission, court, tribunal, department, office or instrumentality of any nature whatsoever or any governmental unit, whether federal, state, county, district, city, other political subdivision, or taxing district, foreign or otherwise, and whether now or hereafter in existence, or any officer or official thereof acting in an official capacity.

"Governmental Authorizations" means any approval, certificate of authority, accreditation, license, registration, permit, franchise, right, or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any law.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

5

"Hazardous Substances" means any substance, chemical, waste, solid, material, pollutant or contaminant that is defined or listed as hazardous or toxic under any applicable Environmental Laws. Without limiting the generality of the foregoing, it shall also include any radioactive material, including any naturally-occurring radioactive material, and any source, special or by-product material as defined in 42 U.S.C. 2011, et seq., any amendments or authorizations thereof, any asbestos-containing materials in any form or condition, any polychlorinated biphenyls in any form or condition, radioactive waste, or natural gas, natural gas liquids, liquefied natural gas, condensate, or derivatives or byproducts thereof or oil or petroleum products or by products and constituents thereof.

"Healthcare Laws" means any state or federal statute relating to the submission of a false and fraudulent claim to a government program or payments or contractual relationships with referral sources, including but not limited to the Medicare and Medicaid Anti-Fraud and Abuse Law, the federal Anti-Kickback law, the Stark laws, and the Health Insurance Portability and Accountability Act, and to the extent applicable, their respective state-law counterparts.

"Health and Safety Requirements" means all applicable federal, state, local and foreign Laws concerning public health and safety and worker health and safety, other than Environmental Laws.

"Indebtedness" means, without duplication, all: (i) indebtedness for borrowed money, including all liabilities generally regarded as indebtedness for borrowed money in accordance with GAAP and all indebtedness issued in substitution for or exchange of the foregoing; (ii) indebtedness evidenced by any note, bond, debenture, mortgage or other debt security; (iii) indebtedness represented by the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise, including all seller notes and "earn-out" payments; (iv) commitments by which a Person assures a creditor against loss (including contingent reimbursement obligations with respect to bankers' acceptances); (v) obligations under capitalized leases with respect to which a Person is liable, contingently or otherwise, as obligor, guarantor or otherwise, or with respect to which obligations a Person assures a creditor against loss; (vi) indebtedness secured by an Encumbrance on a Person's assets or properties; (vii) obligations or commitments to repay deposits or other amounts advanced by and owing to third parties; (viii) transaction bonuses, severance, stay put, retention or other compensatory payments or payment obligations to Employees or other Persons (whether contingent or otherwise, and whether due before, on or after the Closing Date) arising specifically out of or triggered by the sale of the Shares; (ix) obligations under any performance bond and letter of credit, but only to the extent drawn or called prior to the Closing Date; (x) Liability under any derivative, hedging or similar agreements (including interest rate, currency or commodity swap agreements, cap agreements, collar agreements or any other agreements or arrangements designed to protect a Person against fluctuations in interest rate, currency exchange rates or commodity prices); and (xi) guarantees or other contingent liabilities (including so called take-or-pay or keep-well agreements) with respect to any indebtedness, obligation, claim or liability of any other Person of a type described in clauses (i) through (xi) above; and (xii) accrued interest in respect of any of the obligations described in the foregoing clauses (i) through (xi) of this definition, and all premiums, penalties, charges, fees, expenses and other amounts which would become due in connection with the payment and satisfaction in full of such obligations on the Closing Date.

"Independent Accountant" has the meaning set forth in Section 2.6(c)(iii).

"Intellectual Property" means any or all of the following and all rights, arising out of or associated therewith: (i) all United States, international and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, re-examinations, revisions, provisionals, continuations and continuations-in-part thereof, and other patent rights; (ii) all inventions (whether patentable or not and whether or not reduced to practice), invention disclosures, improvements, mask works, trade secrets, research and development, inventor notebooks, formulas, compositions, manufacturing and production processes and

6

techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and all documentation relating to any of the foregoing throughout the world; (iii) all works of authorship (whether copyrightable or not), all copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto throughout the world; (iv) all industrial designs and any registrations and applications therefor throughout the world; (v) all internet uniform resource locators, domain names, trade names, logos, slogans, designs, trade dress, logos, common law trademarks and service marks, trademark and service mark and trade dress registrations and applications therefor throughout the world; and (vi) all databases and data collections and all rights therein throughout the world.

"Intellectual Property Rights" has the meaning set forth in Section 5.15.

"Inventory" means all inventory of the Company as of the Closing Date including all raw materials, work in process, finished goods, office and other supplies, laboratory consumables/products and other tangible goods held for resale and similar items of the Company.

"Knowledge of the Company" means the actual knowledge of Stockholder and the knowledge that such person would have reasonably obtained in the performance of such person's duties in his or her position with the Company without any implication of verification or investigation concerning such knowledge.

"Knowledge of the Buyer" means the actual knowledge of Buyer's officers and the knowledge that such person would have reasonably obtained in the performance of such person's duties in his or her position with the Buyer without any implication of verification or investigation concerning such knowledge.

"Law" means any constitution, statute, treaty, code, convention, ordinance, law (including common law), rule or regulation of any applicable Governmental Authority.

"Leased Real Property" means the land, together with all buildings, structures, improvements and fixtures located thereon, and all easements and other rights and interests appurtenant thereto, leased, subleased or licensed by the Company.

"Leases" means the Company's right, title and interest in all leases, subleases, licenses, concessions and other agreements (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto), pursuant to which the Company holds a leasehold or subleasehold estate in, or are granted the right to use or occupy, any land, buildings, structures, improvements, fixtures or other interest in real property which is used or intended to be used in, or otherwise related to, the Business, including the right to all security deposits and other amounts and instruments deposited by or on behalf of the Company thereunder.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"Material Adverse Change" or "Material Adverse Effect" means a change, event or occurrence that individually, or together with any other change, event or occurrence, has or is reasonably likely to have a material adverse impact on (a) the validity or enforceability of this Agreement or the transactions contemplated hereby or (b) the financial position, business, or results of operations of a Party, its assets or its business, taken as a whole, except to the extent resulting from (A) changes in the general local, domestic, foreign or international market conditions, (B) changes affecting generally the industries or markets in which a Party operates, (C) acts of war, sabotage or terrorism, military actions or escalation thereof, (D) any changes in applicable laws, or (E) any other action required by this Agreement.

7

"Material Contracts" has the meaning set forth in Section 5.16(a).

"Most Recent Financial Statements" has the meaning set forth in Section 5.8.

"Most Recent Fiscal Month End" means June 30, 2018.

"Most Recent Fiscal Year End" means December 31, 2017.

"Multiemployer Plan" has the meaning set forth in Section 5.24(j).

"Necessary Assets" has the meaning set forth in Section 5.5.

"Noncompetition Agreement" means that certain Noncompetition Agreement entered into by the Buyer and Stockholder as of the date hereof.

"Options" has the meaning set forth in Section 5.2.

"Ordinary Course of Business" means, with respect to either the Company or the Buyer, the ordinary course of business consistent with the regular conduct and past custom and practice (including with respect to quantity and frequency) of the Company or the Buyer.

"Organizational Documents" means the articles of incorporation, certificate of incorporation, charter, bylaws, articles or certificate of formation, regulations, operating agreement, certificate of limited partnership, partnership agreement, and all other similar documents, instruments or certificates executed, adopted, or filed in connection with the creation, formation, or organization of a Person, including any amendments thereto.

"Owned Real Property" has the meaning set forth in Section 5.6(b).

"Parties" has the meaning set forth in the preamble.

"Permits" means all written permits, consents, licenses, orders, certificates, registrations, franchises, approvals and similar rights and authorizations issued by a Governmental Authority and held by the Company, which are listed in Section 5.12 of the Disclosure Schedule.

"Permitted Encumbrances" means any of the following: (i) any liens for Taxes and assessments of Governmental Authorities not yet due and payable or that are being contested in good faith and by appropriate proceedings if adequate reserves are maintained therefor; (ii) liens of mechanics, materialmen, carriers, warehousemen or processors of labor, materials or supplies incurred in the Ordinary Course of Business (A) which are not overdue for a period of more than thirty (30) days or (B) which are being contested in good faith and by appropriate proceedings if adequate reserves are maintained therefor; and (iii) with respect to real property, easements, zoning, and similar restrictions on title.

"Person" means an individual or an Entity.

"Post-Closing Adjustment" has the meaning set forth in Section 2.6(b)(ii).

"Post-Closing Period" means any taxable period beginning after the Closing Date.

"Post-Closing Tax Return" has the meaning set forth in Section 10.1.

"Pre-Closing Period" means any taxable period ending on or before the Closing Date.

"Pre-Closing Tax Return" has the meaning set forth in Section 10.2.

"Proceeding" means any action, litigation, suit, claim, dispute, demand, investigation, review, hearing, charge, complaint or other judicial or administrative proceeding, at law or in equity, before or by any Governmental Authority or arbitration or other dispute resolution proceeding.

"Products" has the meaning set forth in Section 5.28(a).

"Purchase Price" has the meaning set forth in Section 2.2(a).

"RCRA" has the meaning set forth in the definition of "Environmental Laws".

"Real Property" means the land, together with all buildings, structures, improvements and fixtures located thereon, and all easements and other rights and interests appurtenant thereto, owned, leased, subleased or licensed by the Company.

"Receivables" means all receivables of the Company reflected in the Financial Statements or on the Books and Records of the Company.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, dumping or disposing into the Environment of Hazardous Substances.

"Resolution Period" has the meaning set forth in Section 2.6(c)(ii).

"Review Period" has the meaning set forth in Section 2.6(c)(i).

"Securities Act" means the Securities Act of 1933, as amended.

"Shares" has the meaning set forth in the Recitals.

"Specified Provisions" has the meaning set forth in Section 8.2(c).

"Statement of Objections" has the meaning set forth in Section 2.6(c)(ii).

"Stockholder" has the meaning set forth in the preamble.

"Stockholder Indemnitees" means, collectively, Stockholder and its Affiliates (including, prior to the Closing, the Company), and the officers, directors, employees and agents of Stockholder and its Affiliates.

"Straddle Period" means a Tax period or year commencing before and ending after the Closing Date.

"Subsidiary" means any Person with respect to which a specified Person (or a Subsidiary thereof), directly or indirectly, (a) owns a majority of the equity interests of an entity or has the power to vote or direct the voting of sufficient equity interests of an entity to elect a majority of the directors or a similar governing body or (b) has the power to direct the business and policies of such Person.

"Target Working Capital" means $150,000

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including

9

taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party Claim" means any Proceeding by or before any Governmental Authority or any arbitration or other alternative dispute resolution proceeding made or brought by any Person who is not a Party or an Affiliate of a Party.

"Transaction Documents" means this Agreement, the Disclosure Schedule, the Noncompetition Agreement, the Employment Agreement, and any and all other agreements, instruments, documents, schedules, exhibits and certificates entered into pursuant to this Agreement or any of the foregoing.

"Workers' Compensation Acts" means Laws that provide for awards to employees and their dependents for employment-related accidents and diseases.

## ARTICLE II
## SHARE EXCHANGE

2.1     Basic Transaction. Upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase the Shares from Stockholder, and Stockholder agrees to sell the Shares to Buyer in return for the consideration specified in this Article II.

2.2     Share Exchange.

(a)     At Closing, Stockholder shall sell, transfer, convey, assign and deliver to Buyer its Shares free and clear of all Encumbrances, in exchange for (i) $▮▮▮▮▮ in shares of the Common Stock of Buyer at a per-share price equal to the price shares of Common Stock of Buyer are offered in the IPO (the "Exchange Shares"), and (ii) USD$▮▮▮▮▮ (less any Interim Payments paid to Stockholder pursuant to Section 2.5 or adjustments pursuant to Section 2.6) in the form of a cashier's check or wire transfer to an account designated by Stockholder (the "Cash Payment: and together with the Exchange Shares, the "Purchase Price").

(b)     As a sign of Buyer's good faith, immediately following the execution of this Agreement, Buyer shall deliver a certificate representing the ▮▮▮▮▮ shares of Common Stock in the name of Stockholder. Stockholder agrees to return (i) the Exchange Shares for cancellation in the event the Closing does not occur for any reason or (ii) such portion of the Exchange Shares if the shares delivered pursuant to this Section 2.2(b) exceed $▮▮▮▮▮ in value as calculated by reference to the price shares are offered in the IPO.

2.3     Closing. On and subject to the terms set forth in this Agreement, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Greenberg Traurig, LLP in Irvine, California, commencing at 10:00 a.m. local time on the three (3) Business Days following the satisfaction of all of Buyer's conditions to close set forth in Section 7.1 but no later than December 31, 2018, or at such place, time or date as the Parties may mutually agree upon in writing. The

date of the Closing is herein referred to as the "Closing Date". The Closing shall be effective as of 12:01 a.m. as of the Closing Date.

2.4    Deliveries and Actions at Closing.  At the Closing, Stockholder shall deliver to Buyer and the Company the various certificates, instruments and documents referred to in Section 7.1 below.  At the Closing, (i) Buyer shall deliver to Stockholder the various certificates, instruments and documents referred to in Section 7.2 below, and (ii) Buyer shall deliver to Stockholder the Cash Payment in accordance with Section 2.2 above.

2.5    Interim Payments.  The Parties acknowledge that from the date of this Agreement through the Closing the Parties intend that Buyer shall act as a distributor of certain Products.  Buyer shall establish a bank account for and deposit into the account 50% of all profits, equal to the dollar amount received by Buyer for its sale of the Product less all of Buyer's out-of-pocket costs in purchasing, marketing and selling the Product (the "Profits Account").  Stockholder shall have access to the Profits Account and shall be entitled to receive, pursuant to Stockholder's written demand made from time to time, any or all of the cleared funds held in the Profits Account.  Any distributions made to Stockholder from the Profits Account shall reduce the amount of the Cash Payment to be made at Closing dollar for dollar.

2.6    Working Capital Adjustments.

(a)    Closing Adjustment.

(i)    At the Closing, the Purchase Price shall be adjusted in the following manner:

(A)    either (1) an increase by the amount, if any, by which the Estimated Closing Working Capital (as determined in accordance with Section 2.6(a)(ii)) is greater than the Target Working Capital, or (2) a decrease by the amount, if any, by which the Estimated Closing Working Capital is less than the Target Working Capital;

(B)    a decrease by the outstanding Indebtedness incurred by the Company between the signing on this Agreement and the Closing Date.

The net amount after giving effect to the adjustments listed above shall be the "Closing Date Payment."

(ii)    At least three Business Days before the Closing, Stockholder shall prepare and deliver to Buyer a statement setting forth its good faith estimate of Closing Working Capital (the "Estimated Closing Working Capital"), which statement shall contain an estimated balance sheet of the Company as of the Closing Date (without giving effect to the transactions contemplated herein), a calculation of Estimated Closing Working Capital (the "Estimated Closing Working Capital Statement"), and a certificate of the Stockholder that the Estimated Closing Working Capital Statement was prepared in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Financial Statements for the most recent fiscal year end as if such Estimated Closing Working Capital Statement was being prepared and audited as of a fiscal year end.

(b)    Post-Closing Adjustment.

(i)    Within 90 days after the Closing Date, Buyer shall prepare and deliver to Stockholder a statement setting forth its calculation of Closing Working Capital, which statement shall

11

contain an balance sheet of the Company as of the Closing Date (without giving effect to the transactions contemplated herein), a calculation of Closing Working Capital (the "Closing Working Capital Statement") and a certificate of the Buyer that the Closing Working Capital Statement was prepared in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Financial Statements for the most recent fiscal year end as if such Closing Working Capital Statement was being prepared and audited as of a fiscal year end.

(ii)     The post-closing adjustment shall be an amount equal to the Closing Working Capital minus the Estimated Closing Working Capital (the "Post-Closing Adjustment").

(c)     Examination and Review.

(i)     Examination. After receipt of the Closing Working Capital Statement, Stockholder shall have 30 days (the "Review Period") to review the Closing Working Capital Statement. During the Review Period, Stockholder and Stockholder's accountants shall have full access to the books and records of the Company, the personnel of, and work papers prepared by, Buyer and/or Buyer's accountants to the extent that they relate to the Closing Working Capital Statement and to such historical financial information (to the extent in Buyer's possession) relating to the Closing Working Capital Statement as Stockholder may reasonably request for the purpose of reviewing the Closing Working Capital Statement and to prepare a Statement of Objections (defined below), provided, that such access shall be in a manner that does not interfere with the normal business operations of Buyer or the Company.

(ii)     Objection. On or prior to the last day of the Review Period, Stockholder may object to the Closing Working Capital Statement by delivering to Buyer a written statement setting forth Stockholder's objections in reasonable detail, indicating each disputed item or amount and the basis for Stockholder's disagreement therewith (the "Statement of Objections"). If Stockholder fails to deliver the Statement of Objections before the expiration of the Review Period, the Closing Working Capital Statement and the Post-Closing Adjustment, as the case may be, reflected in the Closing Working Capital Statement shall be deemed to have been accepted by Stockholder. If Stockholder delivers the Statement of Objections before the expiration of the Review Period, Buyer and Stockholder shall negotiate in good faith to resolve such objections within 30 days after the delivery of the Statement of Objections (the "Resolution Period"), and, if the same are so resolved within the Resolution Period, the Post-Closing Adjustment and the Closing Working Capital Statement with such changes as may have been previously agreed in writing by Buyer and Stockholder, shall be final and binding.

(iii)     Resolution of Disputes. If Stockholder and Buyer fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("Disputed Amounts" and any amounts not so disputed, the "Undisputed Amounts") shall be submitted for resolution to the office of an impartial nationally recognized firm of independent certified public accountants other than Stockholder's accountants or Buyer's accountants (the "Independent Accountant") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Adjustment, as the case may be, and the Closing Working Capital Statement. The parties hereto agree that all adjustments shall be made without regard to materiality. The Independent Accountant shall only decide the specific items under dispute by the parties and their decision for each Disputed Amount must be within the range of values assigned to each such item in the Closing Working Capital Statement and the Statement of Objections, respectively.

(iv)     Fees of the Independent Accountant. The fees and expenses of the Independent Accountant shall be paid by Stockholder, on the one hand, and by Buyer, on the other hand,

12

based upon the percentage that the amount actually contested but not awarded to Stockholder or Buyer, respectively, bears to the aggregate amount actually contested by Stockholder and Buyer.

(v)     Determination by Independent Accountant. The Independent Accountant shall make a determination as soon as practicable within 30 days (or such other time as the parties hereto shall agree in writing) after their engagement, and their resolution of the Disputed Amounts and their adjustments to the Closing Working Capital Statement and/or the Post-Closing Adjustment shall be conclusive and binding upon the parties hereto.

(vi)    Payments of Post-Closing Adjustment. Except as otherwise provided herein, any payment of the Post-Closing Adjustment, together with interest calculated as set forth below, shall (A) be due (x) within five Business Days of acceptance of the applicable Closing Working Capital Statement or (y) if there are Disputed Amounts, then within five Business Days of the resolution described in clause (v) above; and (B) be paid by wire transfer of immediately available funds to such account as is directed by Buyer or Stockholder, as the case may be.

(vii)   Adjustments for Tax Purposes. Any payments made pursuant to Section 2.6 shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

2.7     Company Lease. Concurrently with the execution of this Agreement, the Company and the Buyer shall execute that certain Company Lease in the form attached hereto as Exhibit F.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF STOCKHOLDER REGARDING THE TRANSACTION

Stockholder represents and warrants to Buyer that the statements contained in this Article III are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article III), except as set forth in the disclosure schedule delivered by Stockholder to Buyer on the date of this Agreement (the "Disclosure Schedule").

3.1     Authorization of Transaction. Stockholder has the requisite power and authority to execute and deliver this Agreement and to perform their obligations under this Agreement. Stockholder's execution, delivery and performance of this Agreement and the execution, delivery and performance of all other agreements and instruments by Stockholder in connection with this Agreement and the transactions contemplated under this Agreement have been duly authorized by all requisite action on the part of Stockholder in accordance with applicable Law (including obtaining any spousal consent to the extent appropriate in light of applicable community property Laws to which Stockholder is subject).  This Agreement and all other agreements and instruments by Stockholder in connection with this Agreement have been duly executed by Stockholder, and constitute the valid and legally binding obligation of Stockholder, enforceable against Stockholder in accordance with their terms and conditions, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting creditor's rights generally and general principles of equity.

3.2     Noncontravention. Except as set forth in Section 3.2 of the Disclosure Schedule, neither the execution or the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (a) violate any Law, Decree, or other restriction of any Governmental Authority to which Stockholder is subject, (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any Person a cause of action, the right to accelerate, terminate, modify, or cancel,

13

or require any notice under, any agreement, contract, lease, license, instrument, or other arrangement to which Stockholder or the Company is a party or by which they or it is bound or to which any of their or its assets are subject, or (c) result in the imposition or creation of an Encumbrance upon or with respect to the Shares or any of the Company's properties or assets. Neither Stockholder nor the Company are required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Person in order to consummate the transactions contemplated by this Agreement except as expressly set forth in Section 3.2 of the Disclosure Schedule.

3.3     Brokers' Fees.  Except as set forth in Section 3.3 of the Disclosure Schedule, neither Stockholder nor the Company have any Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by the Transaction Documents and have retained no such broker, finder or agent with respect to such transactions.

3.4     Shares.  Stockholder holds of record and owns beneficially all of the Shares as set forth in Section 3.4 of the Disclosure Schedule.  The delivery of the Shares to Buyer pursuant to the terms of this Agreement will transfer to Buyer valid legal and beneficial title to all such Shares, free and clear of any restrictions on transfer (other than any restrictions under the Securities Act and state securities laws), Taxes, Encumbrances, options, warrants, purchase rights, contracts, commitments, equities, claims and demands. Except as set forth in Section 3.4 of the Disclosure Schedule, Stockholder is not a party to (i) any agreement (other than this Agreement) that could require Stockholder to sell, transfer or otherwise dispose of any capital stock or other security interest in or issued by the Company, or (ii) any voting trust, proxy or other agreement or understanding with respect to the voting of any capital stock or other security interest in or issued by the Company.  Any agreement set forth on Section 3.4 of the Disclosure Schedule shall be terminated and of no further force or effect as of the Closing.

3.5     Solvency.  Stockholder is, and immediately after giving effect to the transactions contemplated by this Agreement shall be, able to pay its debts as they become due.  Stockholder owns, and immediately after giving effect to the transactions contemplated by this Agreement will own, assets that have a fair saleable value greater than the amounts required to pay her debts (including a reasonable estimate of the amount of all contingent liabilities).  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Stockholder.

3.6     Absence of Claims.  Neither Stockholder nor any Affiliate of Stockholder have any claim, contingent or otherwise, against the Company or the officers, directors, managers, employees, Affiliates, predecessors, successors or assigns of the Company, including, but not limited to, any claims which relate to or arise out of Stockholder's or any Affiliate of Stockholder's prior relationship with the Company or his, her or its rights or status as an equity holder, officer, director, manager, or employee of the Company.

3.7     Purchase Entirely for Own Account.  The Stockholder is acquiring the Exchange Shares proposed to be acquired hereunder for investment for its own account and not with a view to the resale or distribution of any part thereof, and the Stockholder has no present intention of selling or otherwise distributing the Exchange Shares, except in compliance with applicable securities laws.

3.8     Available Information.  The Stockholder has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in Buyer and has had full access to all the information it considers necessary or appropriate to make an informed investment decision with respect to the Exchange Shares.

3.9     Non-Registration. The Stockholder understands that the Exchange Shares have not been registered under the Securities Act, and, if issued in accordance with the provisions of this Agreement, will be issued by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Stockholder's representations as expressed herein. The non-registration shall have no prejudice with respect to any rights, interests, benefits and entitlements attached to the Exchange Shares in accordance with Buyer's certificate of incorporation or bylaws or the laws of its jurisdiction of incorporation.

3.10     Restricted Securities. The Stockholder understands that the Exchange Shares are characterized as "restricted securities" under the Securities Act. The issuance of the Exchange Shares hereunder is being effected in reliance upon an exemption from registration afforded under Section 4(a)(2) of the Securities Act for transactions by an issuer not involving a public offering. The Stockholder further acknowledges that if the Exchange Shares are issued to the Stockholder in accordance with the provisions of this Agreement, such Exchange Shares may not be resold without registration under the Securities Act or the existence of an exemption therefrom. The Stockholder represents that it is familiar with Rule 144 promulgated under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

3.11     Legends. It is understood that the Exchange Shares will bear the following legend or one that is substantially similar to the following legend:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND NEITHER SUCH SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR OTHERWISE TRANSFERRED EXCEPT (1) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR (2) PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, IN WHICH CASE THE HOLDER MUST, PRIOR TO SUCH TRANSFER, FURNISH TO THE COMPANY AN OPINION OF COUNSEL, WHICH COUNSEL AND OPINION ARE REASONABLY SATISFACTORY TO THE COMPANY, THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR OTHERWISE TRANSFERRED IN THE MANNER CONTEMPLATED PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.

3.12     Additional Legend. Additionally, the Exchange Shares will bear any legend required by the "blue sky" laws of any state to the extent such laws are applicable to the securities represented by the certificate so legended.

3.13     Accredited Investor. The Stockholder represents and warrants that he, she or it is an Accredited Investor as that term is defined in Rule 501 of Regulation D under the Securities Act.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER REGARDING THE TRANSACTION**

Buyer represents and warrants to Stockholder that the statements contained in this Article IV are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article IV).

15

4.1     Organization.  Buyer is duly organized, validly existing, and in good standing under the Laws of the jurisdiction of the State of Delaware.

4.2     Authorization of Transaction.  Buyer has the requisite power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.  Buyer's execution, delivery and performance of this Agreement and the execution, delivery and performance of all other agreements and instruments by Buyer in connection with this Agreement and the transactions contemplated under this Agreement have been duly authorized by all requisite organizational or other action on the part of Buyer in accordance with applicable Law.  This Agreement and all other agreements and instruments by Buyer in connection with this Agreement have been duly executed by Buyer and constitute the valid and legally binding obligation of Buyer, enforceable against it in accordance with their terms and conditions, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting creditor's rights generally and general principles of equity.

4.3     Noncontravention.  Neither the execution or the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (a) violate any Law, Decree, or other restriction of any Governmental Authority to which Buyer is subject or any provision of its Organizational Documents or (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any Person a cause of action, the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject.  Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Person which has not already been obtained in order to consummate the transactions contemplated by this Agreement.

4.4     Brokers' Fees.  Buyer has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by the Transaction Documents for which Stockholder or any of her Affiliates could become liable or obligated and have retained no such broker, finder or agent with respect to such transactions.

4.5     Litigation.  Section 4.5 of the Disclosure Schedule sets forth each instance in which the Buyer (i) is, or has been at any time subject to any outstanding Decree or (ii) is, or has been at any time a party or, to the Knowledge of the Buyer, is threatened to be made a party to, any Proceeding of, in, or before any Governmental Authority or before any arbitrator.  None of the Proceedings set forth in Section 4.5 of the Disclosure Schedule has resulted, or could result, in any Material Adverse Effect.  To the Knowledge of the Buyer, no event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a Basis for the commencement of any Proceeding against or involving the Buyer.

4.6     Investment Purpose.  Buyer is acquiring the Shares solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. Buyer acknowledges that the Shares are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Shares may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable. Buyer is able to bear the economic risk of holding the Shares for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

4.7     Capitalization.  Section 4.8 of the Disclosure Schedule sets forth the aggregate number and description of the authorized and issued and outstanding capital stock of the Buyer.  All of the issued and outstanding capital stock of the Buyer have been duly authorized and are validly issued, fully paid and non-assessable.  Except as set forth in Section 4.8 of the Disclosure Schedule, there are no outstanding or

16

authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that could require the Buyer to issue, sell or otherwise cause to become outstanding any of its capital stock (collectively, "Options"). There are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the Buyer and no payments owing by the Buyer to any former stockholder of the Buyer in connection with the Buyer's capital stock. There are no voting trusts, proxies or other agreements or understandings with respect to the voting of the Shares of the Buyer.

4.8     Capitalization.  Section 4.8 of the Disclosure Schedule sets forth the aggregate number and description of the authorized and issued and outstanding capital stock of the Buyer. All of the issued and outstanding capital stock of the Buyer have been duly authorized and are validly issued, fully paid and non-assessable. Except as set forth in Section 4.8 of the Disclosure Schedule, there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that could require the Buyer to issue, sell or otherwise cause to become outstanding any of its capital stock (collectively, "Options"). There are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the Buyer and no payments owing by the Buyer to any former stockholder of the Buyer in connection with the Buyer's capital stock. There are no voting trusts, proxies or other agreements or understandings with respect to the voting of the Shares of the Buyer.

4.9     Financial Statements.  Section 4.10 of the Disclosure Schedule sets forth the following financial statements (collectively, the "Buyer Financial Statements"): (i) unaudited balance sheets and statements of income and retained earnings, income and cash flow of Buyer as of and for the fiscal year ended December 31, 2017, prepared in a manner consistent with GAAP; and (ii) unaudited balance sheet and income statements of Buyer as of and for the Most Recent Fiscal Month End, prepared in a manner consistent with GAAP (the "Most Recent Buyer Financial Statements"). The Buyer Financial Statements present fairly the financial condition of Buyer in all material respects as of such dates, the assets and liabilities of Buyer, and the results of operations of Buyer for such periods, are correct and complete, and are consistent with the books and records of Buyer (which books and records are true, correct, and complete).

4.10     Undisclosed Liabilities.  Except as set forth in Section 4.11 of the Disclosure Schedule, Buyer has no Liabilities (and, to the Knowledge of Buyer, there is no Basis for any present or future Proceeding against Buyer giving rise to any Liability), except for (i) Liabilities set forth on the face of the Most Recent Buyer Financial Statements, and (ii) Liabilities which have arisen after the Most Recent Fiscal Month End in the Ordinary Course of Business (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement, or violation of Law).

4.11     Intellectual Property.  Section 4.12 of the Disclosure Schedule contains a list and description of all material foreign and domestic patents, patent rights, trademarks, service marks, trade names, brands, and copyrights (whether or not registered and, if applicable, including pending applications for registration) owned, used, licensed, or controlled by Buyer and all goodwill associated therewith. Buyer owns or has the right to use and shall as of the Closing Date own or have the right to use any and all information, know-how, trade secrets, patents, copyrights, trademarks, tradenames, software, formulae, methods, processes, and other intangible properties that are necessary, in all material respects, or customarily used by Buyer for the ownership, management, or operation of its properties ("Buyer Intellectual Property Rights"), including, but not limited to, the Buyer Intellectual Property Rights listed on Section 4.12 of the Disclosure Schedule. Except as set forth on Section 4.12 of the Disclosure Schedule, (i) Buyer is the sole and exclusive owner of all right, title, and interest in and to all of the Intellectual Property, and has the exclusive right to use and license the same, free and clear of any claim or conflict

17

with the Buyer Intellectual Property Rights of others; (ii) no royalties, honorariums, or fees are payable by Buyer to any Person by reason of the ownership or use of any of the Buyer Intellectual Property Rights; (iii) there have been no claims made against Buyer asserting the invalidity, abuse, misuse, or unenforceability of any of the Buyer Intellectual Property Rights, and no grounds for any such claims exist; (iv) Buyer has not made any claim of any violation or infringement by others of any of the Buyer Intellectual Property Rights or interests therein and, to the Knowledge of Buyer, no grounds for any such claims exist; (v) Buyer has not received any notice that it is in conflict with or infringing upon the asserted intellectual property rights of others in connection with the Buyer Intellectual Property Rights, and neither the use of the Buyer Intellectual Property Rights nor the operation of Buyer's businesses is infringing or has infringed upon any intellectual property rights of others; (vi) the Buyer Intellectual Property Rights are sufficient and include all intellectual property rights necessary for Buyer to lawfully conduct its business as presently being conducted; (vii) no interest in any of the Buyer Intellectual Property Rights has been assigned, transferred, licensed, or sublicensed by Buyer to any Person other than Buyer pursuant to this Agreement; (viii) to the extent that any item constituting part of the Buyer Intellectual Property Rights has been registered with, filed in, or issued by, any Governmental Authority, such registrations, filings, or issuances are listed on Section 4.12 of the Disclosure Schedule and were duly made and remain in full force and effect; (ix) to the Knowledge of Buyer, there has not been any act or failure to act by Buyer or any of its members, managers, officers, employees, attorneys, or agents during the prosecution or registration of, or any other proceeding relating to, any of the Buyer Intellectual Property Rights or of any other fact which could render invalid or unenforceable, or negate the right to issuance of any of the Buyer Intellectual Property Rights; (x) to the extent any of the Buyer Intellectual Property Rights constitutes proprietary or confidential information, Buyer has adequately safeguarded such information from disclosure; and (xi) all of Buyer's current Buyer Intellectual Property Rights will remain in full force and effect immediately following the Closing without alteration or impairment.

### ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF STOCKHOLDER REGARDING THE COMPANY

Stockholder represents and warrants to Buyer that the statements contained in this Article V are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article V), except as set forth in the Disclosure Schedule:

5.1    <u>Organization, Qualification, Corporate Power and Authorization</u>. The Company is duly organized, validly existing, and in good standing under the Laws of the State of California. The Company is duly authorized to conduct business and are in good standing under the Laws of each jurisdiction where such qualification is required as set forth in Section 5.1 of the Disclosure Schedule except where the absence of such qualification would not have a Material Adverse Effect. The Company has full corporate power and authority and all licenses, permits, and authorizations necessary to carry on the Business and to own and use the properties owned and used by them except where the absence of such license, permit or authorization would not have a Material Adverse Effect. Section 5.1 of the Disclosure Schedule lists the directors and officers of the Company. Stockholder has delivered to Buyer copies of the Organizational Documents of the Company (as amended to date). Except as set forth in Section 5.1 of the Disclosure Schedule, the Company's minute books (containing the records of meetings of the stockholders, the board of directors and any committees of the board of directors) are correct and complete in all material respects, stock record books for the Company are correct and complete in all respects. The Company has delivered to Buyer correct and complete copies of its minute books, stock record books. The Company is not in default under or in violation of any provision of their Organizational Documents.

18

5.2     Capitalization.  Section 5.2 of the Disclosure Schedule sets forth the aggregate number and description of the authorized and issued and outstanding capital stock of the Company.  All of the issued and outstanding capital stock of the Company have been duly authorized and are validly issued, fully paid and non-assessable.  Except as set forth in Section 5.2 of the Disclosure Schedule, there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that could require the Company to issue, sell or otherwise cause to become outstanding any of its capital stock (collectively, "Options").  There are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the Company and no payments owing by the Company or the Stockholder to any former stockholder of the Company in connection with the Company's capital stock.  There are no voting trusts, proxies or other agreements or understandings with respect to the voting of the Shares of the Company.  Any Options set forth in Section 5.2 of the Disclosure Schedule shall be cancelled or redeemed in full as of the Closing and the Company shall have further no liability or obligation in respect of such Options.  Any agreement set forth on Section 5.2 of the Disclosure Schedule shall be terminated and of no further force or effect as of the Closing. None of the Shares have been certificated.

5.3     Noncontravention.  Except as set forth in Section 5.3 of the Disclosure Schedule, neither the execution or the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (a) violate any Law, Decree or other restriction of any Governmental Authority to which the Company is subject or any provision of the Organizational Documents of the Company or (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any Person a cause of action, the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Company is a party or by which it is bound or to which any of its assets are subject (or result in the imposition of any Encumbrance upon any of its assets, or result in any third party discontinuing to do business with the Company due to provisions regarding the Company's ownership contained in the prior contracts that such third party may have entered into with the Company within the past five years).  Except as set forth in Section 5.3 of the Disclosure Schedule, the Company is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Person in order for the Parties to consummate the transactions contemplated by this Agreement.

5.4     Brokers' Fees; Company Transaction Expenses.  Except as set forth in Section 5.4 of the Disclosure Schedule, the Company has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by the Transaction Documents and have retained no such broker, finder or agent with respect to such transactions.

5.5     Tangible Assets.  The Company has good and marketable (and, in the case of Owned Real Property, good and marketable fee simple) title to, or a valid leasehold interest in, all Real Property, buildings, improvements, Equipment, Inventory and other tangible assets shown on the Most Recent Financial Statements or acquired after the date thereof, or otherwise used in connection with the operation of the Business in the manner presently operated by the Company (the "Necessary Assets"), free and clear of all Encumbrances (other than the Permitted Encumbrances and other Encumbrances set forth in Section 5.5 of the Disclosure Schedule), except for properties and assets disposed of in the Ordinary Course of Business since the date of the Most Recent Financial Statements.  Without limiting the generality of the foregoing, no Necessary Asset is owned by Stockholder or any Affiliate of Stockholder (other than the Company).  To the Knowledge of the Company, other than as set forth in Section 5.5 of the Disclosure Schedule, Section 5.17(b) of this Agreement and Section 5.17(b) of the Disclosure Schedule thereto and normal wear and tear excepted, each material tangible asset owned or leased by the Company (including all material Inventory and Equipment) is free from material defects (patent and latent), is in commercially reasonable repair and operating condition subject to routine maintenance and has been maintained in accordance with customary practices of the Company and is suitable for the purposes for which the

19

Company is presently using such asset.  To the Knowledge of the Company, other than as set forth in Section 5.5 of the Disclosure Schedule, no material item of Equipment is in need of repair or replacement other than as part of routine maintenance in the Ordinary Course of Business.  All of the Equipment is in the possession of the Company.

      5.6    <u>Real Property</u>.

      (a)    Section 5.6(a) of the Disclosure Schedule sets forth the address of each parcel of Real Property leased by the Company, and a true and complete list of all Leases for each such Leased Real Property.  Stockholder has delivered to Buyer a true and complete copy of each such Lease document.  Except as set forth in Section 5.6(a) of the Disclosure Schedule, with respect to each of the Leases: (i) such Lease is in full force and effect and legal, valid, binding, and enforceable against the Company and, to the Knowledge of the Company, any other party thereto; (ii) the sale of the Shares to Buyer pursuant to this Agreement does not require the consent of any other party to such Lease, will not result in a breach of or default under such Lease, or otherwise cause such Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing; (iii) no possession and quiet enjoyment of the Leased Real Property by the Company under such Lease has been disturbed; (iv) neither the Company nor, to the Knowledge of the Company, any other party to such Lease is in material breach or default under such Lease, and, to the Knowledge of the Company, no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would reasonably be expected to constitute such a material breach or default, or permit the termination, modification or acceleration of rent under such Lease; (v) the Company has not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; (vi) to the Knowledge of the Company, the Leased Real Property is in material compliance with all applicable building, zoning, subdivision, health and safety and other land use laws, including the Americans with Disabilities Act of 1990, as amended; (vii) to the Knowledge of the Company, the Company has obtained all material licenses, permits, building permits and occupancy permits that are required to permit the use and occupancy of the Leased Real Property as presently used by the Company in connection with the Business; and (viii) there are no unwritten or oral modifications to the Leases or any course of dealing or business operations that could reasonably be construed as a modification to the Leases.

      (b)    Section 5.6(b) of the Disclosure Schedule sets forth the address of each parcel of Real Property owned by the Company (the "Owned Real Property").  Stockholder has delivered to Buyer a true and complete copy of the deeds and other instruments (as recorded) by which the Company acquired such Owned Real Property, and copies of all title insurance policies, opinions, abstracts and surveys in the possession of Stockholder or the Company and relating to the Owned Real Property.  Except as set forth in Section 5.6(b) of the Disclosure Schedule, with respect to each parcel of Owned Real Property: (i) the Company has not leased, licensed or otherwise granted any Person the right to use or occupy such Owned Real Property or any portion thereof; (ii) to the Knowledge of the Company, the Owned Real Property is in material compliance with all applicable building, zoning, subdivision, health and safety and other land use laws, including the Americans with Disabilities Act of 1990, as amended; (iii) to the Knowledge of the Company, the Company has obtained all material licenses, permits, building permits and occupancy permits that are required to permit the use and occupancy of the Owned Real Property as presently used by the Company in connection with the Business; (iv) no material improvements constituting a part of the Owned Real Property encroach on real property owned or leased by a Person other than the Company; and (v) there are no Proceedings pending nor, to the Knowledge of the Company, threatened against or affecting the Owned Real Property or any portion thereof or interest therein in the nature or in lieu of condemnation or eminent domain proceedings.

      5.7    <u>Subsidiaries</u>.  The Company does not own any equity interest in another Person nor control directly or indirectly any Person.

20

5.8     Financial Statements and Projections.

(a)     Section 5.8(a) of the Disclosure Schedule sets forth the following financial statements (collectively, the "Financial Statements"): (i) balance sheets and statements of income and retained earnings, income and cash flow of the Company as of and for the fiscal years ended December 31, 2016, and 2017, all prepared in a manner consistent with GAAP; and (ii) unaudited balance sheet and income statements of the Company (the "Most Recent Financial Statements") as of and for the Fiscal Month End, June 30th 2018, prepared in a manner consistent with GAAP.  The Financial Statements present fairly the financial condition of the Company in all material respects as of such dates, the assets and liabilities of the Company, and the results of operations of the Company for such periods, are correct and complete, and are consistent with the Books and Records of the Company (which Books and Records are true, correct, and complete).  The Company has maintained systems of internal accounting controls sufficient to provide reasonable assurances that (A) all transactions are executed in accordance with management's general or specific authorization, (B) all transactions are recorded as necessary to permit the preparation of annual and interim financial statements in conformity with GAAP, and to maintain proper accountability for items, and (C) access to the Company's property and assets is permitted only in accordance with management's general or specific authorization.

(b)     Section 5.8(b) of the Disclosure Schedule sets forth certain financial projections of the Company provided by the Company to the Buyer (collectively, the "Financial Projections").  Stockholder has no reason to believe that the Financial Projections as presented are not achievable by the Company.

5.9     Events Subsequent to Most Recent Fiscal Year End.  Except as otherwise specifically contemplated by this Agreement and as set forth in Section 5.9 of the Disclosure Schedule, since the Most Recent Fiscal Year End, the Company has conducted the Business only in the Ordinary Course of Business and there has not been any Material Adverse Change.

5.10     Undisclosed Liabilities; Indebtedness.

(a)     Except as set forth in Section 5.10(a) of the Disclosure Schedule, the Company has no Liabilities (and, to the Knowledge of the Company, there is no Basis for any present or future Proceeding against the Company giving rise to any Liability), except for (i) Liabilities set forth on the face of the Most Recent Financial Statements, and (ii) Liabilities which have arisen after the Most Recent Fiscal Month End in the Ordinary Course of Business (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement, or violation of Law).

(b)     Except as set forth in Section 5.10(b) of the Disclosure Schedule, the Company has no Indebtedness.

5.11     Legal Compliance.  Except as set forth in Section 5.11 of the Disclosure Schedule, the Company has complied and is in compliance, in all material respects, with all applicable Laws, and no Proceeding or notice has been filed or commenced against the Company alleging any failure to so comply.  Without limiting the generality of the foregoing, the Company has not received any notice of violation or non-compliance from any Governmental Authority.  Any and all audits carried out by the Company or a third party, in the past five years, with respect to the Company's compliance with any and all applicable Laws have been satisfactory in all respects and to the extent that any deficiencies were noted in any such audits, the Company has promptly cured such deficiencies.

5.12     Permits.  The Permits, as set forth in Section 5.12 of the Disclosure Schedule, include all material permits, consents, licenses, orders, certificates, registrations, qualifications, franchises, approvals

and similar rights and authorizations owned and possessed by the Company to conduct the Business as currently conducted. The Company is in material compliance with all such Permits and such Permits are in full force and effect. Other than the Permits, no material permits, consents, licenses, orders, certificates, registrations, franchises, approvals or similar rights and authorizations are required to be owned or possessed by the Company to conduct the Business as currently conducted.

     5.13    Environmental Compliance.

        (a)    The Company is in compliance with all Environmental Laws in all material respects and is not identified on (i) the current or proposed National Priorities List under 40 C.F.R. § 300, (ii) the Comprehensive Environmental Response, Compensation and Liability Inventory System ("CERCLIS") list or (iii) any similar list arising from any Law similar to CERCLA applicable in the U.S. or any foreign country. The Company has not received any notification from any Governmental Authority or any other Person alleging, claiming or notifying them that the Company is in violation of any Environmental Laws, and no Basis exists for the Company to receive such notification. The Company is also in compliance with all of their own policies and procedures regarding regulatory and environmental compliance.

        (b)    Neither the Company nor Stockholder have received any citations, notices of non-compliance or notices of violation from the federal Environmental Protection Agency ("EPA") or other Governmental Authorities with similar responsibilities. The Company is not subject to any Decrees issued by the EPA or any such other Governmental Authority.

        (c)    After the Closing, neither Buyer nor the Company will be liable for any fines, penalties, fees, Taxes or other charges assessed against the Company or Stockholder with respect to the Business, under Environmental Laws by Governmental Authorities with respect to operations, notices of violation, cessation orders, closure orders, show cause orders or other enforcement actions issued by a Governmental Authority, or any other Environmental Matter prior to Closing. Neither this Agreement nor the consummation of the transactions hereunder will result in any Liabilities being imposed on the Company or Buyer with respect to the Business, for site investigation or cleanup, or notification to or consent of any Governmental Authority or third parties, pursuant to any of the so-called "transaction-triggered" or "responsible property transfer" Environmental Laws.

        (d)    (i) Except in compliance with applicable Laws, none of the assets of the Company are being, or has been during the previous five (5) years, used in any manner associated with the production, manufacture, processing, generation, storage, treatment, disposal, management, shipment or transportation of Hazardous Substances, and no such assets are Contaminated by any Hazardous Substance; (ii) there are no underground storage tanks regulated pursuant to RCRA §§ 9001 et seq.(42 U.S.C. §§ 6991 et seq.) or equivalent authorized state or foreign program, and no above ground storage tanks, located at, on, in or under the leased Real Property; (iii) there is no asbestos-containing material in any form or condition located at, on, in or under any of the assets of the Company; (iv) there are no materials or equipment containing polychlorinated biphenyls located at, on, in or under the assets of the Company; (v) there are no landfills or other areas located at, on, in or under the assets of the Company where Hazardous Substances have been disposed; (vi) the Company has not disposed of any Hazardous Substance at any offsite disposal area located on the property of any other Person, other than a facility permitted by any Governmental Authority with jurisdiction to receive such Hazardous Substance; and (vii) the leased Real Property is not Contaminated with any Hazardous Substance.

5.14    Taxes.

(a)    Except as set forth in Section 5.14(a) of the Disclosure Schedule, the Company has timely filed all Tax Returns that it was required to file under applicable Laws.  All such Tax Returns were correct and complete in all material respects and were prepared in substantial compliance with all applicable Laws.  Except as set forth in Section 5.14(a) of the Disclosure Schedule, all Taxes due and owing by the Company (whether or not shown on any Tax Return) have been paid or accrued on the Financial Statements. Except as set forth in Section 5.14(a) of the Disclosure Schedule, the Company is not currently the beneficiary of any extension of time within which to file any Tax Return.  No claim has ever been made to the Company in writing or, to the Knowledge of the Company, by any other means, by an authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction.  There are no Encumbrances on any of the assets of the Company that arose in connection with any failure (or alleged failure) to pay any Tax.

(b)    Except as set forth in Section 5.14(b) of the Disclosure Schedule, the Company has withheld and timely paid all Taxes required to have been withheld and paid and have complied with all requirements under Law with respect to such Tax withholdings, including information reporting and record maintenance requirements.

(c)    Neither Stockholder nor any director or officer (or employee responsible for Tax matters) of the Company expects any Government Authority to assess any additional Taxes for any period for which Tax Returns have been filed.  No federal, state, local, or non-U.S. tax audits or administrative or judicial Tax Proceedings are pending or being conducted with respect to the Company, and, to the Knowledge of the Company, no such Proceeding is threatened. The Company has not received from any federal, state, local, or non-U.S. taxing authority (including jurisdictions where the Company have not filed Tax Returns) any (i) notice indicating an intent to open an audit or other review, (ii) request for information related to Tax matters, or (iii) notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any taxing authority against the Company.  There is no dispute concerning any Tax Liability of the Company either (A) claimed or raised by any Government Authority in writing or (B) as to which the Company has Knowledge based upon personal contact with any agent of such Government Authority.  Section 5.14(c) of the Disclosure Schedule (x) lists all federal, state, local and foreign Tax Returns filed by the Company for taxable periods ended after December 31, 2010, (y) indicates those Tax Returns that have been audited by any Tax authority, and (z) indicates those Tax Returns that currently are the subject of any audit or Proceeding.  The Company has delivered to Buyer correct and complete copies of all Tax Returns filed by the Company and all examination reports and statements of deficiencies assessed against or agreed to by the Company, since December 31, 2010.  To the Knowledge of the Company, the Company has complied, in all material respects, with all applicable Laws regarding Taxes, including those governing retention of records.

(d)    No audits or examinations relating to Taxes by any taxing Governmental Authority have occurred for the Company's taxable years ending after December 31, 2010.

(e)    The Company has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(f)    Except as set forth in Section 5.14(f) of the Disclosure Schedule, the Company is not a party to or bound by any Tax allocation or sharing agreement, Tax indemnity obligation or similar agreement with respect to Taxes (including any advance pricing agreement, closing agreement or other agreement relating to Taxes with any taxing Government Authority) or any agreement, contract, arrangement or plan that has resulted or could result, separately or in the aggregate, in the payment of (i)

23

any "excess parachute payment" within the meaning of Code §280G (or any corresponding provision of state, local, or non-U.S. Tax law).

(g)     Section 5.14(g) of the Disclosure Schedule sets forth a list of all foreign countries in which the Company has engaged in a trade or business, or from which the Company has materially derived income.

(h)     (i) The Company is not and has not been a United States real property holding corporation within the meaning of Code §897(c)(2) during the applicable period specified in Code §897(c)(1)(A)(ii), and no Stockholder is a foreign person within the meaning of Code §1445; (ii) the Company has never been a party to any "reportable transaction," as defined in Code §6707A(c)(1) and Treas. Reg. §1.6011-4(b).

(i)     The unpaid Taxes of the Company (i) did not, as of the Most Recent Fiscal Month End, exceed the net amount of prepaid Taxes and Tax Liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Most Recent Financial Statements (rather than in any notes thereto) and (ii) do not exceed that net amount as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company in filing its Tax Returns.

(j)     The Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any (i) change in method of accounting for a taxable period ending on or prior to the Closing Date; (ii) "closing agreement" as described in Code §7121 (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Closing Date; (iii) inter-company transaction or any excess loss account described in Treasury Regulations under Code §1502 (or any corresponding or similar provision of state, local or foreign income Tax law); (iv) installment sale or open transaction disposition made on or prior to the Closing Date; or (v) prepaid amount received on or prior to the Closing Date.

5.15     Intellectual Property and Software.  Section 5.15 of the Disclosure Schedule contains a list and description of all material foreign and domestic patents, patent rights, trademarks, service marks, trade names, brands, and copyrights (whether or not registered and, if applicable, including pending applications for registration) owned, used, licensed, or controlled by the Company and all goodwill associated therewith. The Company owns or has the right to use and shall as of the Closing Date own or have the right to use any and all information, know-how, trade secrets, patents, copyrights, trademarks, tradenames, software, formulae, methods, processes, and other intangible properties that are necessary, in all material respects, or customarily used by the Company for the ownership, management, or operation of its properties ("Intellectual Property Rights"), including, but not limited to, the Intellectual Property Rights listed on Section 5.15 of the Disclosure Schedule.  Except as set forth on Section 5.15 of the Disclosure Schedule, (i) the Company is the sole and exclusive owner of all right, title, and interest in and to all of the Intellectual Property, and has the exclusive right to use and license the same, free and clear of any claim or conflict with the Intellectual Property Rights of others; (ii) no royalties, honorariums, or fees are payable by the Company to any Person by reason of the ownership or use of any of the Intellectual Property Rights; (iii) there have been no claims made against the Company asserting the invalidity, abuse, misuse, or unenforceability of any of the Intellectual Property Rights, and no grounds for any such claims exist; (iv) the Company has not made any claim of any violation or infringement by others of any of its Intellectual Property Rights or interests therein and, to the Knowledge of the Company, no grounds for any such claims exist; (v) the Company has not received any notice that it is in conflict with or infringing upon the asserted intellectual property rights of others in connection with the Intellectual Property Rights, and neither the use of the Intellectual Property Rights nor the operation of the Company's businesses is infringing or has

24

infringed upon any intellectual property rights of others; (vi) the Intellectual Property Rights are sufficient and include all intellectual property rights necessary for the Company to lawfully conduct its business as presently being conducted; (vii) no interest in any of the Company's Intellectual Property Rights has been assigned, transferred, licensed, or sublicensed by the Company to any Person other than Buyer pursuant to this Agreement; (viii) to the extent that any item constituting part of the Intellectual Property Rights has been registered with, filed in, or issued by, any Governmental Authority, such registrations, filings, or issuances are listed on Section 5.15 of the Disclosure Schedule and were duly made and remain in full force and effect; (ix) to the Knowledge of the Company, there has not been any act or failure to act by the Company or any of its members, managers, officers, employees, attorneys, or agents during the prosecution or registration of, or any other proceeding relating to, any of the Intellectual Property Rights or of any other fact which could render invalid or unenforceable, or negate the right to issuance of any of the Intellectual Property Rights; (x) to the extent any of the Intellectual Property Rights constitutes proprietary or confidential information, the Company has adequately safeguarded such information from disclosure; and (xi) all of the Company's current Intellectual Property Rights will remain in full force and effect immediately following the Closing without alteration or impairment.

     5.16    Contracts.

       (a)    Except as set forth in Section 5.16(a) of the Disclosure Schedule, the Company is not a party to or bound by any: (i) Contract containing covenants not to compete in any line of business, industry or geographical area restricting the Business; (ii) Contract which creates a partnership or joint venture or similar arrangement between the Company and another Person or any options, rights (preemptive or otherwise), warrants, calls, convertible securities or commitments or any other agreements or arrangements with respect to any equity securities of the Company; (iii) indenture, letters of credit, credit agreement, loan agreement, security agreement, guarantee, note, mortgage or other evidence of Indebtedness or agreement providing for Indebtedness or any Encumbrance (other than a Permitted Encumbrance) on any assets of the Company; (iv) Contract for the sale of any material assets of the Company in excess of Fifty Thousand Dollars ($50,000) (other than Inventory in the Ordinary Course of Business); (v) consulting agreement, management agreement, advisory agreement, employment agreement, severance agreement, retention agreement or change-of-control agreement, in each case providing for payments in excess of Fifty Thousand Dollars ($50,000) in any fiscal year; (vi) Contract under which the Company has made, or anticipates making in the future, payments in excess of Fifty Thousand Dollars ($50,000) during any fiscal year (other than purchase orders or invoices entered into in the Ordinary Course of Business consistent with past practice); (vii) Contract containing any covenant not to sue; (viii) Contract involving any of the Business' top ten (10) customers or top ten (10) suppliers in the two (2) most recent fiscal years or for the portion of the current fiscal year; (ix) lease, sublease, or license of any Real Property, material personal property or other material tangible assets; (x) Contract that grants a customer or any other Person "most favored nation" type pricing, terms or conditions; (xi) Contract not otherwise disclosed under this Section 5.16(a) with a term of more than six (6) months, which is not terminable by the Company upon less than thirty (30) days' notice without penalty and which involves more than Twenty-Five Thousand Dollars ($25,000) annually; (xii) Contract involving the acquisition of the business or stock (or, to the extent constituting a going-concern business, assets or other properties) of any other Person since December 31, 2012; (xiii) Contract that grants the Company goods on consignment; (xiv) Contract granting any exclusive marketing, distribution or similar rights to a third party; (xv) Contracts limiting the Company's ability to employ; and (xvi) any other Contract which is material to its operations and business prospects and involves a consideration in excess of Fifty Thousand Dollars ($50,000) annually. Each such contract described in clauses (i)-(xvi) is referred to herein as a "Material Contract."

       (b)    Except as set forth in the following Section 5.16(b) of the Disclosure Schedule: (i) the Material Contracts are legal, valid and binding, enforceable against the Company, and to the Knowledge of the Company, against each other party thereto in accordance with their respective terms (subject to any

OC 287832843v8

applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally), and are in full force and effect; (ii) the Company has performed all material obligations required to be performed by it to date under the Material Contracts; and (iii) neither the Company, nor, to the Knowledge of the Company, any other party, is in default under any material obligation of any such Material Contracts and, to the Knowledge of the Company, no event has occurred which, with notice or lapse of time or both, would constitute a breach or default, or permit termination, modification, or acceleration, under any such Material Contracts; and (iv) neither the Company, nor, to the Knowledge of the Company, any other party, has repudiated any material provision of any of the Material Contracts.

      5.17    <u>Notes and Accounts Receivable; Inventory</u>.

      (a)    All notes and Receivables of the Company are reflected properly on the Company's Books and Records, are valid Receivables subject to no setoffs or counterclaims, are current and collectible in all material respects, and will be collected in accordance with their terms at their recorded amounts, subject only to the reserve for bad debts set forth on the face of the Most Recent Financial Statements (rather than in any notes thereto) as adjusted for the passage of time through the Closing Date. Section 5.17(a) of the Disclosure Schedule sets forth an aging schedule for Receivables shown on the Most Recent Financial Statements.

      (b)    Except as set forth in Section 5.17(b) of the Disclosure Schedule, the Inventory of the Company consists of raw materials and supplies, goods in process, and finished goods, all of which is merchantable and fit for the purpose for which it was procured or manufactured, and none of which is obsolete, damaged or defective in any material respect, subject only to the reserve for Inventory obsolescence set forth on the face of the Financial Statements as adjusted for the passage of time through the Closing Date in the Ordinary Course of Business.

      (c)    Section 5.17(c) of the Disclosure Schedule sets forth all goods which have been consigned to the Company and the location of such goods. Except as set forth in Section 5.17(c) of the Disclosure Schedule, the Company does not hold any goods on consignment or have title to any Inventory in the possession of others. None of the consigned goods have been lost, stolen or damaged. All of the consigned goods can, at the Company's election, be returned to the applicable consignor at any time without payment or penalty. Except as set forth in Section 5.17(c) of the Disclosure Schedule, all payments due and owing to any consignors for consigned goods sold by the Company have been timely made by the Company and no such payments remain outstanding.

      5.18    <u>Powers of Attorney</u>. There are no outstanding powers of attorney executed on behalf of the Company or other similar appointment authorizing an agent of the Company to execute Contracts on their behalf.

      5.19    <u>Insurance</u>.

      (a)    Section 5.19(a) of the Disclosure Schedule sets forth a true and complete list of all current insurance policies or binders (including policies providing property, casualty, liability, and workers' compensation coverage and bond and surety arrangements) to which the Company has been a party, a named insured, or otherwise the beneficiary of coverage at any time within the past two (2) years.

      (b)    With respect to each such insurance policy: (i) the policy is legal, valid, binding, enforceable and in full force and effect; (ii) the policy will continue to be legal, valid, binding, enforceable and in full force and effect on identical terms following the consummation of the transactions contemplated by this Agreement; (iii) neither the Company, nor, to the Knowledge of the Company, any other party to

26

OC 287832843v8

the policy is in breach or default (including with respect to the payment of premiums or the giving of notices), and no event has occurred which, with notice or the lapse of time, would constitute such a breach or default, or permit termination, modification, or acceleration, under the policy; (iv) the Company has not been denied coverage since January 1, 2012; and (v) since the date of the policy, no notice of cancellation or non-renewal with respect to the policy has been received by the Company. Such policies are sufficient for material compliance with all requirements of Law currently applicable to the Company and of all Material Contracts to which the Company is a party. Except as set forth in Section 5.19(b) of the Disclosure Schedule, there are no pending claims with respect to all such insurance policies.

5.20    Litigation. Section 5.20 of the Disclosure Schedule sets forth each instance in which the Company (i) is, or has been at any time subject to any outstanding Decree or (ii) is, or has been at any time a party or, to the Knowledge of the Company, is threatened to be made a party to, any Proceeding of, in, or before any Governmental Authority or before any arbitrator. None of the Proceedings set forth in Section 5.20 of the Disclosure Schedule has resulted, or could result, in any Material Adverse Effect. To the Knowledge of the Company, no event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a Basis for the commencement of any Proceeding against or involving the Company.

5.21    Important Customers and Suppliers. Section 5.21 of the Disclosure Schedule sets forth a complete and accurate list of (a) the names of the top twenty (20) customers of the Company (by dollar volume of sales to such customers) and (b) the names of the top twenty (20) suppliers of the Company (by dollar volume of purchases from such suppliers), in each case, for fiscal years 2014 through and including 2017. The Company has not; (i) received written notice of, and is not aware of any Basis for, any material disputes with any of the Persons listed in Section 5.21 of the Disclosure Schedule; or (ii) received any written or oral notice that a customer or vendor listed in Section 5.21 of the Disclosure Schedule for the fiscal year 2018 intends to terminate or substantially reduce its business or relationship with the Company.

5.22    Restrictions on Business Activities. Except for this Agreement and as set forth in Section 5.22 of the Disclosure Schedule, there is no agreement, arrangement or Decree binding upon the Company or, to the Knowledge of the Company, any Employee that has or would reasonably be expected to have the effect of prohibiting the conduct of all or a material portion of the Business as currently conducted or would reasonably be expected to result in a Material Adverse Effect.

5.23    Employees.

(a)    The Company is not a party to, bound by, or negotiating with respect to any agreement with any labor or trade union, association or other employee group, nor is any unit of Employees represented by any labor union or similar association. No labor or trade union or employee organization has been certified or recognized as the collective bargaining representative of any Employees. There has not been during the five (5) years prior to the date of this Agreement and there is not any existing or, to the Knowledge of the Company, any threatened, union organizational campaigns or representation proceedings with respect to any Employees, threatened labor strikes, work stoppages, slowdowns, grievances, unfair labor practice charges, discrimination charges or labor arbitration proceedings affecting the Company or the Business. The Company is and has been in compliance, in all material respects, with all applicable Laws respecting employment and/or employment practices, terms and conditions of employment, payment or non-payment of wages and other compensation, affirmative action, working conditions, labor unions, and payment, non-payment, and/or provision of employee benefits (collectively, "Employment Laws"), except in those cases where such noncompliance would not have a Material Adverse Effect. None of the current or former Employees, directors or applicants for employment of the Company has a pending, or, to the Knowledge of the Company, has threatened any, claim against the Company and there are no circumstances of which the Company is aware of which might give rise to any such claim. Except as set

27

forth in Section 5.23(a) of the Disclosure Schedule, all of the Employees are employed at will, meaning they can quit at any time or be terminated at any time, subject to applicable Employment Laws.

(b)     Section 5.23(b) of the Disclosure Schedule lists all of the Employees, along with their current status, job title, rate of pay, years of service and any bonuses paid or payable, in whole or part, with respect to the two-year period prior to the Closing and any period thereafter.

5.24    Employee Benefits.

(a)     Section 5.24(a) of the Disclosure Schedule lists each Employee Benefit Plan that the Company or any ERISA Affiliate maintains, to which the Company contributes or has any obligation to contribute, or with respect to which the Company has any Liability (contingent or direct).

(b)     Each such Employee Benefit Plan (and each related trust, insurance Contract or fund) has been maintained, funded and administered in accordance with the terms of such Employee Benefit Plan and complies in form and in operation in all respects with the applicable requirements of ERISA, the Code and other applicable Laws. All Persons who participate in the operation of such Employee Benefit Plans and all plan "fiduciaries" (within the meaning of Section 3(21) of ERISA) have always acted in accordance with the provisions of the Employee Benefit Plans and all applicable Laws, including ERISA and the Code. There has been no, and the Company has no Knowledge of any, default or violation by any party to, any Employee Benefit Plan.

(c)     All required notices, reports and descriptions (including Form 5500 annual reports, summary annual reports and summary plan descriptions) have been timely filed and/or distributed in accordance with the applicable requirements of ERISA and the Code with respect to each such Employee Benefit Plan. The requirements of COBRA and any applicable state continuation or conversion coverage requirements have been met with respect to each such Employee Benefit Plan and each Employee Benefit Plan maintained by an ERISA Affiliate that is an Employee Welfare Benefit Plan subject to COBRA or any applicable state continuation or conversion coverage requirement.

(d)     All contributions (including all employer contributions and employee salary reduction contributions) that are due have been made within the time periods prescribed by ERISA and the Code to each such Employee Benefit Plan and all contributions for any period ending on or before the Closing Date that are not yet due have been made to each such Employee Pension Benefit Plan or have been timely and properly accrued in compliance with GAAP and all Laws. All amounts withheld from Employees' payroll checks have been fully and timely contributed or deposited in accordance with applicable Laws. All premiums or other payments for all periods ending on or before the Closing Date have been paid with respect to each such Employee Benefit Plan that is an Employee Welfare Benefit Plan.

(e)     Each such Employee Benefit Plan that is intended to meet the requirements of a "qualified plan" under Code Section 401(a) has received a determination from the Internal Revenue Service that such Employee Benefit Plan is so qualified, and nothing has occurred since the date of such determination that could adversely affect the qualified status of any such Employee Benefit Plan.

(f)     Each such Employee Benefit Plan (and each related trust, insurance Contract or fund) has been maintained, funded and administered in accordance with the terms of such Employee Benefit Plan and complies in form and in operation in all respects with the applicable requirements of ERISA, the Code and other applicable Laws.

(g)     No Proceeding with respect to the sponsorship, administration or the investment of the assets of any such Employee Benefit Plan (other than routine claims for benefits) is pending or, to

28

the Knowledge of the Company, threatened. There is no basis for any such action, suit, proceeding, hearing or investigation.

(h)     The Company has delivered to Buyer correct and complete copies of (as applicable) with respect to every Employee Benefit Plan: the plan documents, plan amendments, and summary plan descriptions, the most recent determination or opinion letter received from the Internal Revenue Service, the five most recent annual reports (Form 5500, with all applicable attachments), and all related trust agreements, insurance Contracts and other funding arrangements that implement each such Employee Benefit Plan.

(i)     Neither the Company nor any ERISA Affiliate contributes to, has any obligation to contribute to or has any Liability under or with respect to any Employee Pension Benefit Plan that is a "defined benefit plan" (as defined in ERISA Section 3(35)) or is subject to Section 412 of the Code. No asset of the Company is subject to any Encumbrance under ERISA or the Code.

(j)     Neither the Company nor any ERISA Affiliate contributes to, has any obligation to contribute to or has any Liability (including withdrawal liability as defined in ERISA Section 4201) under or with respect to any Multiemployer Plan.

(k)     No "prohibited transaction" (within the meaning of ERISA Section 406 and Code Section 4975) has occurred with respect to which the Company, to the Knowledge of the Company, could have any liability.

(l)     No Employee Benefit Plan provides post-employment welfare benefits except to the extent required by COBRA or any applicable state continuation or conversion coverage requirement.

(m)     No agreement, commitment, or obligation exists, regardless if in writing, to increase any benefits under any Employee Benefit Plan or to adopt any new Employee Benefit Plan.

(n)     No contract, agreement, plan or other arrangement, whether or not an Employee Benefit Plan, exists pursuant to which the execution of this Agreement or the consummation of the transactions contemplated hereby, either standing alone or in combination with any subsequent event, would trigger any obligation by the Company to pay any amount or provide any property to, any employee, officer or director of the Company or accelerate the vesting of any benefit incentive award, or equity award.

(o)     The Company has no "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code.

5.25     Guarantees.  Except as set forth in Section 5.25 of the Disclosure Schedule, the Company is not a guarantor or otherwise liable for any Liability or obligation (including Indebtedness) of any other Person.

5.26     Certain Business Relationships with the Company.  Except as set forth in Section 5.26 of the Disclosure Schedule, no officer, director, manager, stockholder or owner of the Company (nor any Affiliate or member of the immediate family of any such Person) (a) has any direct or indirect material ownership interest in any customer, supplier or competitor of the Company or in any Person from whom the Company leases real or personal property, (b) is a party to any contract or transaction with the Company or has any interest in any property used by the Company or (c) owes to, or is owed by, the Company any Indebtedness.

5.27   Absence of Certain Payments.  During the five (5) year period prior to the date of this Agreement, to the Knowledge of the Company, neither the Company, nor any director, officer, manager, stockholder, agent, or employee of the Company has directly or indirectly (i) used any of the funds of the Company for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity; (ii) made any unlawful payment to foreign or domestic government officials or employees or to foreign or domestic political parties or campaigns from the funds of the Company; (iii) violated any provision of the Foreign Corrupt Practices Act of 1977 applicable to the Company; (iv) established or maintained any unlawful or unrecorded fund of monies or other assets of the Company; (v) made any false or fictitious entry on the books or records of the Company; or (vi) made any bribe, rebate, payoff, influence payment, kickback, or other unlawful payment, to any Person or entity, private or public, regardless of form, whether in money, property, or services, to obtain favorable treatment in securing business or to obtain special concessions for the Company, or to pay for favorable treatment for business secured or for special concessions already obtained for the Company.

5.28   Products; Product Liability; Product Warranties.

(a)   Set forth on Exhibit A attached hereto is a true and complete list of all products offered for sale by the Company (the "Products"), including the base price for each such Product.

(b)   The Company does not have any Liability arising out of any injury to individuals or property as a result of the ownership, possession, or use of any product manufactured, sold or delivered by the Company, over and above any reserves applicable thereto as set forth on the Financial Statements.

(c)   Each product and service manufactured, sold, licensed, leased, provided or delivered by the Company has been in material conformity with all applicable contractual commitments and all express and implied warranties and in conformity with the requirements of all applicable Laws in effect at the time of sale of said products, and the Company has no Liability for replacement or repair thereof or other damages in connection therewith, subject only to the reserve for product warranty claims set forth on the face of the Financial Statements (rather than in any notes thereto) as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company.  Section 5.28 of the Disclosure Schedule includes copies of the standard terms and conditions of sale, license or lease for the Company (containing applicable guaranty, warranty, and indemnity provisions).  No product or service manufactured, sold, licensed, leased, provided or delivered by the Company is subject to any guaranty, warranty, or other indemnity beyond the applicable standard terms and conditions of sale or lease set forth in Section 5.28 of the Disclosure Schedule.

(d)   With respect to the products of the Company sold or marketed in all applicable jurisdictions, except as set forth in Section 5.28 of the Disclosure Schedule:

(i)   the Company has at all times been in material compliance with applicable government regulations or laws governing the sale and marketing of Company's OTC drug and medical device products, to the conduct of their business or to the ownership or use of their assets and properties, including without limitation development, testing, manufacture, marketing, distribution, labeling, promotion, advertising, storage and transport, in all jurisdictions in which any such acts occurred, or in which any of their products have been sold or used;

(ii)   since January 1, 2013, the Company has not received any written, oral notice from any Governmental Authority or any other Person regarding (A) any actual, alleged, possible or potential violation of, or failure to comply with, any OTC Drug or Medical Device Legal Requirement, or (B) any actual, alleged, possible or potential obligation on the part of the Company to undertake, or to bear

30

all or any portion of the cost of, any remedial action related to a OTC Drug or Medical Device Legal Requiremennt;

      (iii)    the Company is not, and has not been subject to, any obligation or requirement arising under any consent decree, consent agreement, inspection report or Warning Letter issued by or entered into with the FDA or the Federal Trade Commission ("FTC"), or any other U.S. or foreign Governmental Authorities or other order from, agreement with, or notice or requirement or commitment made to any other Governmental Authorities with regard to the development, testing, manufacture, registration, approval, marketing, distribution, labeling, advertising, promotion, storage, or transport of any of the Company' products;

      (iv)    there are no investigations, audits, actions, inquiries or other proceedings pending or threatened with respect to a violation by the Company of any Healthcare Law with regard to the development, testing, manufacture, registration, approval, marketing, distribution, labeling, advertising, promotion, storage, or transport of any of the Company' products that reasonably would be expected to result in administrative, civil, or criminal liability;

      (v)    there are no genetically modified ingredients or materials in any of the Company' products; and such products (A) have not been adulterated or misbranded within the meaning of the FFDC Act, or within the meaning of any other Healthcare Law; (B) have been manufactured in accordance with Healthcare Law and in a sanitary manner, are in compliance with industry standards, and are safe when used in accordance with the labeling; (C) contain each of the ingredients on the label, and only the ingredients on the label, in descending order of predominance; (D) have been free of contamination and defect; (E) have been merchandise which may be legally transported or sold under the provisions of any Healthcare Law; (F) have been exposed to only those chemicals or sprays permitted by applicable Governmental Authorities; (G) have not been the subject of any notices, Actions, decrees, citations, investigations, audits, inquiries or other Proceedings pursuant to The Safe Drinking Water and Toxic Enforcement Act of 1986, as amended, promulgated by the State of California; (H) have not been the subject of any claims, lawsuits, orders, consent orders, judgments or settlements in the last five (5) years; and (I) have material amounts of all ingredients which are listed on the front of the packaging, or for which claims are made on the packaging or in promotional materials or advertising, including but not limited to claims made on the website.

      (e)    Except as set forth in Section 5.28 of the Disclosure Schedule, the labeling claims, as well as the advertising and promotional claims, made by the Company for each of their products in each jurisdiction in which the products have been sold, have not been labeled or promoted in a manner which is in violation of the FFDC Act, the FPLA, or any other Healthcare Law, and have not been labeled or promoted as a treatment, prevention or cure for any specific disease or condition. Except as disclosed in Section 5.28 of the Disclosure Schedule, claims on the labeling and in the advertising and promotional materials of the Company has been limited to those allowed under the Cosmetic Legal Requirements. Any claims on the labeling, advertising or promotional materials are supported by data or other substantiation in all material respects to show that they are truthful and are not misleading, including but not limited to a claim that a product and/or an ingredient is natural or organic.

      (f)    The Company has not made any false representation or misleading statement in violation of applicable FDA or FTC standards or other Healthcare Law or other applicable state law in regard to its products, including the quality or properties of such products, and have not been engaged in any other unfair trade practices, whether in advertising, printed material, web site or otherwise, with respect to the products offered by the Company.

      (g)    The Company has delivered to Buyer true, correct and complete copies of:

31

(i)     all warning letters, untitled letters, regulatory letters, written notices of inspectional observations or similar written notices, or other correspondence, including meeting notes or minutes, if any, from Governmental Authorities relating to the products and their compliance with Cosmetic Legal Requirements and rules and regulations of other Governmental Authorities, and all of the responses thereto within the last five (5) years;

(ii)     labeling for all products marketed within the last five (5) years by the Company; and

(iii)     all written reports of inspections or audits of the Company' contract manufacturers received by the Company, or in their possession or control, within the last five (5) years.

(h)     Except as set forth in Section 5.28 of the Disclosure Schedule, the use of each ingredient or material currently used in the manufacture of products or used in the manufacture of products since January 1, 2013 complies in all material respects with applicable regulations or laws governing the sale and marketing of Company's Products.  To the Knowledge of the Company, all imported ingredients and materials that are used to manufacture the Company' products are legally permitted for use in OTC drugs and medical devices in the United States, and there is no restriction on the importation of any ingredients or materials used in the manufacture of the Company' products.

(i)     Since January 1, 2013, and except as disclosed in Section 5.28 of the Disclosure Schedule, none of the products of the Company has been subject to withdrawal, modification, cancellation or suspension by FDA or any other Governmental Authority and no products manufactured, marketed or sold by the Company has been discontinued (other than for commercial or other business reasons), recalled or subject to a removal or safety alert (whether voluntarily or otherwise), nor has the production of such products been enjoined.  Since January 1, 2013, and except as disclosed in Section 5.28 of the Disclosure Schedule, no proceedings have occurred (whether completed or pending) seeking to recall, re-label, suspend, detain or seize any product sold or proposed to be sold by the Company.

(j)     All products sold by the Company are properly registered, notified or otherwise imported in all applicable foreign jurisdictions to permit the lawful sale of the same.  All advertising or promotional materials are in compliance with the Laws of the relevant Governmental Authorities in all applicable foreign jurisdictions.

(k)     Neither the Company, nor to the knowledge of the Company, any officers, employees or agents of any of them, has made any materially false statements on, or material omissions from, any applications, notifications, registrations, reports, or other submissions to the FDA, the FTC, or any other Governmental Authority, or made any materially false statements on, or material omissions from, any other records and documentation prepared or maintained to comply with the requirements of the FDA, FTC or any other Governmental Authority.

(l)     Except as set forth in Section 5.28 of the Disclosure Schedule, the Company has had no products liability claims or Actions for products liability filed against them, or, to the Knowledge of the Company, consumer class action claims threatened against them.  Except as set forth in Section 5.28 of the Disclosure Schedule, the Company has no Knowledge of any potential products liability claim or consumer class action claim.

5.29     Bank Accounts.  Section 5.29 of the Disclosure Schedule lists all bank accounts, safety deposit boxes and lock boxes (designating each authorized signatory with respect thereto) of the Company.

32

5.30   Health Law Compliance.

(a)     The Business is conducted in compliance in all material respects with all applicable Healthcare Laws, and the Company is not in material violation of, and has not received any written notice from any Governmental Authority regarding any violation of any Healthcare Laws, and the Company's admission and discharge procedures are in material compliance with the agreements entered into between the Company and its patients or patient representatives.

(b)     (i) The Company possesses all material Governmental Authorizations required by applicable Healthcare Laws necessary for the operation of the Business, including all necessary professional licenses for healthcare professionals; (ii) the Company has been in compliance in all material respects with such Governmental Authorizations, and all of such Governmental Authorizations are valid and in full force and effect; (iii) there is no action or investigation by or before any Governmental Authority pending or threatened against the Company to revoke, suspend, or otherwise limit any such Governmental Authorization; (iv) the Company has not received any written notice from any Governmental Authority regarding any violation of any such Governmental Authorization or any revocation, withdrawal, suspension, cancellation or termination of any such Governmental Authorization; and (v) the Company has filed all reports and maintained and retained all records required by applicable Healthcare Laws pertaining to all of its respective Governmental Authorization, except where such failure would not, individually or in the aggregate, reasonably be expected to be material to the Company.

(c)     (i) All billing practices (including rebates, billing, coding, filing, and claims practices) of the Company are, and have been, in compliance in all material respects with all applicable Healthcare Laws; and (ii) except as set forth on Section 5.30 of the Disclosure Schedule, there is no pending or threatened recoupment, denial of payment, overpayment, or penalty action or proceeding against Company under any program of any Governmental Authority or applicable Healthcare Law or any other third party payor program, other than any overpayment, setoff, recoupment or adjustment that occurs in the ordinary course of business.

5.31   Disclosure.   To Stockholder's knowledge, after making reasonable inquiry, the representations and warranties contained in this Article V do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements and information contained in this Article V not misleading.

## ARTICLE VI
## COVENANTS OF THE PARTIES

6.1   Pre-Closing Conduct.

(a)     Conduct of Company.  From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Stockholder shall, and shall cause the Company to, (x) conduct the business of the Company in the ordinary course of business consistent with past practice; and (y) use reasonable best efforts to maintain and preserve intact the current organization, business and franchise of the Company and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having business relationships with the Company. Without limiting the foregoing, from the date hereof until the Closing Date, Stockholder shall:

(i)      cause the Company to preserve and maintain all of its Permits;

(ii)     cause the Company to pay its debts, Taxes and other obligations when due;

33

(iii)   cause the Company to maintain the properties and assets owned, operated or used by the Company in materially the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(iv)   cause the Company to continue in full force and effect without modification all insurance policies, except as required by applicable Law;

(v)   cause the Company to defend and protect its properties and assets from infringement or usurpation;

(vi)   cause the Company to perform all of its obligations under all Contracts relating to or affecting its properties, assets or business;

(vii)   cause the Company to maintain its books and records in accordance with past practice;

(viii)   cause the Company to comply in all material respects with all applicable Laws; and

(ix)   cause the Company not to take or permit any action that would cause any of the changes, events or conditions described in Section 5.9 to occur.

(b)   Conduct of Buyer.  From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Stockholder (which consent shall not be unreasonably withheld or delayed), Buyer shall, and shall cause the Buyer to, (x) conduct the business of the Buyer in the ordinary course of business consistent with past practice; and (y) use reasonable best efforts to maintain and preserve intact the current organization, business and franchise of the Buyer and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having business relationships with the Buyer.  Without limiting the foregoing, from the date hereof until the Closing Date, Buyer shall:

(i)   preserve and maintain all of its Permits;

(ii)   pay its debts, Taxes and other obligations when due;

(iii)   maintain the properties and assets owned, operated or used by the Buyer in materially the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(iv)   continue in full force and effect without modification all insurance policies, except as required by applicable Law;

(v)   defend and protect its properties and assets from infringement or usurpation;

(vi)   perform all of its obligations under all contracts relating to or affecting its properties, assets or business;

(vii)   maintain its books and records in accordance with past practice;

(viii)   comply in all material respects with all applicable Laws;

34

(ix)     not issue any additional securities or capital stock of the Buyer, or options or warrants to issue additional capital stock of the Buyer, except pursuant to the terms of this Agreement or in connection with the IPO;

(x)     pay Company employees that are providing services for Buyer; and

(xi)     comply in all material respects with the obligations pursuant to the Company Lease.

6.2     Access to Information.

(a)     From the date hereof until the Closing, Stockholder shall, and shall cause the Company to, (a) afford Buyer and its representatives full and free access to and the right to inspect all of the Real Property, properties, assets, premises, books and records, Contracts and other documents and data related to the Company; (b) furnish Buyer and its representatives with such financial, operating and other data and information related to the Company as Buyer or any of its Representatives may reasonably request; and (c) instruct the representatives of Stockholder and the Company to cooperate with Buyer in its investigation of the Company. Without limiting the foregoing, Stockholder shall permit Buyer and its representatives to conduct environmental due diligence of the Company and the Real Property, including the collecting and analysis of samples of indoor or outdoor air, surface water, groundwater or surface or subsurface land on, at, in, under or from the Company and the Real Property. Any investigation pursuant to this Section 6.2 shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Stockholder or the Company. Upon the request of Buyer, Stockholder shall cause the Company to provide reasonable cooperation and assistance to Buyer in connection with the arrangement of the financing contemplated by the Buyer.  No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Stockholder in this Agreement.

(b)     From the date hereof until the Closing, Buyer shall: (a) afford Company, Stockholder, and its representatives full and free access to and the right to inspect all of the Real Property, properties, assets, premises, books and records, Contracts and other documents and data related to the Buyer; (b) furnish Company, Stockholder, and its representatives with such financial, operating and other data and information related to the Buyer as Company, Stockholder or any of its Representatives may reasonably request; and (c) instruct the representatives of Buyer to cooperate with Company and Stockholder in its investigation of the Buyer.

6.3     Notice of Certain Events.

(a)     From the date hereof until the Closing, each party shall promptly notify the other party in writing of:

(i)     any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Change, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by such party hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in Section 7.1 to be satisfied;

(ii)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

35

(iii) any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv) any Proceedings commenced or, to such party's knowledge, threatened against, relating to or involving or otherwise affecting such party that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 5.20 or Section 4.5 or that relates to the consummation of the transactions contemplated by this Agreement.

(b) A party's receipt of information pursuant to this Section 6.3 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by such party in this Agreement (including Section 8.2 and Section 9.01(b)) and shall not be deemed to amend or supplement the Disclosure Schedules.

6.4 General. In case at any time after the Closing any further reasonable action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as the other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement). Stockholder acknowledges and agrees that, from and after the Closing, Buyer will be entitled to possession of all documents, books, records (including Tax records), agreements, and financial data of any sort relating to the Company.

6.5 Transition. Stockholder will not take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier, or other business associate of the Company from maintaining the same business relationships with the Company after the Closing as it maintained with the Company prior to the Closing.

6.6 Litigation Support. In the event and for so long as either Party actively is contesting or defending against any Proceeding in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Company, the other Party will reasonably cooperate with the contesting or defending Party and its counsel in the contest, make available their personnel and provide such testimony and access to their books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party (unless the contesting or defending Party is entitled to indemnification therefore under this Agreement).

6.7 Confidentiality. Stockholder will treat and hold as confidential all of the Confidential Information, refrain from using any of the Confidential Information except in connection with this Agreement or, in the case of any Stockholder beneficiary employed after Closing by Buyer or its Affiliates (including the Company), in connection with such employment in accordance with the policies of Buyer and its Affiliates, and deliver promptly to Buyer or destroy, at the request and option of Buyer, all tangible embodiments (and all copies) of the Confidential Information which are in their possession. In the event that Stockholder is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, Stockholder will notify Buyer promptly of the request or requirement so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this Section 6.4. If, in the absence of a protective order or the receipt of a waiver hereunder, Stockholder is, on the advice of counsel, legally required to disclose any Confidential Information, Stockholder may disclose the Confidential Information to the requesting authority; provided, however, that Stockholder shall use Commercially Reasonable Efforts to obtain, at the reasonable request of Buyer, an order or other assurance

36

that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as Buyer shall designate.

6.8     Books and Records.  The Parties and the Company, for a period of five (5) years following the Closing, shall: (i) preserve, maintain and store, (ii) not destroy, delete, erase, record over or otherwise impede the ability of anyone to recover and read, and (iii) grant the other party hereto access, for any legitimate purpose, within ten (10) Business Days written notice to, any and all documents, correspondence, books and records, and files, whether maintained or stored electronically or in writing, that in any way relate to the Business.  Stockholder shall notify Buyer, in writing, within thirty (30) days prior to the expiration of such five (5) year period if it desires to copy said books and records.  If Buyer does not receive written notice from Stockholder within such thirty (30) day period, Buyer or the Company may destroy any books and records without further notice or liability to Stockholder.  If Buyer receives written notice from Stockholder within such thirty (30) day period, Stockholder shall have thirty (30) days from Buyer's receipt of the notice to copy the books and records, and following the expiration of such thirty (30) day period, Buyer or the Company may destroy any books and records without further notice or liability to Stockholder.

6.9     Lock-Up.  Stockholder hereby agrees that he or it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the Buyer's initial public offering (the "IPO") and ending on the date specified by Buyer and the managing underwriter (such period not to exceed 180 days or such longer period, not to exceed thirty (30) days after the expiration of the one hundred eighty (180) day period, as the underwriters of the Buyer shall request in their customary form of holdback agreement) (a) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock held immediately prior to the effectiveness of the registration statement for the IPO, or (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the capital stock, whether any such transaction described in clause (a) or (b) above is to be settled by delivery of capital stock or other securities, in cash or otherwise.  The foregoing provisions of this Section 6.9 shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and shall only be applicable to the Stockholder if all officers, directors and holders of more than five percent (5%) of the outstanding common stock enter into similar agreements.  The underwriters in connection with the IPO are intended third-party beneficiaries of this Section 6.9 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto.  Stockholder further agrees to execute such agreements as may be reasonably requested by the underwriters in the IPO that are consistent with this Section 6.9 or that are necessary to give further effect thereto.

6.10    IPO.  The Buyer shall use its reasonable best efforts to complete the IPO prior to Closing.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

The Parties agree as follows with respect to the period following the Closing:

7.1     Conditions to Buyer's Obligations for the Closing.  Buyer's obligation to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(c)     the representations and warranties set forth in Articles III and V above shall be true and correct in all material respects at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material" or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so

37

written, including the term "material" or "Material") shall be true and correct in all respects at and as of the Closing Date;

(d)     Stockholder and the Company shall have performed and complied with all of their covenants hereunder in all material respects through the Closing Date, except to the extent that such covenants are qualified by the term "material" or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case Stockholder and the Company shall have performed and complied with all of such covenants (as so written, including the term "material" or "Material") in all respects through the Closing Date;

(e)     Stockholder and the Company shall have procured all of the third-party consents and authorizations of Governmental Authorities required pursuant to this Agreement, all of which shall be in full force and effect as of the Closing Date;

(f)     no action, suit or proceeding against or involving Stockholder and the Company shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local or foreign jurisdiction wherein an unfavorable injunction, judgment, Governmental Order, decree, ruling or charge could (i) prevent consummation of any of the transactions contemplated by this Agreement, (ii) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, (iii) adversely affect the right of Buyer to own the Shares and to control, directly or indirectly, the Company, (iv) adversely affect the right of the Company to own their assets and to operate the Business, or (v) result in a Material Adverse Change (and no such injunction, judgment, Governmental Order, decree, ruling or charge shall be in effect);

(g)     Stockholder and the Company shall have delivered to Buyer a duly executed certificate of an authorized officer of the Company, dated the Closing Date, certifying that each of the conditions specified above in Section 7.1(a)-(d) is satisfied in all respects;

(h)     Stockholder shall have delivered to Buyer duly executed assignments of common stock in form reasonably acceptable to Buyer assigning the Shares to Buyer;

(i)     Buyer shall have received from counsel to Stockholder and from counsel to the Company separate opinions in form and substance as set forth in Exhibits D-1 and D-2 attached hereto and otherwise reasonably acceptable to Buyer, addressed to Buyer and dated as of the Closing Date; the Company shall have preserved intact the Business and the Company's relationships with its employees, customers, agents and all other Persons reasonably related to the Business.

(j)     all actions to be taken by Stockholder and the Company in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments and other documents required to effect the transactions contemplated hereby shall be satisfactory in form and substance to Buyer;

(k)     Stockholder shall have delivered to Buyer a certificate, duly completed and executed pursuant to Treasury Regulation Sections 1.897-2(h) and 1.1445-2(c), certifying that the Shares are not United States real property interests;

(l)     Buyer shall have received the most recent internal interim financial statement of the Company available as of the Closing Date;

38

(m)     Stockholder shall have delivered to Buyer copies of the articles of incorporation of the Company certified as of a date not more than thirty (30) days prior to the Closing Date by the Secretary of State of the relevant state or country of incorporation;

(n)     Stockholder shall (i) have delivered to Buyer a copy of a certificate of good standing of the Company issued not more than ten (10) days prior to the Closing Date by the Secretary of State (or comparable officer) of the jurisdiction of incorporation and formation and each other jurisdiction in which the Company is required by law to qualify to do business and (ii) have provided verbal bring-downs as of the Closing Date as to the good standing of the Company in the jurisdictions of its incorporation and each other jurisdiction referred to in the preceding clause (i);

(o)     Stockholder shall have delivered to Buyer a duly executed certificate of the secretary of the Company, dated the Closing Date, in form and substance reasonably satisfactory to Buyer, certifying: (i) the articles of incorporation of the Company; (ii) the bylaws of the Company; and (iii) the due adoption, validity and effectiveness of the resolutions of the board of directors or other authorizing body (or a duly authorized committee thereof) of the Company authorizing its execution, delivery and performance of the Transaction Documents to which it is a party and its consummation of the transactions contemplated hereby and thereby;

(p)     Buyer shall have received invention assignment agreements from each of the employees of the Company, satisfactory in form and substance to Buyer.

(q)     Stockholder and Company shall have taken all necessary and proper action to ratify all corporate actions, annual meetings and issuances of the Shares and otherwise to correct the books and records of Company related thereto, in each case to the reasonable satisfaction of Buyer;

(r)     Buyer shall have received from Stockholder the Noncompetition Agreement in the form of Exhibit C attached hereto, duly executed by Stockholder, and such Noncompetition Agreement shall be in full force and effect as of the Closing;

(s)     UCC termination statements and other releases of interest by all lenders to Stockholder and the Company with respect to the assets of the Company and the Shares;

(t)     the Company shall provide Buyer access to conduct, at Buyer's option, a physical count of the Company's inventory and an inspection of the Company's other assets and of the Company's liabilities on or within three (3) days prior to the Closing. The results of such count and inspection shall be satisfactory to Buyer in its sole and absolute discretion.

(u)     Buyer shall have closed on its sale of its equity securities for the gross offering proceeds of at least $███████ in connection with the IPO; and

(v)     the Company shall grant Buyer the right to continue its due diligence inquiry of the Company which shall be acceptable to Buyer in its reasonable discretion.

Buyer may waive any condition specified in this Section 7.1 if it executes a writing so stating at or prior to the Closing.

7.2    Conditions to Stockholder's Obligations for the Closing. The obligation of Stockholder to consummate the transactions to be performed by them in connection with the Closing is subject to satisfaction of the following conditions:

39

(a)     the representations and warranties set forth in Article IV above shall be true and correct in all material respects at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material" or contain terms such as "Material Adverse Effect" or "Material Adverse Change", in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects at and as of the Closing Date;

(b)     Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing Date, except to the extent that such covenants are qualified by the term "material" or contain terms such as "Material Adverse Effect" or "Material Adverse Change", in which case Buyer shall have performed and complied with all of such covenants (as so written, including the term "material" or "Material") in all respects through the Closing Date;

(c)     the Buyer shall have procured all of the corporate approvals, third-party consents and authorizations of Governmental Authorities required pursuant to this Agreement, all of which shall be in full force and effect as of the Closing Date;

(d)     no action, suit or proceeding against Buyer shall be pending before any court or quasi-judicial or administrative agency of any federal, state, local or foreign jurisdiction wherein an unfavorable injunction, judgment, order, decree, ruling or charge would (i) prevent consummation of any of the transactions contemplated by this Agreement or (ii) cause any of the transactions contemplated by this Agreement to be rescinded following consummation (and no such injunction, judgment, order, decree, ruling or charge shall be in effect);

(e)     Buyer shall have delivered to Stockholder a duly executed certificate of an authorized officer, dated the Closing Date, certifying that each of the conditions specified above in Section 7.2(a)-(d) is satisfied in all respects;

(f)     Buyer shall issue and deliver the Exchange Shares to the Stockholder.

(g)     Buyer shall have delivered to Stockholder a duly executed certificate of an authorized officer of Buyer, dated as of the Closing Date, in form and substance reasonably satisfactory to Stockholder, certifying the due adoption, validity and effectiveness of the resolutions of the board of directors or other authorizing body (or a duly authorized committee thereof) of Buyer authorizing its execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party and its consummation of the transactions contemplated hereby and thereby.

(h)     Buyer shall have delivered the Cash Payment to Stockholder.

(i)     Buyer shall have delivered to Stockholder the Employment Agreement in the form of Exhibit E attached hereto, duly executed by Buyer, and such Employment Agreement shall be in full force and effect as of the Closing.

        Stockholder may waive any condition specified in this Section 7.2 if they execute a writing so stating at or prior to the Closing.

## ARTICLE VIII
## REMEDIES FOR BREACHES OF AGREEMENT

8.1     Survival of Representations, Warranties and Covenants.  All of the representations and warranties contained in this Agreement shall survive the Closing and continue in full force and effect until thirty (30) days after the expiration of the applicable statute of limitations; *provided* that the representations

and warranties contained in Sections 3.4 5.2, and 4.7, shall survive the Closing and continue in full force and effect forever thereafter (the representations and warranties referred to in subsections (a) and (b) above hereinafter referred to as "Fundamental Representations"). The covenants and other agreements of the Parties contained in this Agreement shall survive the Closing until such covenants and agreements are otherwise terminated, whether by their express terms or as a matter of applicable law.

     8.2    <u>Indemnification Provisions for Benefit of Buyer</u>.

     (a)    In the event Stockholder breaches (or in the event any third party alleges facts that, if true, would mean Stockholder has breached) any of his representations, warranties or covenants contained in this Agreement, and Buyer makes a written Claim for Indemnification against Stockholder pursuant to Section 11.7 during an applicable survival period pursuant to Section 8.1 above, then Stockholder shall indemnify Buyer Indemnitees from and against the entirety of any Adverse Consequences any of them may suffer through and after the date of the Claim for Indemnification (including any Adverse Consequences any of them may suffer after the end of any applicable survival period) resulting from, arising out of, relating to, in the nature of, or caused by the breach (or the alleged breach). Buyer Indemnitees' right to indemnification, reimbursement, or other remedy based on such representations, warranties or covenants will not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) about the accuracy or inaccuracy of or compliance with, any such representation, warranty or covenant.

     (b)    In addition to the foregoing, Stockholder agrees to indemnify Buyer Indemnitees from and against the entirety of any Adverse Consequences any of them may suffer resulting from, arising out of, relating to, in the nature of, or caused by any of the following:

     (i)    any Indebtedness of the Company arising or accruing on or prior to the Closing Date;

     (ii)    any unpaid bonuses to Company employees arising or accruing with respect to any period on or prior to the Closing Date;

     (iii)    any of Stockholder's and the Company's obligations to pay any Taxes with respect to Pre-Closing Periods and Straddle Periods (as such Periods are determined pursuant to Article X); and

     (iv)    fraud or intentional misrepresentation.

     (c)    Stockholder shall not have any obligation to indemnify Buyer Indemnitees pursuant to Section 8.2(a) until Buyer Indemnitees have suffered Adverse Consequences in excess of an aggregate threshold of Fifty Thousand Dollars ($50,000.00) (the "Deductible"), at which point Stockholder will be obligated to indemnify Buyer Indemnitees from and against all such Adverse Consequences in excess of the Deductible; *provided, however*, that the Deductible shall not apply to indemnification for the Adverse Consequences Buyer Indemnitees may suffer resulting from, arising out of, or relating to, the breach or alleged breach of any of the Specified Provisions. For purposes of this Article VIII, any inaccuracy in or breach of any representation or warranty shall be determined without regard to any materiality, Material Adverse Effect or other similar qualification contained in or otherwise applicable to such representation or warranty. Stockholder's liability under the indemnification provisions of Section 8.2(b) shall not be subject to the Deductible.

     8.3    <u>Indemnification Provisions for Benefit of Stockholder</u>.

41

(a)     In the event Buyer breaches (or in the event any third party alleges facts that, if true, would mean Buyer has breached) any of its representations, warranties or covenants contained in this Agreement, and Stockholder makes a written Claim for Indemnification against Buyer pursuant to Section 11.7 during an applicable survival period pursuant to Section 8.1 above, then Buyer shall indemnify Stockholder Indemnitees from and against the entirety of any Adverse Consequences any of them may suffer through and after the date of the Claim for Indemnification (including any Adverse Consequences any of them may suffer after the end of any applicable survival period) resulting from, arising out of, relating to, in the nature of, or caused by the breach (or the alleged breach). Stockholder Indemnitees' right to indemnification, reimbursement, or other remedy based on such representations, warranties or covenants will not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) about the accuracy or inaccuracy of or compliance with, any such representation, warranty or covenant.

(b)     In addition to the foregoing, Buyer agrees to indemnify Stockholder Indemnitees from and against the entirety of any Adverse Consequences any of them may suffer resulting from, arising out of, relating to, in the nature of, or caused by fraud or intentional misrepresentation.

(c)     Buyer shall not have any obligation to indemnify Stockholder Indemnitees pursuant to Section 8.3(a) until Stockholder Indemnitees have suffered Adverse Consequences in excess of an aggregate threshold of Fifty Thousand Dollars ($50,000.00) (the "Deductible"), at which point Buyer will be obligated to indemnify Stockholder Indemnitees from and against all such Adverse Consequences in excess of the Deductible; provided, however, that the Deductible shall not apply to indemnification for the Adverse Consequences Stockholder Indemnitees may suffer resulting from, arising out of, or relating to, the breach or alleged breach of any of the Specified Provisions. For purposes of this Article VIII, any inaccuracy in or breach of any representation or warranty shall be determined without regard to any materiality, Material Adverse Effect or other similar qualification contained in or otherwise applicable to such representation or warranty. Buyer's liability under the indemnification provisions of Section 8.3(b) shall not be subject to the Deductible.

8.4    <u>Matters Involving Third Party Claims</u>. The party making a claim under this Article VIII is referred to as the "Indemnified Party", and the party against whom such claims are asserted under this Article VIII is referred to as the "Indemnifying Party".

(a)     If any third party shall notify an Indemnified Party with respect to a Third Party Claim which may give rise to a Claim for Indemnification against Indemnifying Party under this Article VIII, then Indemnified Party shall promptly provide a Claim for Indemnification to the Indemnifying Party; *provided, however*, that no delay on the part of Indemnified Party in notifying Indemnifying Party shall relieve Indemnifying Party from any obligation hereunder unless (and then solely to the extent) Indemnifying Party thereby are prejudiced by such delay.

(b)     Indemnifying Party will have the right to defend Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to Indemnified Party so long as: (i) Indemnifying Party notifies Indemnified Party in writing within thirty (30) days after Indemnified Party has made a Claim for Indemnification that Indemnifying Party will indemnify Indemnified Party from and against the entirety of any Adverse Consequences Buyer may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim; (ii) Indemnifying Party provides Indemnified Party with evidence reasonably acceptable to Indemnified Party that Indemnifying Party will have the financial resources to defend against the Third Party Claim and fulfill its indemnification obligations hereunder; (iii) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief; (iv) settlement of, or an adverse judgment with respect to, the Third Party Claim is not, in the good faith judgment of Indemnified Party, likely to establish a precedential custom or practice materially adverse

to the continuing business interests of Indemnified Party; and (v) Indemnifying Party conducts the defense of the Third Party Claim actively and diligently.

(c)     So long as Indemnifying Party is conducting the defense of the Third Party Claim in accordance with Section 8.4(b): (i) Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim; (ii) Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of Indemnifying Party (not to be withheld unreasonably); and (iii) Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of Indemnified Party (not to be withheld unreasonably).

(d)     In the event any of the conditions in Section 8.4(b) are or become unsatisfied, however: (i) Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third Party Claim in any manner it reasonably may deem appropriate (and Indemnified Party need not consult with, or obtain any consent from, Indemnifying Party in connection therewith); (ii) at Indemnified Party's option, in Indemnified Party's sole discretion, Indemnified Party will offset the costs of defending against the Third Party Claim (including reasonable attorneys' fees and expenses) against any amounts due and payable to Indemnifying Party under this Agreement or the Transaction Documents or Indemnifying Party will reimburse Indemnified Party promptly and periodically for the costs of defending against the Third Party Claim (including reasonable attorneys' fees and expenses); and (iii) Indemnifying Party will remain responsible for any Adverse Consequences Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim to the fullest extent provided in this Article VIII.

(e)     Indemnifying Party failure to respond in writing within thirty (30) days after Indemnified Party has made a Claim for Indemnification shall constitute a final and binding acceptance of the Claim for Indemnification by Indemnifying Party, and the Claim for Indemnification shall be paid in accordance with Section 8.9.

8.5     Matters not Involving Third Party Claims.  Indemnified Parties may make a claim for any matter that does not involve a Third Party Claim in any amount to which they may be entitled under this Article VIII by providing a Claim for Indemnification against Indemnifying Party promptly after Indemnified Party has notice of any Adverse Consequence which may give rise to a Claim for Indemnification; *provided, however*, that no delay on the part of the Indemnified Parties in notifying Indemnifying Party shall relieve Indemnifying Party from any obligation hereunder unless (and then solely to the extent) Indemnifying Party is actually prejudiced by such delay. Indemnifying Party shall have thirty (30) days to object to the Claim for Indemnification by delivery of a written notice of such objection to Indemnified Party specifying in reasonable detail the basis for such objection. Indemnifying Party's failure to respond in writing within such thirty (30) day period shall constitute a final and binding acceptance of the Claim for Indemnification by Indemnifying Party, and the Claim for Indemnification shall be paid in accordance with Section 8.9. If an objection is delivered in writing within such thirty (30) day period by Indemnifying Party, then Indemnifying Party and Indemnified Party shall negotiate in good faith for a period of twenty (20) days from the date Indemnified Party receives such objection prior to commencing any Proceeding with respect to such Claim for Indemnification.

8.6     Adjustments to Purchase Price.  All indemnification payments under this Article VIII shall be deemed adjustments to the Purchase Price.

8.7     Waiver of Certain Damages.  Each of the Parties expressly waives and agrees not to, and to cause his, her or its Affiliates not to, seek punitive, consequential, incidental, or exemplary damages of any kind with respect to any dispute arising under, related to, or in connection with this Agreement or the

43

breach of this Agreement or the transactions contemplated by this Agreement, except to the extent any Party or its Affiliate suffers such damages (including costs of defense and reasonable attorney's fees incurred in connection with defending against such damages) in connection with a Third Party Claim, which damages (including costs of defense and reasonable attorney's fees incurred in connection with defending against such damages) shall not be excluded by this provision as to the recovery hereunder.

      8.8     Other Indemnification Provisions.

          (a)     The foregoing indemnification provisions are in addition to, and not in derogation of, any statutory, equitable or common law remedy any Party may have with respect to the other Party or the transactions contemplated by this Agreement. Each individual Indemnified Party hereby agrees that he or she will not make any Claim for Indemnification against an Indemnifying Party by reason of the fact that he or she was a director, officer, employee, or agent of the either Party or was serving at the request of either Party as a partner, trustee, director, officer, employee, or agent of another Entity (whether such claim is for judgments, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses, or otherwise and whether such claim is pursuant to any Law, Organizational Document, agreement, or otherwise) with respect to any Claim for Indemnification or Proceeding brought by an Indemnified Party against an Indemnifying Party pursuant to this Agreement. Effective as of the Closing, except for the claims for; (i) any liability of the Company for accrued salary, wages, compensation and benefits for the period prior to the Closing (provided such liability is set forth in the Financial Statements); and (ii) any payments and other rights Stockholder has pursuant to this Agreement and those agreements entered into as part of this Agreement, Stockholder hereby unconditionally and irrevocably acquits, remises, discharges and forever releases Buyer, the Company and their respective Affiliates, partners, managers, employees, officers, directors and agents from any and all liabilities and obligations of every kind whatsoever, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, including those arising under any Law, contract, agreement, arrangement, commitment or undertaking, whether written or oral, to the extent that any of the foregoing arose out of any facts, circumstances or events occurring or existing prior to the Closing.

          (b)     The representations, warranties, covenants and obligations of Indemnifying Party, and the rights and remedies that may be exercised by Indemnified Party, shall not be limited or otherwise affected by or as a result of any information furnished to, or any investigation made by or knowledge of, Indemnified Party or any of its representatives. Without limiting the generality of the foregoing, Indemnified Party expressly reserves the right to seek indemnity or other remedy for any Adverse Consequences arising out of or relating to any breach of any representation, warranty or covenant contained herein, notwithstanding any investigation by, disclosure to, knowledge or imputed knowledge of Indemnified Party and its representatives in respect of any fact or circumstance that reveals the occurrence of any such breach. In furtherance of the foregoing, Indemnifying Party agrees that any knowledge or lack of reliance shall not be a defense in law or equity to any claim of breach of representation, warranty or covenant by Indemnifying Party herein, Indemnifying Party shall not in any proceeding concerning a breach or alleged breach of any representation, warranty or covenant herein, or any indemnity thereof, seek information concerning knowledge or reliance of Indemnified Party and its representatives, through deposition, discovery or otherwise or seek to introduce evidence or argument in any proceeding regarding the knowledge or lack of reliance of Indemnified Party and its representatives prior to the Closing on or with respect to any such representations, warranties or covenants.

      8.9     Payment of Claims.

          (a)     Upon Final Determination of the amount of a Claim for Indemnification, Indemnifying Party shall pay the amount of such claim within ten (10) days of the date of such Final Determination. If Indemnifying Party is obligated to make payment of a Claim for Indemnification

44

pursuant to a Final Determination, Indemnified Party may satisfy such claim by offsetting the amount of such Claim against any amounts payable to Indemnifying Party under the Transaction Documents. The foregoing offset rights shall not limit the liability or obligation of Indemnifying Party to make payment of such Claim for Indemnification.

(b)     A "Final Determination" of a claim shall be the earliest to occur of the following: (i) a judgment of any court determining the validity of a disputed claim, if no appeal is pending from such judgment or if the time to appeal therefrom has elapsed (it being understood that Indemnified Party shall have no obligation to appeal); (ii) an award of any arbitrator or arbitration panel determining the validity of such disputed claim, if there is not pending any motion to set aside such award or if the time within which to move to set such award aside has elapsed; (iii) a written termination of the dispute with respect to such claim signed by all of the parties thereto or their attorneys; (iv) a written acknowledgment of Indemnifying Party that they no longer dispute the validity of such claim; (v) the date on which Indemnifying Party fail to respond to a Claim for Indemnification as specified in Section 8.4(e) or Section 8.5; or (vi) such other evidence of final determination of a disputed claim as shall be reasonably acceptable to the Parties.

**ARTICLE IX**
**TERMINATION**

9.1     <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Stockholder and Buyer;

(b)     by Buyer by written notice to Stockholder if:

(i)     Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Stockholder pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure has not been cured by Stockholder within ten days of Stockholder's receipt of written notice of such breach from Buyer; or

(ii)    any of the conditions set forth in Section 7.1 or Section 7.2 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by December 31, 2018.

(c)     By Stockholder if:

(i)     Stockholder is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure has not been cured by Buyer within ten days of Buyer's receipt of written notice of such breach from Stockholder; or

(ii)    any of the conditions set forth in Section 7.1 or Section 7.2 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by December 31, 2018.

**ARTICLE X**
**CERTAIN TAX MATTERS**

10.1    <u>Post-Closing Tax Returns</u>. Buyer shall prepare and file, or cause to be prepared and filed, on a timely basis, all Tax Returns (including any amendments thereto) with respect to the Company which are due following the Closing Date ("Post-Closing Tax Returns"), other than the Pre-Closing Tax Returns.

*OC 287832843v8*

The Tax Returns shall be made, to the extent permitted by Law, in a manner consistent with the prior practice of the Company. At least thirty (30) days prior to the filing of any Tax Return with respect to any tax period beginning prior to the Closing and not yet filed as of the Closing Date (or any amendments to those Tax Returns with respect to taxable periods prior to the Closing Date), Buyer shall, and shall cause the Company, to submit copies of those Tax Returns, in draft form, to Stockholder, or representative of Stockholder, for written approval, which approval shall not be unreasonably delayed, withheld or conditioned.

10.2    Pre-Closing Tax Returns.  Stockholder shall prepare, or cause to be prepared, and file, on a timely basis, all Tax Returns (including any amendments thereto) with respect to the Company for all periods ending on or prior to the Closing Date which are filed after the Closing Date ("Pre-Closing Tax Returns"), including the Company's final federal and state Tax Returns.  Stockholder shall permit Buyer to review and comment on each Tax Return described in the preceding sentence at least thirty (30) days prior to filing and shall not file any such Tax Return without the consent of Buyer, which consent shall not be unreasonably withheld delayed, or conditioned.  Stockholder shall provide Buyer with a copy of each Tax Return described above within ten (10) days after the filing of each such Tax Return.  Stockholder shall not file or cause to be filed any amended Tax Returns or claim for Tax refund for any Tax period ending on or before the Closing Date without the written consent of Buyer, which consent shall not be unreasonably withheld, delayed or conditioned, to the extent that the action would reasonably be expected to materially and adversely change the Tax liability of Buyer or the Company for any Tax period after the Closing Date.

10.3    Straddle Periods.  For purposes of determining when Taxes or tax liabilities are attributable to the period prior to the Closing Date, Taxes and tax liabilities with respect to the income, property or operations of the Company that relate to a taxable year or other taxable period beginning before and ending after the Closing Date (the "Straddle Period") will be apportioned between the applicable pre-Closing Tax period and the applicable post-Closing Tax period as follows:  (i) in the case of Taxes other than income taxes, sales and use taxes and employment taxes, on a per diem basis and (ii) in the case of income taxes, sales and use taxes and employment taxes between the pre-Closing and post-Closing Tax Periods as if the taxable year of the Company shall be closed at the close of business on the Closing Date.

10.4    Cooperation on Tax Matters.

(a)    Buyer and Stockholder shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns pursuant to this Article X and any audit or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided under this Agreement.  Buyer and Stockholder shall (i) retain all books and records with respect to Tax matters pertinent to the Company relating to any whole or partial taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by Buyer or Stockholder, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (ii) give the other Party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other Party so requests, Buyer or Stockholder, as the case may be, shall allow the other Party to take possession of such books and records.

(b)    Buyer and Stockholder further agree, upon request, to use Commercially Reasonable Efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated by this Agreement).

46

     (c)    Buyer and Stockholder further agree, upon request and to the extent available, to provide the other Party with all information that either Party may be required to report with respect to the Company pursuant to Code §6043, or Code §6043A, or Treasury Regulations promulgated thereunder.

10.5    <u>Certain Taxes</u>. Buyer will file all necessary Tax Returns and other documentation with respect to all transfer (including stock transfer), recording, documentary, sales, use, stamp, registration, severance and other Taxes and fees, and, if required by applicable Law. Stockholder will join in the execution of any such Tax Returns and other documentation.

10.6    <u>Confidentiality</u>.  Any information shared in connection with Taxes shall be kept confidential, except as may otherwise be necessary in connection with Tax audits, Tax claims and Tax litigation, or the filing of Tax Returns or reports, refund claims, or as required by Law.

10.7    <u>Audits</u>.  Stockholder and Buyer shall provide prompt written notice to the other of any pending or threatened Tax audit, assessment or Proceeding that it becomes aware of related to the Company for whole or partial periods for which it may be indemnified by the other Party hereunder. Such notice shall contain factual information (to the extent known) describing the asserted tax Liability in reasonable detail and shall be accompanied by copies of any notice or other document received from or with any tax authority in respect of any such matters. If an Buyer has knowledge of an asserted tax Liability with respect to a matter for which it may be indemnified under this Agreement and such Party fails to give Stockholder prompt notice of such asserted tax Liability, then (a) if Stockholder is precluded by the failure to give prompt notice from contesting the asserted tax Liability in any forum, Stockholder shall have no obligation to indemnify the Buyer for any Taxes arising out of such asserted tax Liability, and (b) if Stockholder is not so precluded from contesting, but such failure to give prompt notice results in costs, expenses or other damages such as additional taxes to Stockholder, then any amount which Stockholder is otherwise required to pay the Buyer pursuant to their obligation to indemnify the Buyer under this Agreement shall be reduced by the amount of such costs, expenses or other damages such as additional taxes, *provided*, the Buyer shall nevertheless be entitled to full indemnification hereunder to the extent, and only to the extent, that such Party can establish that Stockholder did not suffer costs, expenses or other damages such as additional taxes because of such failure.

10.8    <u>Control of Proceedings</u>.  The Party responsible for the Tax (or refunds) under this Agreement shall control amendment of tax returns, control audits and disputes with a Governmental Authority related to such Taxes (or refunds), including action taken to pay, compromise or settle such Taxes; *provided*, that Buyer shall control any such amendment of tax returns, audits, disputes and actions relating to Straddle Periods. Reasonable out of pocket expenses with respect to any such audits, disputes and actions shall be borne by Stockholder and Buyer in proportion to their responsibility for such Taxes (or refunds) as set forth in this Agreement.

10.9    <u>Remittance of Refunds</u>. If Buyer or the Company receive a refund of any Taxes attributable to a Pre-Closing Period or the portion of a Straddle Period that Stockholder is responsible for under this Agreement, or if Stockholder or any Affiliate of Stockholder receives a refund of any Taxes attributable to a Post-Closing Period or the portion of a Straddle Period that Buyer is responsible for under this Agreement, the Party receiving such refund shall, within thirty (30) days after receipt of such refund, remit it to the Party who has responsibility for such Taxes under this Agreement. For the purpose of this Section 10.9, the term "refund" shall include a reduction in Tax and the use of an overpayment as a credit or other tax offset, and in these instances, the receipt of a refund shall occur upon the filing of a return or an adjustment thereto using such reduction, overpayment or offset or upon the receipt of cash.

10.10    <u>Property Taxes</u>. Property Taxes of the Company (including property Taxes payable as a tenant or lessee under any lease) will be pro-rated as of the Closing Date and, notwithstanding any other

provision of this Agreement to the contrary, the economic burden of any such property Tax will be borne by (a) Stockholder for all Pre-Closing Periods and the portion of any Straddle Period through the Closing Date and (b) by Buyer for all Post-Closing Periods and the portion of any Straddle Period after the Closing Date. Accordingly, notwithstanding any other provision of this Agreement to the contrary, (i) if Stockholder paid or pay (either directly or through an adjustment of the consideration payable to Stockholder under this Agreement) such a property Tax with respect to a Post-Closing Period or the portion of Straddle Period after the Closing Date, Buyer shall reimburse Stockholder within fifteen (15) days after receiving from Stockholder written demand for the amount of such property Tax, and (ii) if Buyer pays (either directly or through an adjustment of the consideration payable to Stockholder under this Agreement) such a property Tax with respect to a Pre-Closing Period or the portion of a Straddle Period through the Closing Date, Stockholder shall reimburse Buyer within fifteen (15) days after receiving from Buyer written demand for the amount of such property Tax; provided, however, Buyer may, in Buyer's sole discretion, offset such amounts against the any amounts payable to Stockholder under the Transaction Documents. For purposes of pro-rating property Taxes, the amount of any property Tax attributable to the portion of a Straddle Period through the Closing Date shall be deemed to be the amount of such property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the Straddle Period through the Closing Date and the denominator of which is the number of days in the entire Straddle Period. In determining the Straddle Period for property Taxes, the Tax period as reflected on the statement of Taxes due, property Tax bill, property "tax ticket", or any other request for payment from a Governmental Authority shall determine the taxable period.

## ARTICLE XI
## MISCELLANEOUS

11.1    <u>Press Releases and Public Announcements</u>.  Neither Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement or the existence of the subject matter of this Agreement prior to the Closing without the prior written approval of the other Party; *provided, however*, that either Party may make any public disclosure he or it believes in good faith is required by applicable Law or agreements related to such Party's indebtedness (in which case the disclosing Party will make only such disclosures that are so required, will not disclose to any Persons other than as so required and will use his or its Commercially Reasonable Efforts to advise the other Party prior to making the disclosure).

11.2    <u>No Third-Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns except as expressly provided in this Agreement.

11.3    <u>Entire Agreement</u>.  This Agreement (including the other documents delivered at the Closing) by and between the Parties constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, to the extent they related in any way to the subject matter of this Agreement.

11.4    <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties named in this Agreement and their respective successors and permitted assigns. Stockholder may not assign either this Agreement or any of her rights, interests, or obligations hereunder without the prior written approval of the other Party; *provided, however*, in the event of any such prior written approval Stockholder nonetheless shall remain responsible for the performance of all of her obligations hereunder. Buyer at any time upon notice to Stockholder, Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates, lenders or other third parties and (ii) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

OC 287832843v8

11.5 _Counterparts._ This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement may be executed separately and in counterparts, in facsimile, .pdf, .tif or other electronic signature, each of which shall be deemed an original and all of which together shall be deemed one Agreement, as if each of the Parties had countersigned the same document in person and the signature to any counterpart may be appended to any other counterpart. Signatures transmitted by electronic mail or facsimile shall have the same effect as an original, manual signature. This Agreement, and any other documents requiring a signature hereunder, may be signed electronically by the Parties in the manner specified by them.

11.6 _Headings._ The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11.7 _Notices._ All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given when (i) delivered by hand (with written confirmation of receipt) or by electronic mail transmission (with confirmation received by the sender), (ii) three (3) Business Days after sent by registered or certified mail, return receipt requested, postage prepaid, or (iii) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses set forth below:

**If to Stockholder:**

Dr. Robert C. Blaine
11037 Lockport Place
Santa Fe Springs, CA 90670
Email: Robert.Blaine@BlaineLabs.com

With a copy to:

Roby Yadegar
Yadegar Law PC
118 S Beverly Dr. Suite 200
Beverly Hills, CA 90212
Email: Roby@yadegarlawpc.com

OC 287832843v8

**If to Buyer:**

Vivera Pharmaceuticals, Inc.
4533 MacArthur Boulevard, Ste. 5049
Newport Beach, California 92660
Attention: Legal
Email: legal@viverapharma.com

With a copy to:

Greenberg Traurig, LLP
Attention: Daniel K. Donahue
3161 Michelson Drive, Suite 1000
Irvine, California 92612
E-mail: donahued@gtlaw.com

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

11.8    Governing Law. This Agreement shall be governed by and construed in accordance with the Laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of California and venue shall be in Orange County, California.

11.9    Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless the same shall be in a writing referring to this Agreement signed by Buyer and Stockholder. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

11.10    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

11.11    Expenses. Except as otherwise provided in this Agreement, each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated by this Agreement. In the event that any legal, declaratory, or equitable action is commenced between the Parties hereto or its personal representatives concerning any provision of this Agreement or the rights and duties of any person in relation thereto, all costs and expenses relating to such action (including attorneys' fees) shall be borne by the Party who is the least successful in such action, which shall be determined by comparing (A) the position asserted by each Party on all disputed matters taken together to (B) the final decision of the court on all disputed matters taken together.

50

11.12    Construction.  Any reference to any federal, state, local, or foreign Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean "including, without limitation."  Unless the context requires otherwise or to the extent not otherwise defined herein, all accounting terms used in this Agreement shall have the meanings given to them in accordance with GAAP.  The singular shall mean the plural, the plural shall mean the singular, and the use of any gender shall include all genders; and all references to any particular party defined herein shall be deemed to refer to each and every Person defined herein as such party individually, and to all of them, collectively, jointly and severally, as though each were named wherever the applicable defined term is used.  All references to "Section" or "Article" shall be deemed to refer to the provisions of this Agreement unless otherwise expressly provided.  Unless otherwise specifically stated, all references to time shall mean Eastern Standard Time or Eastern Daylight Time, as then in effect.  The words "this Agreement," "hereof," "hereunder," "herein," "hereby," or words of similar import shall refer to this Agreement as a whole and not to a particular section, subsection, clause or other subdivision of this Agreement, unless the context otherwise requires.  The Parties intend that each representation, warranty, and covenant contained in this Agreement shall have independent significance.  If any Party has breached any representation, warranty, or covenant contained in this Agreement in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

11.13    Incorporation of Exhibits and Schedules.  The Exhibits and Disclosure Schedule identified in this Agreement are incorporated into this Agreement by reference and made a part of this Agreement.

11.14    Specific Performance.  Each Party acknowledges and agrees that the other Parties would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise is breached.  Without limiting the foregoing, the Parties acknowledge that the Business is unique and recognize and affirm that in the event that Stockholder breaches this Agreement before Closing, money damages would be inadequate and Buyer would have no adequate remedy at law, so that Buyer shall have the right, in addition to any other rights and remedies existing in its favor, to enforce its rights and the other Parties' obligations hereunder not only by action for damages but also by action for specific performance, injunctive and/or other equitable relief.

11.15    Arbitration.  Any dispute, controversy or claim arising out of or relating to this Agreement (a "Dispute"), excluding any matter covered by Section 6.5 or Section 11.14, shall be settled by binding arbitration in accordance with the commercial arbitration rules of JAMS, except as otherwise provided in this Section 11.15.  Any such Dispute shall be arbitrated on an individual basis, and shall not be consolidated in any arbitration with any dispute, claim or controversy of any other Party.  The arbitration shall be conducted in Orange County, California and any court having jurisdiction thereof may immediately issue judgment on the arbitration award.  All costs of JAMS, including any fees of the arbitrators, shall be advanced by the Party initiating the arbitration.  At the conclusion of the arbitration, all costs of the Dispute resolution process contemplated by this Section 11.15 (including the fees of JAMS, the arbitrators and attorneys' fees) shall be borne by the Party who is the least successful in such process, which shall be determined by comparing (x) the position asserted by each Party on all disputed matters taken together to (y) the final decision of the arbitrator on all disputed matters taken together.  The Parties agree that the arbitration provided for in this Section 11.15 shall be the exclusive means to resolve all Disputes except as expressly noted in this Section 11.15.

OC 287832843v8

11.16   Disclosure Schedule.

(a)     The representations and warranties set forth in this Agreement contemplate that there is attached a Disclosure Schedule setting forth information that might be "material" or have a "Material Adverse Effect" or might not be in the "Ordinary Course of Business." The Parties may, at their option, include in such schedules items or information that are not material or are not likely to have a Material Adverse Effect or are in the Ordinary Course of Business, and any such inclusion shall not be deemed to be an acknowledgment or representation that such items are material or would have a Material Adverse Effect, to establish any standard of materiality, Material Adverse Effect or Ordinary Course of Business, or to define further the meaning of such terms for purposes of this Agreement.

(b)     Nothing in the Disclosure Schedule shall be deemed adequate to disclose an exception to a representation or warranty made unless the Disclosure Schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself). The Disclosure Schedule will be arranged in paragraphs corresponding to the numbered and lettered paragraphs contained in this Agreement. Qualification of any disclosure in the Disclosure Schedule by the Knowledge of the Company, awareness or belief of Stockholder or the Company or limitation of any disclosure in the Disclosure Schedule by materiality standards does not affect or amend the language of any representation or warranty of Stockholder contained in the Agreement if the same qualification or limitation is not expressly set forth in such representation or warranty. Nothing contained in the Disclosure Schedule is intended to either expand or diminish (other than as an exception to a representation) the scope of any representation or warranty of Stockholder contained in the Agreement or to create any covenant on the part of Stockholder. The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant. In addition, each of the Parties acknowledges and agrees that any Purchase Price adjustments as a result of the application of any provision of this Agreement or any documents referenced therein do not prejudice or limit in any respect whatsoever any Party's rights to indemnification under any other provision of this Agreement or any documents referenced therein, except to the extent that such a recovery would result in a duplication of damages.

11.17   Waiver of Jury Trial. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, IN CONNECTION WITH OR RELATING TO THE TRANSACTION, THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR ANY AMENDMENT HEREOF OR THEREOF, ANY PROVISION HEREOF OR THEREOF OR THE BREACH, PERFORMANCE, ENFORCEMENT, VALIDITY OR INVALIDITY HEREOF OR THEREOF. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES' ACCEPTANCE OF THIS AGREEMENT.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first above written.

**BUYER:**

Vivera Pharmaceuticals, Inc.,
a Delaware Corporation

By: _____  9/28/18
Paul Edalat,
Chairman of the Board & Director

**STOCKHOLDER:**

_____  9/28/18
Dr. Robert C. Blaine

<u>EXHIBIT A</u>

Products List

*OC 287832843v8*

<u>EXHIBIT C</u>

Form of Non Competition Agreement

*OC 287832843v8*

EXHIBIT D(1) and (2)

Form of Legal Opinions

*OC 287832843v8*

## EXHIBIT E

Form of Employment Agreement

*OC 287832843v8*

EXHIBIT F

Form of Company Lease

3

**APPENDIX A to Share Exchange Agreement: Change of Control Provision**

Effective October 1, 2018, Dr. Robert C. Blaine provided to Vivera Pharmaceuticals, Inc. ("Vivera") its management and board of directors strategic, operational and procedural control of Blaine Laboratories, Inc. This ensures that as of October 1, 2018 that Vivera Pharmaceuticals, Inc. will consolidate the operations of Blaine Laboratories, Inc. into its books and records.

Consideration provided to Dr. Robert C. Blaine is in the form of ███████ of common shares in Vivera Pharmaceuticals, Inc. to be issued at the IPO price and a note for ███████ to be paid for in cash. As of December 31, 2018, Robert C. Blaine has been paid ████████████████████████████████████████████████████

Date: 12/31/18

_____
**Vivera Pharmaceuticals, Inc.**

Paul Edalat

Chairman and Chief Business Development Officer

**Accepted and Agreed:**

Date: 12/31/18

_____
**Blaine Laboratories, Inc.**

Dr. Robert C. Blaine, CEO

# EXHIBIT 2

## VIVERA PHARMACEUTICALS, INC.

## EXECUTIVE EMPLOYMENT AGREEMENT

THIS EXECUTIVE EMPLOYMENT AGREEMENT is entered into effective as of October 1st, 2018 between VIVERA PHARMACEUTICALS, INC., a Delaware corporation ("*Company*"), and DR. ROBERT C. BLAINE ("*Employee*").

**1.     EMPLOYMENT**.  Company hereby employs Employee in accordance with the terms of this Agreement and all the policies and procedures set forth in the Employee Handbook as in effect as of the date of this Agreement and as it may be modified or amended in the future ("*Employee Manual*"), and other Company policies or procedures currently in effect or subsequently implemented.  Employee acknowledges that Employee is not employed for a specific term but is an at-will employee who may resign at any time without notice.  Likewise, the Company may terminate the Employee at any time, with or without notice, and with or without cause or reason.

**2.     TITLE AND WORK RESPONSIBILITIES:**

**2.1**     Employee shall be employed hereunder as Chief Medical Officer of Company effective as of October 1st, 2018 ("*Appointment Date*").  Employee's compensation and benefits under Sections 4.1 through 4.3 shall commence on the first day of Employee's service hereunder.

**2.2**     As Chief Medical Officer, Employee shall be responsible for acting as a liaison between doctors and health area executives, ensure patients receive the highest quality products and treatments, speaking engagements not limited to conventions, videos, events and medical conferences.  CMO may be asked to facilitate or participate in CME course events or teaching material.  Continued innovation and product contribution.  Position will require travel.

**2.3**     Work assignments are made at the exclusive discretion of the Company and the Company has the absolute right to assign Employee new or different job duties as deemed appropriate by the Company.

**3.     EMPLOYEE'S OBLIGATIONS**.   Employee covenants and agrees, as a condition of accepting or continuing employment with the Company, to all the terms and conditions in the Employee Manual, as amended, other agreements executed by Employee and all Company policies, procedures and other agreements now in existence or hereafter implemented, including, without limitation, the duty to:

**3.1**     Comply with all Company policies and procedures as set forth in the Employee Manual, policy and procedure manuals, safety manuals and other sources;

**3.2**     Devote his full time and attention to meet the requirements set forth in the job description which objectives or duties may change from year to year;

**3.3**     Follow the direction and recommendations of Company management, including the Chief Executive Officer and the Board of Directors;

**3.4**     Refrain from investing in any direct competitor of the Company except that Employee may at any time own beneficially up to one (1%) of the stock of any competing

corporation whose securities are listed on a national securities exchange or regularly traded in the national over-the-counter-market; and

      **3.5**    To observe and comply at all times with the provisions of the Company's Insider Trading Policy (as amended, from time to time) and with every rule of law and every regulation in force in relation to dealings in stock, shares, debentures or other securities of the Company (including in relation to unpublished price sensitive information affecting such securities), in whatever jurisdiction, and to observe and comply with all laws and regulations of any stock exchange, market or dealing system in which such dealings take place.

## 4.    COMPENSATION

      **4.1**    **Salary**.  The Employee will be paid an annual salary of One Hundred Twenty Thousand Dollars ($120,000). Salary shall be paid on a bi-weekly basis as adjusted from time to time.  During employment, the Company will pay Employee the annual base salary in accordance with the terms of the Employee Manual less state and federal withholding and authorized deductions.

      **4.2**    **Bonuses**.  Employee shall be eligible to receive performance based bonuses as determined from time to time by the Compensation Committee of the Board of Directors in its discretion.

      **4.3**    **Benefits.**  Employee shall be entitled to the insurance and employee benefits set forth in the Employee Manual and such other benefits that are made available generally to senior management of the Company ("**Benefits**").  The Company does not warrant that it will continue to offer the same or similar medical insurance benefits or other related Benefits in the future and reserves the right to modify, reduce or eliminate benefits at its sole discretion.

      **4.4**    **Severance on Termination Without Cause Or For Good Reason**.  If the Company terminates the Employee for any reason without Cause (including death or Disability) or Employee resigns from the Company for Good Reason, the Employee shall be entitled to a lump sum payment in the amount of ninety days' salary at the salary rate effective on the date of termination, less all federal and state withholding.  The receipt of any severance pursuant to this Section 4.4 will be subject to Employee signing, and not revoking, a customary separation agreement and release of claims in a form acceptable to the Company in its reasonable discretion.  No severance will be paid or provided until the separation agreement and release agreement becomes effective.

## 5.    CONFIDENTIAL INFORMATION, NON DISCLOSURE, AND TRADE SECRETS AGREEMENT

      **5.1**    Employee expressly agrees that he will never disclose to a third party or make unauthorized use of any "**Confidential Information**" as defined in the Confidential Information, Non-Disclosure, and Trade Secrets Agreement attached hereto as Exhibit A to this Agreement.

      **5.2**    Employee shall not during his employment directly or indirectly render any services of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, which would be in competition with the

Company, or which would prevent Employee from rendering the agreed services to Company during the tenure of his employment.

**6.     INTENTIONALLY OMITTED.**

**7.     TERMINATION.**  Upon termination of employment, Employee shall return all Company's property such as cell phones, laptops, or other tangible and intangible property including, without limitation, customer lists, manuals, contract forms, documents or any other tangible or intangible documents or information used by the Company in the Employee's possession at the time of termination, in a manner consistent with Company policy.

**8.     SURVIVAL OF PROVISIONS OF AGREEMENT POST TERMINATION**. All the obligations set forth in Sections 4, 5.1, 7 and 8 shall survive the termination of the Agreement and the termination of Employee's employment with the Company.

**9.     MISCELLANEOUS**

**9.1     Notices.**  All notices required or permitted hereunder shall be in writing and deemed properly given when delivered in person to Employee or to a corporation officer of Company, as the case may be, or when deposited in the United States mail, postage prepaid and properly addressed to the party to be notified, if to Employee, to his residence, and if to Company, to its Secretary, at the home office, Newport Beach, California, or to any such other address as shall have last been given by the party to be notified.

**9.2     Parties Benefited.**  This Agreement shall inure to the benefit of, and be binding on Employee, his heirs, executors and administrators and on Company, its successors and assigns.

**9.3     Assignments.**  This Agreement may be assigned at any time by Company to any related corporation or a successor corporation. In the event of such an assignment, the assignee corporation to which the Agreement is assigned shall automatically be substituted for the assignor Company for all intentions and purposes and to the same extent as if this assignee were the Company that had originally executed this Agreement. This is a personal contract and the Employee cannot assign or transfer all or any portion of the contract except that in the event of the Employee's death the compensation due and owing the Employee can be paid in accordance with any assignment of death benefits.

**9.4     Waiver**.  The waiver by either party of a default or a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent default or breach.

**9.5     Modifications.**  The provisions of this Agreement shall constitute the entire agreement between the parties, with respect to the specific terms set forth herein, and may only be modified by an agreement in writing signed by the party against whom enforcement is sought.  Modifications to this Agreement do not change or alter the at-will status of the Employee.

**9.6     Construction of Agreement.**  This Agreement shall be construed consistently with the terms and conditions of all other Company policies and procedures, which are referenced in this Agreement. If there is any conflict with the terms of this Agreement and

Company policy or procedure, this Agreement shall be interpreted to comply with Company policies or procedures.

       **9.7**    **Supersedes Prior Agreements**. This Agreement and all the terms thereof supersede all prior employment agreements executed by Employee but shall be interpreted consistent with the Employee Manual and other policies and procedures of the Company. This Agreement will be interpreted independently of any and all agreements executed by Employee pertaining to equity awards.

       **9.8**    **Attorneys Fees**. The prevailing party in any action brought to enforce this Agreement may recover reasonable attorneys' fees and costs including all costs and fees incurred in the preparation, trial and appeal of an action brought to enforce this Agreement.

       **9.9**    **Applicable Law**. It is the intent of the parties that all provisions of this Agreement be enforced to the fullest extent permissible under the law and public policy of the state of California, unless prohibited by law in which case this Agreement shall be enforced in accordance with the laws where the action for enforcement is filed. If any section is determined by a court of law to be unenforceable, that section shall be severed from the Agreement and the balance of the Agreement shall be enforced according to its terms.

    **10.**    **Definitions.** Capitalized terms used in this Agreement but not otherwise defined herein shall have the meaning hereby assigned to them as follows:

       **10.1**    "**Disability.**" The Employee shall be deemed to have a Disability for purposes of this Agreement if either (i) the Employee is deemed disabled for purposes of any group or individual disability policy or (ii) in the good faith judgment of the Board, the Employee is substantially unable to perform the Employee's duties under this Agreement for more than ninety (90) days, whether or not consecutive, in any twelve (12) month period, by reason of a physical or mental illness or injury.

       **10.2**    "**Cause**" shall mean (i) Employee's conviction of, or plea of nolo contendere to, a felony; (ii) a willful act by the Employee which constitutes gross misconduct and which is injurious to the Company; (iii) any act or acts of dishonesty by Employee intended or reasonable expected to result in any gain or personal enrichment of Employee at the expense of the Company; or (iv) if Employee fails to perform the duties and responsibilities of his position after a written demand from the Board which describes the basis for the Board's belief that Employee has not substantially performed his duties and provides Employee with thirty (30) days to take corrective action.

       **10.3**    "**Good Reason**" shall mean, in the context of a resignation by the Employee, a resignation that occurs within thirty (30) days following the occurrence, without the written consent of the Employee, of one or more of the following events: (i) any adverse change in the Employee's base salary then in effect; (ii) a significant reduction of the Employees responsibilities relative to Employee's responsibilities in effect immediately prior to such reduction; or (iii) the relocation of the Employee to a facility or location more than fifty (50) miles from the Company's present location; provided, however, that "Good Reason" shall not be deemed to exist hereunder if such change in Base Salary or reduction of responsibilities occurs in connection with (x) changes or reductions generally applicable to the Company's management group, or (y) Employee's engagement in any action or any inaction that would otherwise enable the Company to terminate the Employee for Cause.

Page 4 of 5

11.    **EMPLOYEE CERTIFICATION**.  Employee hereby certifies that he has had an adequate opportunity to review, and understands all the terms and conditions of, this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and year first above written.

**EMPLOYEE**

Dr. Robert C. Blaine

**COMPANY**

Vivera Pharmaceuticals, Inc.,
a Delaware corporation

By:_____

*OC 287884022v1*

# VIVERA PHARMACEUTICALS, INC.
## CONFIDENTIAL INFORMATION AND
## INVENTION ASSIGNMENT
## AGREEMENT

As a condition of my employment with or contractor or advisory services on behalf of Vivera Pharmaceuticals, Inc., its subsidiaries, affiliates, successors or assigns (together the "**Company**"), and in consideration for such engagement by the Company and my receipt of the compensation (cash or otherwise) now and hereafter paid to me by Company, I agree to the following:

1. *Services.* I will perform for the Company such duties as may be designated by the Company from time to time. During my period of employment or consulting relationship with the Company, I will devote my reasonable best efforts to the interests of the Company and will not, directly or indirectly, engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company. As used herein, unless the context expressly provides otherwise, the terms "employ", "employment" and their derivatives shall refer to all work related relationships, including a formal employer/employee relationship, consultancies, advisory relationships, independent contractor relationships and the like.

2. *Confidential Information.*

A. *Company Information.* I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company, except under a non-disclosure agreement duly authorized and executed by the Company. I understand that "**Confidential Information**" means any non-public information that relates to the actual or anticipated business or research and development of the Company, technical data, trade secrets or know-how, including, but not limited to, research, product plans or other information regarding Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, patent ideas, formula ideas, product ideas, engineering, hardware configuration information, marketing, finances or other business information and communication. I further understand that Confidential Information does not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

B. *Former Employer Information.* I agree that I will not, during my employment or consulting/advisory engagement with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

C. *Third Party Information.* I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

-1-

OC 287851904v1

3. *Inventions.*

A. *Inventions Retained and Licensed.*  I have attached hereto, as <u>Exhibit A</u>, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to my employment or consulting/advisory relationship with the Company (collectively referred to as "**Prior Inventions**"), which belong to me, which relate to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Prior Inventions.  If in the course of my employment or consulting/advisory relationship with the Company, I incorporate into a Company product, process or service a Prior Invention owned by me or in which I have an interest, I hereby grant to the Company a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or service, and to practice any method related thereto.

B. *Assignment of Inventions.*  I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company (collectively referred to as "**Inventions**"), except as provided in <u>Section 3.F</u> below.  I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my employment or consulting/advisory relationship with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.  I understand and agree that the decision whether or not to commercialize or market any Invention developed by me solely or jointly with others is within the Company's sole discretion and for the Company's sole benefit and that no royalty will be due to me as a result of the Company's efforts to commercialize or market any such Invention.

C. *Inventions Assigned to the United States.*  I agree to assign to the United States government all my right, title, and interest in and to any and all Inventions whenever such full title is required to be in the United States by a contract between the Company and the United States or any of its agencies.

D. *Maintenance of Records.*  I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment or consulting/advisory relationship with the Company.  The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company.  The records will be available to and remain the sole property of the Company at all times.

E. *Patent and Copyright Registrations.*  I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.  I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement.  If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of

authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

4.   *Conflicting Employment or Consulting*.

I agree that, during the term of my employment or consulting/advisory relationship with the Company, I will not engage in any other employment, occupation or consulting directly related to the business in which the Company is now involved or becomes involved during the term of my employment or consulting/advisory relationship, nor will I engage in any other activities that conflict with my obligations to the Company.

5.   *Returning Company Documents*.   I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment or consulting/advisory relationship with the Company or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to Section 3.D.

6.   *Notification of New Employer*.   In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

7.   *Non-Solicitation of Employees and Clients*.   I agree that I will not, during the period of my employment or consulting/advisory relationship and for the period ending three (3) years after my termination (the "**Non-Solicit Period**") for any reason or no reason at all, induce or attempt to induce any employees, exclusive consultants, exclusive contractors or exclusive representatives of Company (or those of any of its affiliates) to stop working for, contracting with or representing Company or any of its affiliates or to work for, contract with or represent any of Company's (or its affiliates') competitors.   Additionally, I agree during the Non-Solicit Period not to influence, encourage, solicit, persuade or induce (or attempt to do so), directly or knowingly indirectly, on behalf of myself or any third party, any Client to cease doing business with or otherwise terminate, limit, postpone or diminish its relationship or business dealings with the Company or any of its subsidiaries.   For purposes of the foregoing, a "**Client**" shall mean any other individual or entity who or which is a client, customer, supplier or partner of the Company or any or any of its subsidiaries as of the date of the expiration of the term of employment or consulting/advisory relationship (or, if during the term, as of the date of such act).

8.   *Conflict of Interest Guidelines*.   I agree to at all times diligently adhere to and obey any and all written internal rules and regulations governing the conduct of Company's employees, as established and modified from time to time and agree to execute and abide by the terms of the Conflict of Interest Agreement in the form attached hereto as Exhibit B.

9.   *Representations*.   I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment or consulting/advisory relationship by the Company.   I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

*OC 287851904v1*

10. *Availability of Injunctive Relief.* IN ADDITION TO THE RIGHT UNDER THE RULES TO PETITION THE COURT FOR PROVISIONAL RELIEF, BOTH PARTIES AGREE THAT ANY PARTY MAY ALSO PETITION THE COURT FOR INJUNCTIVE RELIEF WHERE EITHER PARTY ALLEGES OR CLAIMS A VIOLATION OF CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT BETWEEN ME AND THE COMPANY OR ANY OTHER AGREEMENT REGARDING TRADE SECRETS, CONFIDENTIAL INFORMATION, OR NONSOLICITATION. I UNDERSTAND THAT ANY BREACH OR THREATENED BREACH OF SUCH AN AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS FEES.

A. *Voluntary Nature of Agreement.* I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *I AM WAIVING MY RIGHT TO A JURY TRIAL*. FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

11.    *Corporate Opportunity.* I agree that so long as I am an officer/employee (excluding for purposes this Section 11 any consulting, contractor or advisory relationships) of the Company, I will not pursue for my account or benefit, either directly or indirectly, any investment or business opportunity ("**Opportunity**") regarding pharmaceutical development or sales until such time as I have fully disclosed to the Company all information in my possession concerning the Opportunity and a majority of the disinterested board of directors has approved has declined to the Company's pursuit of the Opportunity and authorized me to pursue the Opportunity for my own account or benefit.

12. *General Provisions.*

A. *Governing Law; Consent to Personal Jurisdiction.* This Agreement will be governed by the laws of the State of California. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in Orange County, California for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

B. *Entire Agreement.* This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions or representations between us including, but not limited to, any representations made during my interview(s) or relocation negotiations, whether written or oral. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the President of the Company and me. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

C. *Severability.* If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

D. *Successors and Assigns.* This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

-4-

OC 287851904v1

Date: _____

_____
Signature

_____
Name of Employee, Consultant or Advisor

Acknowledged and agreed:

**VIVERA PHARMACEUTICALS, INC.**

By: _____
      Mr. Paul Edalat, Chairman, President & CBDO

-5-

**Exhibit A**

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP**

| Title | Date | Identifying Number or Brief Description |
|-------|------|------------------------------------------|
|       |      |                                          |

\_\_\_   No inventions or improvements

\_\_\_   Additional Sheets Attached


Signature of Employee/Consultant/Advisor: _____

Print Name of Employee/Consultant/Advisor: _____

Date: _____

A-1

<u>**Exhibit B**</u>

**VIVERA PHARMACEUTICALS, INC.**

**CONFLICT OF INTEREST GUIDELINES**

Vivera Pharmaceuticals, Inc., a Delaware corporation, its subsidiaries, affiliates, successors or assigns (together the **"Company"**), holds its employees and contractors to the highest standard of business ethics. As a conflict of interest can compromise an employee's business ethics, the Company employees are expected to diligently avoid such conflicts. At the Company, a conflict of interest is any activity that is inconsistent with or opposed to the Company's interests, or gives the appearance of impropriety. In that regard, while you are employed by the Company, you agree as follows:

- *Proper Payments*: You agree to pay for and receive only that which is proper. You should not make payments or promises to influence another's acts or decisions, and you must not give gifts beyond those extended in normal business. You must observe all government restrictions on gifts and entertainment. You will not receive payments of any kind from the Company customers.

- *Interest in Other Businesses*: You and members of your immediate family will avoid any direct or indirect financial relationship that could cause divided loyalty. You will obtain written permission from the CEO of the Company before you begin any employment, business, or consulting relationship with another company.

- *Inventions, Books and Publications*: You will obtain written permission from the CEO before developing, outside of the Company, any products, software, or intellectual property that is or may be related to the Company's current or potential business.

- *Family*: You will not conduct the Company business with members of your family – or others with whom you have a significant relationship – unless you have prior written permission from the CEO of the Company. You shall not have a direct reporting relationship with any member of your family or others with whom you have a significant relationship. If such a relationship exists or occurs, you will report it in writing to the CEO of the Company.

- *Favors, Gifts and Entertainment*: Neither you nor members of your family will give or receive valuable gifts (including gifts of equipment or money, discounts, or favored personal treatment) to or from any person associated with the Company vendors or customers. This includes accepting the opportunity to buy "directed shares" (also called "friends and family shares") from a company where you are now or are likely to become involved in the evaluation, recommendation, negotiation or approval of current or prospective business with that company.

  o This is not intended to preclude the Company from receiving or evaluating appropriate complimentary products or services. Nor is it intended to preclude the Company from making a gift to a company or organization, provided that the gift is openly given, with full knowledge by the company or organization, and is consistent with applicable law. In rare circumstances, local customs in some countries may call for the exchange of gifts having more than nominal value as part of the business relationship. In these situations, you may accept gifts only on behalf of the Company (not an individual) with the approval of the

CEO of the Company.  You agree to turn any gifts received over to the Company for appropriate disposition.  In all cases, you to conduct the exchange of gifts so there is no appearance of impropriety.  You acknowledge that gifts may only be given in accordance with applicable laws, including the U.S. FCPA.

    o   You agree not to provide or accept advertising novelties, favors, or entertainment unless the following conditions are met: 1) they are consistent with the Company's business practices; 2) they do not violate any applicable law, such as state and federal procurement laws and regulations; 3) they are of limited value; and 4) public disclosure would not embarrass the Company.

- *Honoraria*: You will not request or negotiate a fee or receive any form of compensation from an organization that requests you to speak at an event, unless you first receive express authorization from the CEO of the Company for your organization.

- *Outside Directorships*:  Prior to accepting a position on an outside board of a profit making organization, you will obtain written approval from the CEO of the Company.  As a rule and at a minimum, you may not accept a position as an outside director of any competitor or partner of the Company.  In addition, you may not accept a position as a director of a company that supports or promotes a competitor's products or services without prior written consent from the review committee.

    o   Unless otherwise specified by the review committee, you will not accept any form of compensation (including stock options, IPO stock or cash) for service on a board of directors of a company if the service is at the request of the company or in connection with the Company's investment in, or a significant relationship exists with, that company.  Any company that is a vendor, supplier, partner or customer of the Company has a "relationship" with the Company. "Significant" is broadly defined to include a sole-source vendor/supplier, or one in which the Company is responsible for generating five percent or more of the outside company's revenues.

It is not possible to list all conflicts of interest.  These are examples of the types of conflicts of interest that you are expected to avoid.  Ultimately, it's your responsibility to avoid any situation that could appear to be a conflict of interest.  You should feel free to discuss any potential conflicts of interest with the CEO of the Company.

Should any provision of this Agreement be determined by any court of competent jurisdiction to be wholly or partially invalid or unenforceable, the legality, validity and enforceability of the remaining parts, terms, or provisions are intended to remain in full force and effect.

*OC 287851904v1*

I HAVE READ AND AGREE TO COMPLY WITH THE TERMS OF THIS AGREEMENT AND ACKNOWLEDGE THAT ANY VIOLATION OF THE PROVISIONS ABOVE WOULD ACTUALLY CONSTITUTE A MATERIAL AND SUBSTANTIAL DISRUPTION OF THE COMPANY'S OPERATION.

Date: _____          _____
                                         Employee/Consultant/Advisor Signature

                                         _____
                                         Name (Please Print)

[Signature page to Conflict of Interest Agreement]

B-3

# EXHIBIT 3

# COMMERCIAL

# LEASE AGREEMENT

**THE PARTIES**. This Lease Agreement ("Agreement" or "Lease") effective as of June 8th, 2018 ("Effective Date") is between: Blaine Holding & Development, LLC, a California limited liability company and Vivera Pharmaceuticals, Inc., a Delaware corporation.

The **Lessor** is a business entity known as Blaine Holdings & Development, LLC, and a California limited liability Company with a mailing address of 11037 Lockport Place, Santa Fe Springs, California, 90670 hereinafter referred to as the "Lessor".

The **Lessee** is a business entity known as Vivera Pharmaceuticals, Inc., a Delaware corporation with a mailing address of 4533 MacArthur Blvd., Ste. 5049, Irvine, CA 92660 hereinafter referred to as the "Lessee".

The Lessor and Lessee hereby agree as follows:

**1)     DESCRIPTION OF LEASED PREMISES**. The Lessor agrees to lease to the Lessee the following described (1) 21,412 square feet (SF) located at 11037 Lockport Place, Santa Fe Springs, California, 90670. (2) 14,670 square feet (SF) of the North warehouse space located at 11100 Greenstone Avenue, Santa Fe Springs, California, 90670; (3) 11,450 square feet (SF) South warehouse space located at 11110 Greenstone Avenue, Santa Fe Springs, California, 90670. Total square feet (SF) of 47,532.

**2)     USE OF LEASED PREMISES**. The Lessor is leasing the Premises to the Lessee and the Lessee is hereby agreeing to lease the Premises for warehousing, storage, receipt, and shipping of Lessee's products, as well as general business operations.

Any change in use or purpose of the Premises other than as described above shall be upon prior written consent of Lessor only otherwise the Lessee will be considered in default of this Lease Agreement. No other uses are permitted during the Term of the Lease.

**3)     TERM OF LEASE**. The Lease will start on **June 8th, 2018** with first rental payment due to Lessor on **January 1, 2019**.  To terminate tenancy the Lessor or Lessee must give the other party a written 30-day notice of Lease non-renewal.  The Lessee may only terminate their Lease on the last day of any month and the Lessor must receive a written notification of non-renewal at least 30 days prior to the last day of that month.  If the Lessee plans to leave on or after the first of any month, they are responsible for that month's full rent.  If the Lessee does not provide the Lessor with a written 30-day notice, they shall forfeit their full deposit amount.

**Term**: 3 years ("**Initial Term**") commencing June 8, 2018 ("**Commencement Date**") and ending May 31st, 2021 ("**Expiration Date**"). Option for renewal or month to month tenancy after expiration date.  The time between the Expiration Date and the end of the renewal period(s) shall be referred to as the "Renewal Term."  The Initial Term and any Renewal Term shall be collectively referred to as the "Term."

**OPTION TO RENEW**.  The Lessee's option for renewal or month to month tenancy after the Expiration Date may be exercised by giving written notice to Lessor no less than 60 days prior to the expiration of the Lease or any Renewal Term.

LESSOR INITIALS

LESSEE INITIALS

Page 1

**4)    RENT.**

**RENT AMOUNT**. Payment shall be made by the Lessee to the Lessor in the amount of **$44,194.00** per month, payable on the 1st day of each month ("Base Rent") for the Initial Term of this Lease Agreement, except during the Free Rent Period.  All sums other than Base Rent that Lessee is obligated to pay under this Lease will be deemed to be additional rent due, regardless of whether those sums are designated as "additional rent."  The term "Rent" means the Base Rent and all additional rent payable under this Lease.

**Free Rent Period**. Lessee's obligation to pay Base Rent will be conditionally abated from the entry into this Lease through December 31, 2018 ("Free Rent Period"). Commencing with the first month after the Free Rent Period, Lessee will pay Base Rent.

**Conditions to Free Rent**.  The abatement of Base Rent described above is expressly conditioned on Lessee's fulfilling Lessee's obligations under the Lease throughout the Term. The amount of the abated Base Rent will be based in part on the amount of Base Rent due under the Lease for the full term. If Tenant defaults under the Lease and that default results in a termination of the Lease prior to the natural expiration of the Term, on the date of that termination Tenant must pay to Landlord the amount of Base Rent that would otherwise have been due during the Free Rent Period. This is in addition to all other amounts and damages that Landlord is entitled to receive.

**RENT PAYMENT**. The Rent shall be paid under the following instructions:

Rent shall be paid by the Lessee to the Lessor on a per month basis with payment due no later than the 1st of every month, with the exception of the Free Rent Period.

Rent shall be paid by the Lessee to the Lessor's aforementioned mailing address.

**RETURNED CHECKS (NSF)**. If the Lessee attempts to pay Rent with a check that is not deemed valid by a financial institution due to non-sufficient funds, or any other reason for it to be returned, the Lessee will be subject to a fee of $50.00 in addition to any late fee.

**LATE FEE**. The Lessor shall charge a late payment fee if Rent is not paid on time in the following amount:  The Lessee shall be charged a late fee in the amount of 10% of the monthly Rent amount per occurrence if payment is made after the 5th day it is due.

**5)    EXPENSES**. This is a "triple net lease" and the Rent will be paid by Lessee and be received by Lessor without any deduction or offset whatsoever by Lessee, foreseeable or unforeseeable. Except as expressly provided to the contrary in this Lease, Lessor will not be required to make any expenditure, incur any obligation, or incur any liability of any kind in connection with this Lease or the ownership, construction, maintenance, operation, or repair of the Premises.  In accordance with a Triple Net (NNN) Lease the responsibility of the expenses shall be attributed to the following (with such expenses being referred to herein as the "Estimated Expenses"):

It is the intention of the Parties, and they hereby agree, that in addition to the Rent, the Lessee shall be obligated to pay the following expenses to the Lessor on a per month basis:

OPERATING EXPENSES. The Lessor shall have no obligation to provide any services, perform any acts or pay any expenses, charges, obligations or costs of any kind whatsoever with respect to the Premises, and Lessee hereby agrees to pay one-hundred percent (100%) of any and all Operating Expenses as hereafter defined for the entire term of the Lease and any renewals thereof in

LESSOR INITIALS                                                                                   LESSEE INITIALS

Page 2

accordance with specific provisions hereinafter set forth. The term "Operating Expenses" shall include all costs to Lessor of operating and maintaining the Premises, and shall include, without limitation, real estate and personal property taxes and assessments, management fee(s), heating, air conditioning, HVAC, electricity, water, waste disposal, sewage, operating materials and supplies, service agreements and charges, lawn care, snow removal, restriping, repairs, repaving, cleaning and custodial, security, insurance, the cost of contesting the validity or applicability of any governmental acts which may affect operating expenses, and all other direct operating costs of operating and maintaining the Premises and related parking areas, unless expressly excluded from operating expenses.

TAXES. Lessee shall pay, during the term of this Lease, the real estate taxes and special taxes and assessments (collectively, the "taxes") attributable to the Premises and accruing during such term. The Lessee shall pay to Lessor said taxes on a monthly basis, based on one-twelfth (1/12) of the estimated annual amount for taxes. Taxes for any fractional calendar year during the term hereof shall be prorated. In the event Lessee does not make any tax payment required hereunder, Lessee shall be in default of this Lease.

INSURANCE. The Lessee shall provide and maintain in force at all times commercial general liability and property damage or casualty insurance. The Lessee and will designate the Lessor as an "also named insured". The Lessee shall provide the Lessor with a copy of such insurance certification or policy prior to the effective date of this Lease Agreement. The insurance shall protect and indemnify the Lessor of any injury, death, or property damage to occur on the property to the limits of $2,000,000.00.  In addition, Lessee shall maintain any required workers' compensation and employer liability insurance as required by law.  Lessor may carry other insurance that Lessor deems advisable.

**UTILITIES**. The Lessee shall be responsible for any and all utilities to the Premises in relation to the total property area.

6)     **SECURITY DEPOSIT**. A security deposit in the amount of **$44,194.00** shall be due and payable in advance upon the signing of this Lease and which amount shall be held in escrow by the Lessor in a separate, interest-bearing savings account as security for the faithful performance of the terms and conditions of the Lease.

Provided the Premises is returned to the Lessor in the same condition as the Start of the Initial Term, less any normal "wear and tear", the Lessee shall have their Security Deposit amount of $44,194.00 returned within 90 days.

7)     **FURNISHINGS**. The Lessor will not provide any furnishings to the Lessee under this Lease.

8)     **PARKING**. Parking shall be provided to the Lessee in a shared manner provided on the Premises. There is no set number of parking spaces provided to the Lessee.

There shall be no fee charged to the Lessee for the use of the Parking Space(s).

9)     **LEASEHOLD IMPROVEMENTS**. The Lessee agrees that no leasehold improvements, alterations or changes of any nature, (except for those listed on any attached addenda) shall be made to the Leasehold Premises or the exterior of the building without first obtaining the consent of the Lessor in writing, which consent shall not be unreasonably withheld, and thereafter, any and all

LESSOR INITIALS _____                                    LESSEE INITIALS _____

Page 3

leasehold improvements made to the Premises which become affixed or attached to the leasehold Premises shall remain the property of the Lessor at the expiration or termination of this Lease Agreement. Furthermore, any leasehold improvements shall be made only in accordance with applicable federal, state or local codes, ordinances or regulations, having due regard for the type of construction of the building housing the subject leasehold Premises. If the Lessee makes any improvements to the Premises the Lessee shall be responsible payment.   All work to be performed by or for Lessee pursuant to the Lease will be performed diligently, in a first-class manner, and in compliance with all applicable laws, ordinances, regulations, and rules of any public authority having jurisdiction over the Premises and Lessee's and Lessor's insurance carriers. Lessor will have the right, but not the obligation, to periodically inspect the work on the Premises and may require changes in the method or quality of the work.  Lessee assumes the risk of damage to any of Lessee's improvements. Lessee will repair all damage to the Premises caused by the installation or removal of these items. Upon the termination of this Lease, Lessee will remove any improvements made or installed by Lessee and restore the Premises to their condition existing prior to the construction of these items. This is provided, however, that Lessor may permit, upon written notice to Lessee, any items designated by Lessor to remain on the Premises. In that case, the items will be the property of Lessor when the Lease terminates. All removals and restoration will be accomplished in a good manner so as not to cause any damage to the Premises.

Nothing in the Lease shall be construed to authorize the Lessee or any other person acting for the Lessee to encumber the rents of the Premises or the interest of the Lessee in the Premises or any person under and through whom the Lessee has acquired its interest in the Premises with a mechanic's lien or any other type of encumbrance. Under no circumstance shall the Lessee be construed to be the agent, employee or representative of Lessor. In the event a lien is placed against the Premises, through actions of the Lessee, Lessee will promptly pay the same or bond against the same and take steps immediately to have such lien removed. If the Lessee fails to have the Lien removed, the Lessor shall take steps to remove the lien and the Lessee shall pay Lessor for all expenses related to the Lien and removal thereof and shall be in default of this Lease.

**10)     LICENSES AND PERMITS.** A copy of any and all local, state or federal permits acquired by the Lessee which are required for the use of the Premises shall be kept on site at all times and shall be readily accessible and produced to the Lessor and/or their agents or any local, state, or federal officials upon demand.

**11)     MAINTENANCE.** The Lessee shall be responsible for all repairs and maintenance on the Premises due to normal wear and tear on the Premises. Particularly items which need immediate attention including but not limited to, the replacement of light bulbs, normal repair and cleaning of windows, cleaning of bathrooms, clearing of toilets, etc. The Lessee shall properly maintain the premises in a good, safe and clean condition and shall properly and promptly remove all rubbish and hazardous wastes and see that the same are properly disposed of according to all local, state or federal laws, rules regulations or ordinances.

In the event the Premises is damaged as a result of any neglect or negligence of Lessee, his employees, agents, business invitees, or any independent contractors serving the Lessee or in any way as a result of Lessee's use and occupancy of the premises, then the Lessee shall be primarily responsible for seeing that the proper claims are placed with the Lessee's insurance company, or the damaging party's insurance company, and shall furthermore be responsible for seeing that the building is safeguarded with respect to said damage and that all proper notices with respect to said

LESSOR INITIALS _____                           LESSEE INITIALS

                                                                                Page 4

damage, are made in a timely fashion, including notice to the Lessor, and the party or parties causing said damage.

**12)     INSURANCE**. In the event Lessee shall fail to obtain insurance required hereunder and fails to maintain the same in force continuously during the term, Lessor may, but shall not be required to, obtain the same and charge the Lessee for same as additional rent. Furthermore, Lessee agrees not to keep upon the premises any articles or goods which may be prohibited by the standard form of fire insurance policy, and in the event the insurance rates applicable to fire and extended coverage covering the premises shall be increased by reason of any use of the premises made by Lessee, then Lessee shall pay to Lessor, upon demand, such increase in insurance premium as shall be caused by said use or Lessee's proportionate share of any such increase.

**13)     SUBLET/ASSIGNMENT**. The Lessee may not transfer or assign this Lease, or any right or interest hereunder or sublet said leased premises or any part thereof without the express prior written consent of Lessor. This Lease will be binding on and inure to the benefit of the successors and assigns of Lessor and, to the extent assignment is approved by Lessor, Lessee.

**14)     DAMAGE TO LEASED PREMISES**. In the event the building housing the leased premises shall be destroyed or damaged as a result of any fire or other casualty which is not the result of the intentional acts or neglect of Lessee and which precludes or adversely affects the Lessee's occupancy of the leased premises, then in every such cause, the rent herein set forth shall be abated or adjusted according to the extent to which the Premises have been rendered unfit for use and occupation by the Lessee and until the demised premises have been put in a condition at the expense of the Lessor, at least to the extent of the value and as nearly as possible to the condition of the premises existing immediately prior to such damage. It is understood, however, in the event of total or substantial destruction to the Premises that in no event shall the Lessor's obligation to restore, replace or rebuild exceed an amount equal to the sum of the insurance proceeds available for reconstruction with respect to said damage.

The Lessee shall, during the term of this Lease, and in the renewal thereof, at its sole expense, keep the interior of the leased premises in as good a condition and repair as it is at the date of this Lease, reasonable wear and use excepted. This obligation would include the obligation to replace any plate glass damaged as a result of the neglect or acts of Lessee or her guests or invitees. Furthermore, the Lessee shall not knowingly commit nor permit to be committed any act or thing contrary to the rules and regulations prescribed from time to time by any federal, state or local authorities and shall expressly not be allowed to keep or maintain any hazardous waste materials or contaminates on the premises. Lessee shall also be responsible for the cost, if any, which would be incurred to bring her contemplated operation and business activity into compliance with any law or regulation of a federal, state or local authority.

**15)     HAZARDOUS MATERIALS LAWS** shall mean any and all federal, state, or local laws, ordinances, rules, decrees, orders, regulations, or court decisions relating to hazardous substances, hazardous materials, hazardous waste, toxic substances, environmental conditions on, under, or about the Premises, the Building, or the Property, or soil and ground water conditions, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), the Resource Conservation and Recovery Act (RCRA), the Hazardous Materials Transportation Act, any other law or legal requirement concerning hazardous or toxic substances,

LESSOR INITIALS _____

LESSEE INITIALS

Page 5

and any amendments to the foregoing.   Lessee agrees that it shall not violate any Hazardous Materials Laws during the Term.

**16)     LESSEE'S DEFAULT AND POSSESSION**. In the event that the Lessee shall fail to pay said rent and expenses as set forth herein, or any part thereof, when the same are due and payable, or shall otherwise be in default of any other terms of said Lease for a period of more than 15 days, after receiving notice of said default, then the parties hereto expressly agree and covenant that the Lessor may declare the Lease terminated and may immediately re-enter said premises and take possession of the same together with any of Lessee's personal property, equipment or fixtures, including any improvements, left on the premises which items may be held by the Lessor as security for the Lessee's eventual payment and/or satisfaction of rental defaults or other defaults of Lessee under the Lease. It is further agreed, that if the Lessee is in default, that the Lessor shall be entitled to take any and all action to protect its interest in the personal property and equipment, to prevent the unauthorized removal of said property or equipment which threatened action would be deemed to constitute irreparable harm and injury to the Lessor in violation of its security interest in said items of personal property. Furthermore, in the event of default, the Lessor may expressly undertake all reasonable preparations and efforts to release the Premises including, but not limited to, the removal of all inventory, equipment or leasehold improvements of the Lessee's, at the Lessee's expense, without the need to first procure an order of any court to do so, although obligated in the interim to undertake reasonable steps and procedures to safeguard the value of Lessee's property, including the storage of the same, under reasonable terms and conditions at Lessee's expense, and, in addition, it is understood that the Lessor may sue the Lessee for any damages or past rents due and owing and may undertake all and additional legal remedies then available.

Each right and remedy of Lessor provided for in this Lease or now or later existing at law, in equity, by statute, or otherwise, will be cumulative and will not preclude Lessor from exercising any other rights or remedies provided for in this Lease or now or later existing at law or in equity, by statute, or otherwise. No payment by Lessee of a lesser amount than the Rent, or any endorsement on any check or letter accompanying any check or payment as Rent, will be deemed an accord and satisfaction of full payment of Rent. However, Lessor may accept this payment without prejudice to Lessor's right to recover the balance of Rent or to pursue other remedies.

**17)     LESSOR'S DEFAULT**. The Lessee may send written notice to the Lessor stating duties or obligations that have not been fulfilled under the full performance of this Lease Agreement. If said duties or obligations have not been cured within 30 days from receiving such notice, unless the Lessor needs to more time to cure or remedy such issue in accordance with standard industry protocol, then the Lessor shall be in default of this Lease Agreement.

If the Lessor should be in default the Lessee shall have the option to terminate this Lease Agreement and be held harmless against any of its terms or obligations.

**18)     DISPUTES**. If any dispute should arise in relation to this Lease Agreement the Lessor and Lessee shall first negotiate amongst themselves in "good faith". Afterwards, if the Lessor and Lessee fail to resolve the dispute through negotiation then the parties shall be allowed to submit their cases in accordance with the local court system.

**19)     INDEMNIFICATION**. Lessor will not be liable for any loss or damage to person or property caused by theft, fire, acts of God, acts of a public enemy, riot, strike, insurrection, war,

LESSOR INITIALS

LESSEE INITIALS

Page 6

court order, requisition, or order of government body or authority, or for any damage or inconvenience that may arise through repair or alteration of any part of the Premises or failure to make any repair. Lessee will indemnify and defend Lessor, by counsel acceptable to Lessor, against any liabilities, including reasonable attorney's fees and court costs, arising out of or relating to the following:

       (i)     claims of injury to or death of persons or damage to property occurring or resulting directly or indirectly from the use or occupancy of the Premises, or from activities of Lessee, Lessee's invitees, or anyone about the Premises, or from any other cause, except to the extent caused by Lessor's gross negligence or willful misconduct;

       (ii)    claims for work or labor performed, or for materials or supplies furnished to or at the request of Lessee in connection with performance of any work done for the account of Lessee within the Premises; and

       (iii)   claims arising from any breach or default on the part of Lessee in the performance of any covenant contained in this Lease. The provisions of this Section 20 will survive the expiration or termination of this Lease with respect to any claims or liability occurring prior to the expiration or termination.

**20)**     **BANKRUPTCY - INSOLVENCY.** The Lessee agrees that in the event all or a substantial portion of the Lessee's assets are placed in the hands of a receiver or a Trustee, and such status continues for a period of 30 days, or should the Lessee make an assignment for the benefit of creditors or be adjudicated bankrupt, or should the Lessee institute any proceedings under the bankruptcy act or any amendment thereto, then such Lease or interest in and to the leased premises shall not become an asset in any such proceedings and, in such event, and in addition to any and all other remedies of the Lessor hereunder or by law provided, it shall be lawful for the Lessor to declare the term hereof ended and to re-enter the leased land and take possession thereof and all improvements thereon and to remove all persons therefrom and the Lessee shall have no further claim thereon.

**21)**     **SUBORDINATION AND ATTORNMENT.** Upon request of the Lessor, Lessee will subordinate its rights hereunder to the lien of any mortgage now or hereafter in force against the property or any portion thereof, and to all advances made or hereafter to be made upon the security thereof, and to any ground or underlying lease of the property provided, however, that in such case the holder of such mortgage, or the Lessor under such Lease shall agree that this Lease shall not be divested or in any way affected by foreclosure, or other default proceedings under said mortgage, obligation secured thereby, or Lease, so long as the Lessee shall not be in default under the terms of this Lease. Lessee agrees that this Lease shall remain in full force and effect notwithstanding any such default proceedings under said mortgage or obligation secured thereby.

Lessee shall, in the event of the sale or assignment of Lessor's interest in the building of which the Premises form a part, or in the event of any proceedings brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Lessor covering the Premises, attorn to the purchaser and recognize such purchaser as Lessor under this Lease.

**22)**     **USAGE BY LESSEE.** Lessee shall comply with all rules, regulations and laws of any governmental authority with respect to use and occupancy. Lessee shall not conduct or permit to be conducted upon the premises any business or permit any act which is contrary to or in violation of

LESSOR INITIALS

LESSEE INITIALS

Page 7

any law, rules or regulations and requirements that may be imposed by any authority or any insurance company with which the premises is insured, nor will the Lessee allow the premises to be used in any way which will invalidate or be in conflict with any insurance policies applicable to the building. In no event shall explosives or extra hazardous materials be taken onto or retained on the premises. Furthermore, Lessee shall not install or use any equipment that will cause undue interference with the peaceable and quiet enjoyment of the premises by other Lessees of the building. Lessee will not commit waste, overload the floors or structure of the Premises, subject the Premises to any use that would cause damage or raise or violate any insurance coverage, permit any unreasonable odors, smoke, dust, gas, substances, noise, or vibrations to emanate from the Premises, take any action that would constitute a nuisance or would disturb, obstruct, or endanger any other tenant's of the Premises, take any action that would abrogate any warranties, or use or allow the Premises to be used for any unlawful purpose.

**23) SIGNAGE**. Lessee shall not place on any exterior door, wall or window of the premises any sign or advertising matter without Lessor's prior written consent and the approval of the local municipality. Thereafter, Lessee agrees to maintain such sign or advertising matter as first approved by Lessor in good condition and repair. Furthermore, Lessee shall conform to any uniform reasonable sign plan or policy that the Lessor may introduce with respect to the building. Upon vacating the premises, Lessee agrees to remove all signs and to repair all damages caused or resulting from such removal.

**24) PETS**. No pets shall be allowed on the premises without the prior written permission of Lessor unless said pet is required for reasons of disability under the Americans with Disability Act.

**25) CONDITION OF PREMISES/INSPECTION BY LESSEE**. The Lessee acknowledges they have had the opportunity to inspect the Premises and acknowledges with its signature on this Lease that the Premises are in good condition and comply in all respects with the requirements of this Lease. The Lessor makes no representation or warranty with respect to the condition of the premises or its fitness or availability for any particular use, and the Lessor shall not be liable for any latent or patent defect therein. The Lessee represents that Lessee has inspected the premises and is leasing and will take possession of the premises with all current fixtures present in their "as is" condition as of the date hereof.

**26) AMERICANS WITH DISABILITY ACT**. Per 42 U.S. Code § 12183 if the Lessee is using the Premises as a public accommodation (e.g. restaurants, shopping centers, office buildings) or there are more than 15 employees the Premises must provide accommodations and access to persons with disabilities that is equal or similar to that available to the general public. Owners, operators, lessors, and lessees of commercial properties are all responsible for ADA compliance. If the Premises is not in compliance with the Americans with Disability Act any modifications or construction will be the responsibility of the Lessee.

**27) RIGHT OF ENTRY**. It is agreed and understood that the Lessor and its agents shall have the complete and unencumbered right of entry to the Premises at any time or times for purposes of inspecting or showing the Premises and for the purpose of making any necessary repairs to the building or equipment as may be required of the Lessor under the terms of this Lease or as may be deemed necessary with respect to the inspection, maintenance or repair of the building. In accordance with State and local laws, the Lessor shall have the right to enter the Premises without the consent of the Lessee in the event of an emergency.

LESSOR INITIALS

LESSEE INITIALS

Page 8

28)     **ESTOPPEL CERTIFICATE.** Lessee at any time and from time to time, upon at least ten (10) days prior notice by Lessor, shall execute, acknowledge and deliver to Lessor, and/or to any other person, firm or corporation specified by Lessor, a statement certifying that the Lease is unmodified and in full force and effect, or if the Lease has been modified, then that the same is in full force and effect except as modified, stating the dates to which the fixed rent and additional rent have been paid, and stating whether or not there exists any default by Lessor under this Lease and, if so, specifying each such default.

29)     **HOLDOVER PERIOD.** If Lessee holds over the Premises or any part of the Premises after expiration of the Term, the holding over will constitute a month-to-month tenancy, at a rent equal to the Base Rent in effect immediately prior to the holding over plus fifty percent (50%) of the Rent. This section will not be construed as Lessor's permission for Lessee to hold over. Acceptance of Rent by Lessor following expiration or termination would not constitute a renewal of this Lease.

30)     **WAIVER.** Waiver by Lessor of a default under this Lease shall not constitute a waiver of a subsequent default of any nature.

31)     **GOVERNING LAW.** This Lease shall be governed by the laws of the State of California.

32)     **NOTICES.** Notices shall be addressed to the following:

**Lessor**:

Blaine Holding & Development, LLC

11037 Lockport Place, Santa Fe Springs, California, 90670

**Lessee**

Vivera Pharmaceuticals, Inc.

4533 MacArthur Blvd., Ste 5049, Irvine, CA 92660

33)     **AMENDMENT(S).** No amendment of this Lease shall be effective unless reduced to writing and subscribed by the parties with all the formality of the original.

34)     **SEVERABILITY.** If any term or provision of this Lease Agreement is illegal, invalid or unenforceable, such term shall be limited to the extent necessary to make it legal and enforceable, and, if necessary, severed from this Lease. All other terms and provisions of this Lease Agreement shall remain in full force and effect.

35)     **BINDING EFFECT.** This Lease and any amendments thereto shall be binding upon the Lessor and the Lessees and/or their respective successors, heirs, assigns, executors and administrators.

36)     **LIMITATION OF LIABILITY.** The obligations of Lessor under this Lease are not personal obligations of the individual partners, directors, officers, shareholders, agents, or employees of Lessor. Lessee may look solely to the Premises for satisfaction of any liability and may not look to other assets of Lessor or seek recourse against the assets of the individual partners, directors, officers, shareholders, agents, or employees of Lessor. Whenever Lessor transfers Lessor's interest, Lessor will be automatically released from further performance under this Lease

LESSOR INITIALS                                                          LESSEE INITIALS

Page 9

and from all further liabilities and expenses under this Lease and the transferee of Lessor's interest will assume all liabilities and obligations of Lessor under this Lease from the date of the transfer.

37)    **TIME OF ESSENCE.**  Time is of the essence in this Lease.

**LESSOR SIGNATURE**

Signature _____ Date _____

By: Robert Blaine, Blaine Holdings

**LESSEE SIGNATURE**

Signature _____ Date _____

By:  Vivera Pharmaceuticals, Inc.

LESSOR INITIALS

LESSEE INITIALS

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is at BUCHALTER, A Professional Corporation, 1000 Wilshire Boulevard, Suite 1500, Los Angeles, CA  90017-2457 and my email address is vmedrano@buchalter.com.

On the date set forth below, I served the foregoing document described as:

**SECOND AMENDED COMPLAINT**

on all other parties and/or their attorney(s) of record to this action as follows:

| | |
|---|---|
| Kenneth P. White<br>Brown White & Osborn LLP<br>333 S. Hope St. #4000<br>Los Angeles, CA 90071<br>kwhite@brownwhitelaw.com | *Attorneys for Defendants / Cross-Complainants*<br>*Dr. Robert C. Blaine, Blaine Laboratories,*<br>*Inc., Blaine Holding & Development, LLC* |
| Noel S. Cohen<br>Danila Toscano<br>Polsinelli LLP<br>2049 Century Park East., Suite 2900<br>Los Angeles, CA 90067<br>ncohen@polsinelli.com<br>dstoscano@polsinelli.com | *Attorney for Defendants, Fred Battah, JM*<br>*Logistical Services and Real Value Products* |

☑    **BY ELECTRONIC SERVICE**.  On May 10, 2019, I caused the above-referenced document to be electronically filed and served using the Court's Electronic Filing System which constitutes service of the same.

☑    **BY MAIL**    I am readily familiar with the business' practice for collection and processing of correspondence for mailing with the United States Postal Service. The address(es) shown above is(are) the same as shown on the envelope.  The envelope was placed for deposit in the United States Postal Service at Buchalter in Los Angeles, California on May 10, 2019.  The envelope was sealed and placed for collection and mailing with first-class prepaid postage on this date following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge.  Executed on May 10, 2019, at Los Angeles, California.

Veronica Medrano
(Name)

(Signature)

40

**SECOND AMENDED COMPLAINT**

BN 35822046v6

# Exhibit 2

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAR 1 4 2019

Sherri R. Carter, Executive Officer/Clerk
By Jennifer De Luna, Deputy

1   BUCHALTER
    A Professional Corporation
2   OREN BITAN (SBN: 251056)
    AARON LEVINE (SBN: 299260)
3   1000 Wilshire Boulevard, Suite 1500
    Los Angeles, CA  90017-1730
4   Telephone: 213.891.0700
    Fax: 213.896.0400
5   E-mail:  obitan@buchalter.com

6   Attorneys for Plaintiff, Vivera Pharmaceuticals, Inc.

7

8                 SUPERIOR COURT OF CALIFORNIA

9                   COUNTY OF LOS ANGELES

10

11  VIVERA PHARMACEUTICALS, INC., a       CASE NO. 19STCV05281
    Delaware corporation,                 Civil Unlimited – Claim Over $25,000
12
            Plaintiff,                    [PROPOSED] ORDER GRANTING, IN
13                                         PART, PLAINTIFF'S REQUEST FOR A
            v.                             PRELIMINARY INJUNCTION
14
    DR. ROBERT C. BLAINE, an individual;  Order to Show Cause Hearing:
15  BLAINE LABORATORIES, INC., a California   Date:    March 14, 2019
    corporation; BLAINE HOLDING &         Time:    9:30 a.m.
16  DEVELOPMENT, LLC, a California limited  Dept.:   85
    liability company; and DOES 1 through 20,
17  inclusive,

18          Defendants.

19

20

21

22

23

24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

                                1
                        [PROPOSED] ORDER

BN 35847071v1

Electronically Received 03/08/2019 04:40

1  The hearing on Plaintiff Vivera Pharmaceuticals, Inc.'s ("Plaintiff" or "Vivera") Order to
2  Show Cause Regarding Why a Preliminary Injunction Should Not be Issued came on for hearing
3  on March 14, 2019, at 9:30 a.m. in Department 85 of the above-captioned Court, the Honorable
4  James Chalfant presiding.  All appearances were noted on the record.  After full consideration of
5  the documents, authorities, and arguments submitted by the parties,

6  **IT IS HEREBY ORDERED** that a preliminary injunction is issued as follows:

7  Dr. Robert C. Blaine ("Blaine"), Blaine Laboratories, Inc. ("Blaine Labs"), and Blaine
8  Holding ("Blaine Holding" and collectively with Blaine and Blaine Labs, "Defendants"), and
9  their agents, principals, partners, attorneys, servants employees and representatives and all those
10  persons or entities acting at their direction or on their behalf, and all person acting in concert or
11  participating with them (with the Defendants, the "Enjoined Parties"), are immediately ordered
12  to:

13  1.  Turn over to Vivera all Scarcare Gel-Pads, the Scarcare Gel-Pad Kit, Siltrex
14  Silicone Gel-Pad, Sil-K, Visilage, TVIA Kit, Opitox Kit, Zyrexal, Folinex, Odor Blast in
15  Defendants' possession custody or control, including any related raw materials, components,
16  electronic files, and marketing materials, including but not limited to the products listed in
17  **Exhibit 1** (the "Vivera Products") Subject to meet and confer ordered by the court.

18  2.  Provide Vivera with access for the purpose of copying any Vivera data stored on
19  any server including but not limited to Vivera emails or email accounts accessible to any of the
20  Enjoined Parties or stored in any device whatsoever, or copies of any emails in any format
21  whatsoever, including but not limited to the files referenced in Exhibit B to the Supplemental
22  Declaration of Olivia Karpinski. Subject to meet and confer ordered by the Court.

23  3.  Refrain from violating Paragraph 5 of the Executive Employment Agreement,
24  including the provisions set forth in its Exhibit A, attached hereto as **Exhibit 2**.

25  4.  Refrain from interfering with Vivera's exclusive possession of the leased premises
26  defined as the following: (1) ~~21,412 square feet (SF) located at 11037 Lockport Place, Santa Fe~~
27  ~~Springs, California, 90670 ("Building One")~~; (2) 14,670 square feet (SF) of the North warehouse
28  space located at 11100 Greenstone Avenue, Santa Fe Springs, California, 90670 ("Building

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

2
**[PROPOSED] ORDER**

BN 35847071v1

half of

1  Two"); and (3) 1,450 square feet (SF) South warehouse space located at 11110 Greenstone

2  Avenue, Santa Fe Springs, California, 90670 (the "Warehouse" and with Building One and

3  Building Two referred to herein as the "Premises").

4      5.      Plaintiff shall post a bond in the amount of $10,000 to serve as a preliminary

5  undertaking pursuant to Code of Civil Procedure Section 529.

6  **IT IS SO ORDERED.**

7

8  DATED: ___3/14/19___                    _____

9                                          HONORABLE JAMES CHALFANT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

| Product Name | Lot Number | P.O # | Case Count | Qty | Receive Date |
|---|---|---|---|---|---|
| E-Scar Label | L08011802 | 9786 | 2 | 13,475 | 8/3/2018 |
| Opitox Booklets | L01051902 | 10127 | 1 | 275 | 12/28/2018 |
| Tvia Booklets | L01051901 | 10127 | 1 | 275 | 12/28/2018 |
| Scarcare gel pad kit Scarcare sticker | L08221803 | 9854 | 1 | 1,005 | 8/29/2018 |
| | | | | | |
| Scarcare Pad in foil | BL2511 | | 1 Clear Container | 248 | |
| 50cc White HDPE Bottle | | | | | |
| 33mm White Ribbed CRC HS Cap | | | | | F10 |
| Size "0" Gelatin Capsules | | | | | |
| | Raw Materials | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Silicon Gel Bulk Part A | SR046982 | 10010 | 4 Drums @ 25kg | 100 kg | 1/4/2019 |
| Silicon Gel Bulk Part B | SR046982 | 10010 | 4 Drums @ 25kg | 100 kg | 1/4/2019 |
| Silicon Gel Bulk Part A | SR046816 | 10010 | 5 Drums @ 25kg | 125 kg | 12/19/2018 |
| Silicon Gel Bulk Part B | SR046816 | 10010 | 5 Drums @ 25kg | 125 kg | 12/19/2018 |
| Silicon Gel Bulk Part A | SR047866 | 10010 | 4 Drums @ 25kg | 100 kg | 2/14/2019 |
| Silicon Gel Bulk Part B | SR047866 | 10010 | 4 Drums @ 25kg | 100 kg | 2/14/2019 |
| 5 Mil Matt Mylar (width 37,000 inches)(Length 4,480 LF) Roll# 3360.OPR.4193.2.746 | 562-9464702 | 9468 | 1 Roll | 1 Roll | |
| Silicone Sheet Part # 183 1702 | 04000-P Sheet | | 1 | | |
| Polyvinyl Carboxy Polymer | 102189886 | 9945 | 4 @ 44.00lbs | 176 lbs | 10/11/2018 |
| Intersil Silicone Sheets | | 10395 | 18 | 5,400 | |
| | | | | | |
| Microcrystalline Cellulose 105 | | | | | |
| Masking Agent Powder 28-11-0151SD2 | | | | | |
| Croscarmelose Sodium | | | | | |
| Natural Cherry Flavor Powder MWNI 28-01-0614SD1 | | | | | |
| Advantol Powder | | | | | |
| CBD Powder | | | | 1 kg | |
| Ascorbic Acid | 118022177 | 10373 | 1 | 25 kg | 1/24/2019 |
| Stearic Acid (Protameen) | 810790807 | 10088 | 16 bags | 400 kg | 10/23/2018 |
| Urea (Agrium) | 82B2018 | 10123 | 40 bags | 907.2 kg | 11/19/2018 |
| Undecylenic Acid USP | RMUDC001 | 10059 | 1 Drum | 352 lbs | 10/26/2018 |
| Endicare ETP 510 | DAPOLISOLA01 | 10039 | 1 Drum | 132 lbs | 12/13/2018 |
| Chamomile Extract | PL-A145201 | 10388 | 1 Drum. | 175 lbs | 2/4/2019 |
| C12-15 Alkyl Benzoate | 118050R 602 | 10086 | 1 Drum | 396 lbs | 10/26/2018 |
| Dimethicone 100CST | 20704 | 10087 | 1 Drum | 440 lbs | 10/26/2018 |
| Menthol Crystals | 180730 | 9939 | 1 Drum | 55.115 lbs | 10/18/2018 |
| Gelaid 8317 | FPCS1800421 | 10317 | 1 Bucket | 40 lbs | 1/16/2019 |
| ESP With Hazel Extract in Glycerin | J24004818 | 10050 | 1 ontainer | 40 lbs | 10/30/2018 |
| | | | | | |
| | Product Labels | | | | |
| | | | | | |
| Revitaderm Psoriasis 4oz label | L02081901 | 10400 | 5 | 50,000 | 2/8/2019 |
| Ortho-Nesic NDC | L01251902 | 10303 | | 22,000 | 1/25/2019 |
| Vite 20 Active Callus 4oz  188.29 mil | L12171801 | 10215 | | 3,000 | 12/17/2018 |
| Vite 20 Active Callus 4oz  188.29 mil | L12271801 | 10161 | 2 | 61,370 | 12/27/2018 |
| Hemp Nesic Sample Lable | L10291803 | | 1 | 493 | 1/4/2019 |
| Terpenicol AF Cream Label | L01111901 | 10305 | 1 | 10,000 | 1/11/2019 |
| Terpenicol 1oz | L0131901 | 10405 | 1 | 15,000 | 1/31/2019 |
| Vite20 Nail Gel Label | L12271802 | 10214 | 1 | 22,000 | 12/27/2018 |
| Vite20 | L12271801 | 10161 | 2 | 31,500 | 12/27/2018 |
| | | | | | |
| | Office | | | | |
| | | | | | |
| LG UltraFine 5K 27" display for Mac | | | 1 | | |
| iMac Pro 27-inch | | | 3 | | |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Large White Board | | | | | |
| Office Desk | | | 3 | | |

## Equipment

| | | | | | |
|---|---|---|---|---|---|
| T-2000 2-Part Dispensing System | Model | Serial No. | | 1 | |
| Blue Hand Truck | T-2000 | 105-0689 | | 1 | |

## In Process Bulk Material

| | | | | | Start Date |
|---|---|---|---|---|---|---|
| Ortho Nesic | BL2688 | | 1 Drum | 300 lbs | | 2/21/2019 |
| Hemp-Nesic | BL2689 | | 1 Drum | 308 lbs | | 2/22/2019 |
| Revitaderm 40 Cream | BL2678 | | 2 Drums | 1006 lbs | | 1/21/2019 |
| Revitaderm Wound Care | BL2697 | | 2 Drums | 480 lbs | | 3/13/2019 |
| Ortho Nesic Bulk | BL2658 | | 1 Drum | 300 lbs | | 12/17/2019 |
| Revitaderm 40 Cream | BL2679 | | 3 Drums | 1,500 lbs | | 1/22/2019 |
| Revitaderm Psoriasis Cream | BL2686 | | 2 Drums | 1,000 lbs | | 1/29/2019 |
| Revitaderm Psoriasis Cream | BL2683 | | 2 Drums | 1,000 lbs | | 1/24/2019 |
| Psoriasis Cream | BL2668 | | 2 Drums | 1,000 lbs | | 1/14/2019 |
| Revitaderm Psoriasis Cream | BL2685 | | 2 Drums | 1,000 lbs | | 1/28/2019 |
| Revitaderm Psoriasis Cream | BL2684 | | 2 Drums | 1,000 lbs | | 1/25/2019 |
| 10% Tineacide | BL2656 | | 2 Drums | 1,000 lbs | | 12/18/2018 |
| Tineacide 2% | BL2671 | | 2 DRums | 1,000 lbs | | 1/17/2019 |
| Tineacide 2% | BL2669 | | 2 Drums | 1,000 lbs | | 1/15/2019 |
| Tineacide 2% | BL2670 | | 2 Drums | 1,000 lbs | | 1/16/2019 |
| Hemp-Nesic | BL2694 | | 2 Drums /2 Buckets | 1,070 lbs | | 2/14/2019 |

**EXHIBIT 2**

## VIVERA PHARMACEUTICALS, INC.

### EXECUTIVE EMPLOYMENT AGREEMENT

THIS EXECUTIVE EMPLOYMENT AGREEMENT is entered into effective as of October 1st, 2018 between VIVERA PHARMACEUTICALS, INC., a Delaware corporation ("*Company*"), and DR. ROBERT C. BLAINE ("*Employee*").

1.    **EMPLOYMENT.**  Company hereby employs Employee in accordance with the terms of this Agreement and all the policies and procedures set forth in the Employee Handbook as in effect as of the date of this Agreement and as it may be modified or amended in the future ("*Employee Manual*"), and other Company policies or procedures currently in effect or subsequently implemented.  Employee acknowledges that Employee is not employed for a specific term but is an at-will employee who may resign at any time without notice.  Likewise, the Company may terminate the Employee at any time, with or without notice, and with or without cause or reason.

2.    **TITLE AND WORK RESPONSIBILITIES:**

2.1    Employee shall be employed hereunder as Chief Medical Officer of Company effective as of October 1st, 2018 ("*Appointment Date*").  Employee's compensation and benefits under Sections 4.1 through 4.3 shall commence on the first day of Employee's service hereunder.

2.2    As Chief Medical Officer, Employee shall be responsible for acting as a liaison between doctors and health area executives, ensure patients receive the highest quality products and treatments, speaking engagements not limited to conventions, videos, events and medical conferences.  CMO may be asked to facilitate or participate in CME course events or teaching material.  Continued innovation and product contribution.  Position will require travel.

2.3    Work assignments are made at the exclusive discretion of the Company and the Company has the absolute right to assign Employee new or different job duties as deemed appropriate by the Company.

3.    **EMPLOYEE'S OBLIGATIONS.**  Employee covenants and agrees, as a condition of accepting or continuing employment with the Company, to all the terms and conditions in the Employee Manual, as amended, other agreements executed by Employee and all Company policies, procedures and other agreements now in existence or hereafter implemented, including, without limitation, the duty to:

3.1    Comply with all Company policies and procedures as set forth in the Employee Manual, policy and procedure manuals, safety manuals and other sources;

3.2    Devote his full time and attention to meet the requirements set forth in the job description which objectives or duties may change from year to year;

3.3    Follow the direction and recommendations of Company management, including the Chief Executive Officer and the Board of Directors;

3.4    Refrain from investing in any direct competitor of the Company except that Employee may at any time own beneficially up to one (1%) of the stock of any competing

corporation whose securities are listed on a national securities exchange or regularly traded in the national over-the-counter-market; and

      3.5    To observe and comply at all times with the provisions of the Company's Insider Trading Policy (as amended, from time to time) and with every rule of law and every regulation in force in relation to dealings in stock, shares, debentures or other securities of the Company (including in relation to unpublished price sensitive information affecting such securities), in whatever jurisdiction, and to observe and comply with all laws and regulations of any stock exchange, market or dealing system in which such dealings take place.

4.     COMPENSATION

      4.1    **Salary.** The Employee will be paid an annual salary of One Hundred Twenty Thousand Dollars ($120,000). Salary shall be paid on a bi-weekly basis as adjusted from time to time. During employment, the Company will pay Employee the annual base salary in accordance with the terms of the Employee Manual less state and federal withholding and authorized deductions.

      4.2    **Bonuses.** Employee shall be eligible to receive performance based bonuses as determined from time to time by the Compensation Committee of the Board of Directors in its discretion.

      4.3    **Benefits.** Employee shall be entitled to the insurance and employee benefits set forth in the Employee Manual and such other benefits that are made available generally to senior management of the Company ("*Benefits*"). The Company does not warrant that it will continue to offer the same or similar medical insurance benefits or other related Benefits in the future and reserves the right to modify, reduce or eliminate benefits at its sole discretion.

      4.4    **Severance on Termination Without Cause Or For Good Reason.** If the Company terminates the Employee for any reason without Cause (including death or Disability) or Employee resigns from the Company for Good Reason, the Employee shall be entitled to a lump sum payment in the amount of ninety days' salary at the salary rate effective on the date of termination, less all federal and state withholding. The receipt of any severance pursuant to this Section 4.4 will be subject to Employee signing, and not revoking, a customary separation agreement and release of claims in a form acceptable to the Company in its reasonable discretion. No severance will be paid or provided until the separation agreement and release agreement becomes effective.

5.     CONFIDENTIAL INFORMATION, NON DISCLOSURE, AND TRADE SECRETS AGREEMENT

      5.1    Employee expressly agrees that he will never disclose to a third party or make unauthorized use of any "*Confidential Information*" as defined in the Confidential Information, Non-Disclosure, and Trade Secrets Agreement attached hereto as Exhibit A to this Agreement.

      5.2    Employee shall not during his employment directly or indirectly render any services of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, which would be in competition with the

Company, or which would prevent Employee from rendering the agreed services to Company during the tenure of his employment.

6.     **INTENTIONALLY OMITTED.**

7.     **TERMINATION.** Upon termination of employment, Employee shall return all Company's property such as cell phones, laptops, or other tangible and intangible property including, without limitation, customer lists, manuals, contract forms, documents or any other tangible or intangible documents or information used by the Company in the Employee's possession at the time of termination, in a manner consistent with Company policy.

8.     **SURVIVAL OF PROVISIONS OF AGREEMENT POST TERMINATION.** All the obligations set forth in Sections 4, 5.1, 7 and 8 shall survive the termination of the Agreement and the termination of Employee's employment with the Company.

9.     **MISCELLANEOUS**

    **9.1**     **Notices.** All notices required or permitted hereunder shall be in writing and deemed properly given when delivered in person to Employee or to a corporation officer of Company, as the case may be, or when deposited in the United States mail, postage prepaid and properly addressed to the party to be notified, if to Employee, to his residence, and if to Company, to its Secretary, at the home office, Newport Beach, California, or to any such other address as shall have last been given by the party to be notified.

    **9.2**     **Parties Benefited.** This Agreement shall inure to the benefit of, and be binding on Employee, his heirs, executors and administrators and on Company, its successors and assigns.

    **9.3**     **Assignments.** This Agreement may be assigned at any time by Company to any related corporation or a successor corporation. In the event of such an assignment, the assignee corporation to which the Agreement is assigned shall automatically be substituted for the assignor Company for all intentions and purposes and to the same extent as if this assignee were the Company that had originally executed this Agreement. This is a personal contract and the Employee cannot assign or transfer all or any portion of the contract except that in the event of the Employee's death the compensation due and owing the Employee can be paid in accordance with any assignment of death benefits.

    **9.4**     **Waiver.** The waiver by either party of a default or a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent default or breach.

    **9.5**     **Modifications.** The provisions of this Agreement shall constitute the entire agreement between the parties, with respect to the specific terms set forth herein, and may only be modified by an agreement in writing signed by the party against whom enforcement is sought. Modifications to this Agreement do not change or alter the at-will status of the Employee.

    **9.6**     **Construction of Agreement.** This Agreement shall be construed consistently with the terms and conditions of all other Company policies and procedures, which are referenced in this Agreement. If there is any conflict with the terms of this Agreement and

Company policy or procedure, this Agreement shall be interpreted to comply with Company policies or procedures.

**9.7    Supersedes Prior Agreements.** This Agreement and all the terms thereof supersede all prior employment agreements executed by Employee but shall be interpreted consistent with the Employee Manual and other policies and procedures of the Company. This Agreement will be interpreted independently of any and all agreements executed by Employee pertaining to equity awards.

**9.8    Attorneys Fees.** The prevailing party in any action brought to enforce this Agreement may recover reasonable attorneys' fees and costs including all costs and fees incurred in the preparation, trial and appeal of an action brought to enforce this Agreement.

**9.9    Applicable Law.** It is the intent of the parties that all provisions of this Agreement be enforced to the fullest extent permissible under the law and public policy of the state of California, unless prohibited by law in which case this Agreement shall be enforced in accordance with the laws where the action for enforcement is filed. If any section is determined by a court of law to be unenforceable, that section shall be severed from the Agreement and the balance of the Agreement shall be enforced according to its terms.

**10.    Definitions.** Capitalized terms used in this Agreement but not otherwise defined herein shall have the meaning hereby assigned to them as follows:

**10.1    "Disability."** The Employee shall be deemed to have a Disability for purposes of this Agreement if either (i) the Employee is deemed disabled for purposes of any group or individual disability policy or (ii) in the good faith judgment of the Board, the Employee is substantially unable to perform the Employee's duties under this Agreement for more than ninety (90) days, whether or not consecutive, in any twelve (12) month period, by reason of a physical or mental illness or injury.

**10.2    "Cause"** shall mean (i) Employee's conviction of, or plea of nolo contendere to, a felony; (ii) a willful act by the Employee which constitutes gross misconduct and which is injurious to the Company; (iii) any act or acts of dishonesty by Employee intended or reasonable expected to result in any gain or personal enrichment of Employee at the expense of the Company; or (iv) if Employee fails to perform the duties and responsibilities of his position after a written demand from the Board which describes the basis for the Board's belief that Employee has not substantially performed his duties and provides Employee with thirty (30) days to take corrective action.

**10.3    "Good Reason"** shall mean, in the context of a resignation by the Employee, a resignation that occurs within thirty (30) days following the occurrence, without the written consent of the Employee, of one or more of the following events: (i) any adverse change in the Employee's base salary then in effect; (ii) a significant reduction of the Employees responsibilities relative to Employee's responsibilities in effect immediately prior to such reduction; or (iii) the relocation of the Employee to a facility or location more than fifty (50) miles from the Company's present location; provided, however, that "Good Reason" shall not be deemed to exist hereunder if such change in Base Salary or reduction of responsibilities occurs in connection with (x) changes or reductions generally applicable to the Company's management group, or (y) Employee's engagement in any action or any inaction that would otherwise enable the Company to terminate the Employee for Cause.

11.    **EMPLOYEE CERTIFICATION**. Employee hereby certifies that he has had an adequate opportunity to review, and understands all the terms and conditions of, this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and year first above written.

EMPLOYEE

_____
Dr. Robert C. Blaine

**COMPANY**

Vivera Pharmaceuticals, Inc.,
a Delaware corporation

By:_____

OC 287884022v1

VIVERA PHARMACEUTICALS, INC.
CONFIDENTIAL INFORMATION AND
INVENTION ASSIGNMENT
AGREEMENT

As a condition of my employment with or contractor or advisory services on behalf of Vivera Pharmaceuticals, Inc., its subsidiaries, affiliates, successors or assigns (together the "**Company**"), and in consideration for such engagement by the Company and my receipt of the compensation (cash or otherwise) now and hereafter paid to me by Company, I agree to the following:

1. *Services.* I will perform for the Company such duties as may be designated by the Company from time to time. During my period of employment or consulting relationship with the Company, I will devote my reasonable best efforts to the interests of the Company and will not, directly or indirectly, engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company. As used herein, unless the context expressly provides otherwise, the terms "employ", "employment" and their derivatives shall refer to all work related relationships, including a formal employer/employee relationship, consultancies, advisory relationships, independent contractor relationships and the like.

2. *Confidential Information.*

A. *Company Information.* I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company, except under a non-disclosure agreement duly authorized and executed by the Company. I understand that "**Confidential Information**" means any non-public information that relates to the actual or anticipated business or research and development of the Company, technical data, trade secrets or know-how, including, but not limited to, research, product plans or other information regarding Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, patent ideas, formula ideas, product ideas, engineering, hardware configuration information, marketing, finances or other business information and communication. I further understand that Confidential Information does not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

B. *Former Employer Information.* I agree that I will not, during my employment or consulting/advisory engagement with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

C. *Third Party Information.* I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

-1-

3. *Inventions.*

A. *Inventions Retained and Licensed.* I have attached hereto, as <u>Exhibit A</u>, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to my employment or consulting/advisory relationship with the Company (collectively referred to as "**Prior Inventions**"), which belong to me, which relate to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Prior Inventions. If in the course of my employment or consulting/advisory relationship with the Company, I incorporate into a Company product, process or service a Prior Invention owned by me or in which I have an interest, I hereby grant to the Company a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or service, and to practice any method related thereto.

B. *Assignment of Inventions.* I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company (collectively referred to as "**Inventions**"), except as provided in <u>Section 3.F</u> below. I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope and during the period of my employment or consulting/advisory relationship with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Invention developed by me solely or jointly with others is within the Company's sole discretion and for the Company's sole benefit and that no royalty will be due to me as a result of the Company's efforts to commercialize or market any such Invention.

C. *Inventions Assigned to the United States.* I agree to assign to the United States government all my right, title, and interest in and to any and all Inventions whenever such full title is required to be in the United States by a contract between the Company and the United States or any of its agencies.

D. *Maintenance of Records.* I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment or consulting/advisory relationship with the Company. The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

E. *Patent and Copyright Registrations.* I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of

authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

4.   *Conflicting Employment or Consulting.*

I agree that, during the term of my employment or consulting/advisory relationship with the Company, I will not engage in any other employment, occupation or consulting directly related to the business in which the Company is now involved or becomes involved during the term of my employment or consulting/advisory relationship, nor will I engage in any other activities that conflict with my obligations to the Company.

5.   *Returning Company Documents.*  I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment or consulting/advisory relationship with the Company or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to <u>Section 3.D</u>.

6.   *Notification of New Employer.*  In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

7.   *Non-Solicitation of Employees and Clients.*  I agree that I will not, during the period of my employment or consulting/advisory relationship and for the period ending three (3) years after my termination (the "**Non-Solicit Period**") for any reason or no reason at all, induce or attempt to induce any employees, exclusive consultants, exclusive contractors or exclusive representatives of Company (or those of any of its affiliates) to stop working for, contracting with or representing Company or any of its affiliates or to work for, contract with or represent any of Company's (or its affiliates') competitors. Additionally, I agree during the Non-Solicit Period not to influence, encourage, solicit, persuade or induce (or attempt to do so), directly or knowingly indirectly, on behalf of myself or any third party, any Client to cease doing business with or otherwise terminate, limit, postpone or diminish its relationship or business dealings with the Company or any of its subsidiaries. For purposes of the foregoing, a "**Client**" shall mean any other individual or entity who or which is a client, customer, supplier or partner of the Company or any or any of its subsidiaries as of the date of the expiration of the term of employment or consulting/advisory relationship (or, if during the term, as of the date of such act).

8.   *Conflict of Interest Guidelines.*  I agree to at all times diligently adhere to and obey any and all written internal rules and regulations governing the conduct of Company's employees, as established and modified from time to time and agree to execute and abide by the terms of the Conflict of Interest Agreement in the form attached hereto as <u>Exhibit B</u>.

9.   *Representations.*  I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment or consulting/advisory relationship by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

OC 287851904v1

10. *Availability of Injunctive Relief*. IN ADDITION TO THE RIGHT UNDER THE RULES TO PETITION THE COURT FOR PROVISIONAL RELIEF, BOTH PARTIES AGREE THAT ANY PARTY MAY ALSO PETITION THE COURT FOR INJUNCTIVE RELIEF WHERE EITHER PARTY ALLEGES OR CLAIMS A VIOLATION OF CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT BETWEEN ME AND THE COMPANY OR ANY OTHER AGREEMENT REGARDING TRADE SECRETS, CONFIDENTIAL INFORMATION, OR NONSOLICITATION. I UNDERSTAND THAT ANY BREACH OR THREATENED BREACH OF SUCH AN AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS FEES.

A. *Voluntary Nature of Agreement*. I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *I AM WAIVING MY RIGHT TO A JURY TRIAL*. FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

11.  *Corporate Opportunity*. I agree that so long as I am an officer/employee (excluding for purposes this Section 11 any consulting, contractor or advisory relationships) of the Company, I will not pursue for my account or benefit, either directly or indirectly, any investment or business opportunity ("**Opportunity**") regarding pharmaceutical development or sales until such time as I have fully disclosed to the Company all information in my possession concerning the Opportunity and a majority of the disinterested board of directors has approved has declined to the Company's pursuit of the Opportunity and authorized me to pursue the Opportunity for my own account or benefit.

12. *General Provisions*.

A. *Governing Law; Consent to Personal Jurisdiction*. This Agreement will be governed by the laws of the State of California. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in Orange County, California for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

B. *Entire Agreement*. This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions or representations between us including, but not limited to, any representations made during my interview(s) or relocation negotiations, whether written or oral. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the President of the Company and me. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

C. *Severability*. If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

D. *Successors and Assigns*. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

OC 287851904v1

Date: _____

Signature
_____

Name of Employee, Consultant or Advisor
_____

Acknowledged and agreed:

VIVERA PHARMACEUTICALS, INC.

By: _____
     Mr. Paul Edalat, Chairman, President & CBDO

*OC 287851904v1*

<u>Exhibit A</u>

LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

___ No inventions or improvements

___ Additional Sheets Attached


Signature of Employee/Consultant/Advisor: _____


Print Name of Employee/Consultant/Advisor: _____


Date: _____

A-1

OC 287851904v1

<u>Exhibit B</u>

VIVERA PHARMACEUTICALS, INC.

CONFLICT OF INTEREST GUIDELINES

Vivera Pharmaceuticals, Inc., a Delaware corporation, its subsidiaries, affiliates, successors or assigns (together the "**Company**"), holds its employees and contractors to the highest standard of business ethics. As a conflict of interest can compromise an employee's business ethics, the Company employees are expected to diligently avoid such conflicts. At the Company, a conflict of interest is any activity that is inconsistent with or opposed to the Company's interests, or gives the appearance of impropriety. In that regard, while you are employed by the Company, you agree as follows:

- *Proper Payments*: You agree to pay for and receive only that which is proper. You should not make payments or promises to influence another's acts or decisions, and you must not give gifts beyond those extended in normal business. You must observe all government restrictions on gifts and entertainment. You will not receive payments of any kind from the Company customers.

- *Interest in Other Businesses*: You and members of your immediate family will avoid any direct or indirect financial relationship that could cause divided loyalty. You will obtain written permission from the CEO of the Company before you begin any employment, business, or consulting relationship with another company.

- *Inventions, Books and Publications*: You will obtain written permission from the CEO before developing, outside of the Company, any products, software, or intellectual property that is or may be related to the Company's current or potential business.

- *Family*: You will not conduct the Company business with members of your family – or others with whom you have a significant relationship – unless you have prior written permission from the CEO of the Company. You shall not have a direct reporting relationship with any member of your family or others with whom you have a significant relationship. If such a relationship exists or occurs, you will report it in writing to the CEO of the Company.

- *Favors, Gifts and Entertainment*: Neither you nor members of your family will give or receive valuable gifts (including gifts of equipment or money, discounts, or favored personal treatment) to or from any person associated with the Company vendors or customers. This includes accepting the opportunity to buy "directed shares" (also called "friends and family shares") from a company where you are now or are likely to become involved in the evaluation, recommendation, negotiation or approval of current or prospective business with that company.

  o  This is not intended to preclude the Company from receiving or evaluating appropriate complimentary products or services. Nor is it intended to preclude the Company from making a gift to a company or organization, provided that the gift is openly given, with full knowledge by the company or organization, and is consistent with applicable law. In rare circumstances, local customs in some countries may call for the exchange of gifts having more than nominal value as part of the business relationship. In these situations, you may accept gifts only on behalf of the Company (not an individual) with the approval of the

CEO of the Company. You agree to turn any gifts received over to the Company for appropriate disposition. In all cases, you to conduct the exchange of gifts so there is no appearance of impropriety. You acknowledge that gifts may only be given in accordance with applicable laws, including the U.S. FCPA.

o   You agree not to provide or accept advertising novelties, favors, or entertainment unless the following conditions are met: 1) they are consistent with the Company's business practices; 2) they do not violate any applicable law, such as state and federal procurement laws and regulations; 3) they are of limited value; and 4) public disclosure would not embarrass the Company.

•   *Honoraria*: You will not request or negotiate a fee or receive any form of compensation from an organization that requests you to speak at an event, unless you first receive express authorization from the CEO of the Company for your organization.

•   *Outside Directorships*: Prior to accepting a position on an outside board of a profit making organization, you will obtain written approval from the CEO of the Company. As a rule and at a minimum, you may not accept a position as an outside director of any competitor or partner of the Company. In addition, you may not accept a position as a director of a company that supports or promotes a competitor's products or services without prior written consent from the review committee.

o   Unless otherwise specified by the review committee, you will not accept any form of compensation (including stock options, IPO stock or cash) for service on a board of directors of a company if the service is at the request of the company or in connection with the Company's investment in, or a significant relationship exists with, that company. Any company that is a vendor, supplier, partner or customer of the Company has a "relationship" with the Company. "Significant" is broadly defined to include a sole-source vendor/supplier, or one in which the Company is responsible for generating five percent or more of the outside company's revenues.

It is not possible to list all conflicts of interest. These are examples of the types of conflicts of interest that you are expected to avoid. Ultimately, it's your responsibility to avoid any situation that could appear to be a conflict of interest. You should feel free to discuss any potential conflicts of interest with the CEO of the Company.

Should any provision of this Agreement be determined by any court of competent jurisdiction to be wholly or partially invalid or unenforceable, the legality, validity and enforceability of the remaining parts, terms, or provisions are intended to remain in full force and effect.

I HAVE READ AND AGREE TO COMPLY WITH THE TERMS OF THIS AGREEMENT AND ACKNOWLEDGE THAT ANY VIOLATION OF THE PROVISIONS ABOVE WOULD ACTUALLY CONSTITUTE A MATERIAL AND SUBSTANTIAL DISRUPTION OF THE COMPANY'S OPERATION.

Date: _____          _____
                                        Employee/Consultant/Advisor Signature

                                        _____
                                        Name (Please Print)

[Signature page to Conflict of Interest Agreement]

B-3

OC 287851904v1

**PROOF OF SERVICE**

1

2

3    I am employed in the County of Los Angeles, State of California.  I am over the age of 18

4    and not a party to the within action.  My business address is at BUCHALTER, A Professional

5    Corporation, 1000 Wilshire Boulevard, Suite 1500, Los Angeles, CA  90017-2457.

6    On the date set forth below, I served the foregoing document described as:

7    **[PROPOSED] ORDER GRANTING, IN PART, PLAINTIFF'S REQUEST FOR A
     PRELIMINARY INJUNCTION**

8

9    on all other parties and/or their attorney(s) of record to this action as follows:

10

11   Kenneth P. White                          *Attorneys for Defendants / Cross-Complainants*
     Brown White & Osborn LLP                  *Dr. Robert C. Blaine, Blaine Laboratories,*
12   kwhite@brownwhitelaw.com                   *Inc., Blaine Holding & Development, LLC*

13

14   ☑    **BY E-SERVICE** pursuant to C.C.P. § 1010.6(b)(3).  On March 8, 2019, I caused the
     above-referenced document to be sent by electronic notification to an email addressed to the
15   persons on whom such document is to be served at the email addresses shown above, as last given
     by that person or as obtained from an internet website(s) relating to such person.

16

17   I declare under penalty of perjury under the laws of the State of California that the

18   foregoing is true and correct to the best of my knowledge.  Executed on March 8, 2019, at

     Los Angeles, California.

19

20   _____            _____
          Veronica Medrano                            (Signature)
21             (Name)

22

23

24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

4
**[PROPOSED] ORDER**

BN 35847071v1

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is at BUCHALTER, A Professional Corporation, 1000 Wilshire Boulevard, Suite 1500, Los Angeles, CA  90017-2457 and my email address is vmedrano@buchalter.com.

On the date set forth below, I served the foregoing document described as:

**NOTICE OF ENTRY OF ORDER GRANTING, IN PART, PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION**

on all other parties and/or their attorney(s) of record to this action as follows:

| | |
|---|---|
| Kenneth P. White | *Attorneys for Defendants / Cross-Complainants* |
| Brown White & Osborn LLP | *Dr. Robert C. Blaine, Blaine Laboratories,* |
| kwhite@brownwhitelaw.com | *Inc., Blaine Holding & Development, LLC* |

☑   **BY ELECTRONIC SERVICE**.  On March 15, 2019, I caused the above-referenced document to be electronically filed and served using the Court's Electronic Filing System which constitutes service of the same.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge.  Executed on March 15, 2019, at Los Angeles, California.

| | |
|---|---|
| _____ | _____ |
| Veronica Medrano | *(Signature)* |
| (Name) | |